Filed 8/30/12

# IN THE SUPREME COURT OF CALIFORNIA

In re RENO                                    )
                                              )               S124660
              on Habeas Corpus.               )
_____)

　　　　We issued an order to show cause in this case to address a problem that, over time, has threatened to undermine the efficacy of the system for adjudicating petitions for collateral relief in cases involving the death penalty.  The cases of those individuals sentenced to suffer the ultimate penalty in this state are automatically appealed directly to this court, bypassing the intermediate Court of Appeal.  (Cal. Const., art. VI, § 11, subd. (a); Pen. Code, § 1239, subd. (b).)  Should this court affirm the judgment on direct appeal, such defendants are entitled to further challenge the judgment by filing in this court a petition for a writ of habeas corpus.

　　　　In the event this court denies the habeas corpus petition, all (or nearly all) capital defendants proceed to file a petition for a writ of habeas corpus in federal district court.  But because the federal courts require claims presented there to have first been exhausted in state court (*Baldwin v. Reese* (2004) 541 U.S. 27, 29;[1]

---

[1]　　"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies [citation], thereby giving the State the ' " 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." ' *Duncan* v. *Henry*, 513 U.S. 364, 365 (1995) (*per curiam*) . . . . To provide the State with the necessary 'opportunity,' the prisoner must 'fairly

*(footnote continued on next page)*

see 28 U.S.C. § 2254(b)(1)(A)), capital defendants quite typically file a second habeas corpus petition in this court to raise unexhausted claims. Third and fourth petitions are not unknown. The potential for delay, as litigants bounce back and forth between this court and the federal courts, is obvious.

The instant case involves the second habeas corpus petition filed in this court by petitioner Reno.[2] This "exhaustion petition" (as such petitions are known because they purport to seek to exhaust state claims in order to raise them in federal court) is well over 500 pages long and by its own count raises 143 separate claims. Nearly all of these claims raise legal issues that are, for a variety of reasons, not cognizable or are procedurally barred in this renewed collateral attack. As we explain, in raising claims already adjudicated by this court, and in raising new claims with no serious attempt to justify why such claims were not raised on appeal or in Reno's first habeas corpus petition, this petition exemplifies abusive writ practices that have become all too common in successive habeas

---

*(footnote continued from previous page)*

present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." (*Baldwin v. Reese*, *supra*, 541 U.S. at p. 29.)

Interpreting title 28 United States Code section 2254, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the United States Supreme Court recently held that review under the act "is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that 'resulted in' a decision that was contrary to, or 'involved' an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time *i.e.,* the record before the state court." (*Cullen v. Pinholster* (2011) 563 U.S. ___, ___ [131 S.Ct. 1388, 1398].)

[2] Petitioner was formerly known in this court as Harold Ray Memro. In December 1994, the Marin County Superior Court granted petitioner's request to change his name to "Reno."

corpus petitions filed in this court. Such practices justify denial of the petition without this court's passing on the substantive merits of the abusive claims. Imposing financial sanctions on counsel, although a permissible consequence for abusive writ practices, will not be imposed in this case but remains an option in future cases.

We take this opportunity to establish some new ground rules for exhaustion petitions in capital cases that will speed this court's consideration of them without unfairly limiting petitioners from raising (and exhausting) justifiably new claims. Therefore, we direct that, in future cases, although a petitioner sentenced to death will still be able to file his or her initial habeas corpus petition with no limit as to length, second and subsequent petitions will be limited to 50 pages (or 14,000 words if produced on a computer), subject to a good cause exception.

Partly in reliance on suggestions made by the parties and amici curiae, we adopt measures by which petitions may be streamlined, making preparation and review of the petition simpler and more efficient. As explained in more detail below, such petitions must clearly and frankly disclose: (a) what claims have been raised and rejected before, and where (either on appeal or on habeas corpus, with appropriate record and opinion citations); (b) what claims could have been raised before (e.g., because they are based on facts in the appellate record or were known at the time the first habeas corpus petition was filed), and why they were not raised at an earlier time; (c) what claims are truly new (that is, they have not previously been presented to this court); and (d) which claims were deemed unexhausted by the federal court and are raised for the purpose of exhaustion. This last disclosure must be supported by a copy of the federal court's order. This background information need not be realleged or described in detail, but can and should be placed in a table or chart not to exceed 10 pages (which will not count against the 50-page limit) accompanying the petition. This chart will permit the court to

3

determine at a glance which claims are repetitive and which are newly alleged, and will allow us to more expeditiously evaluate the claims in the petition. It is, moreover, improper to state new claims or theories for the first time in the informal reply or traverse. The same is true for allegations explaining why a procedural bar is inapplicable; such allegations must appear in the petition proper. In addition, the lack of investigative funds will no longer be routinely accepted as an excuse to justify a delayed presentation of a claim. We add that petitioners may cite and incorporate by reference prior briefing, petitions, appellate transcripts, and opinions in the same case but no longer need to separately request judicial notice of such matters, as this court routinely consults these documents when evaluating exhaustion petitions. Thus, an argument raised in a prior appeal or habeas corpus petition and reraised in a subsequent petition may be incorporated by reference and need not be reargued (subject to the discussion, *post*).

Finally, in recognition of circumstances in which counsel wish to present issues purely to exhaust remedies in compliance with a federal exhaustion order, a petitioner may elect to submit for our consideration, in a table or chart and in a very summary way, some or all of the claims deemed unexhausted by the federal court. This summary presentation may take the form of a brief statement of the issue and reasons procedural bars may not apply, and no presentation of this nature will be considered to be an abuse of the writ.

## I. BACKGROUND

As we describe below, petitioner committed his crimes in 1976 and 1978. He was tried and convicted of his crimes and sentenced to death. We reversed that first conviction for legal error in 1985. Following his retrial (in which he was again sentenced to death), we affirmed his conviction and sentence in 1995. We also denied his first habeas corpus petition that same year. We consider here his second habeas corpus petition.

### A. The Crime

"A jogger found the bodies of Scott Fowler and Ralph Chavez, Jr., sprawled 178 feet apart near a pond in John Anson Ford Park in Bell Gardens early on the morning of July 26, 1976. Fowler was 12 years old, Chavez 10. Each victim's throat had been cut with a sharp instrument. Witnesses testified that the boys had been fishing for hours the day before, staying well into the evening. They were placing their catch in a plastic gallon-size milk jug with the top excised so as to keep the handle intact. The police found the jug nearby, along with bologna wrappers, which were evidence of the boys' picnic. A trail of blood suggested that Chavez had tried to run after the attack. The medical examiner fixed the time of death at about midnight.

"Carl Carter, Jr. [(hereafter Carl Jr.)], was reported missing in South Gate on October 22, 1978. He was seven years old. His body was found some five days later amidst dense scrub alongside a road. He had been strangled to death—a cord was still bound around his neck. An enzyme found in his anal area suggested an attempt at sodomy." (*People v. Memro* (1995) 11 Cal.4th 786, 811 (*Memro II*).)

The police became aware of petitioner Reno when they were interviewing people who might know where Carl Jr. could be found. When officers went to petitioner's apartment, he introduced himself by saying, " ' "I knew you were coming . . . . I['v]e been in Atascadero [State Prison] . . . ." ' " (*Memro II*, *supra*, 11 Cal.4th at p. 812.) Petitioner provided no useful information at that time, and the officers returned to the Carter residence. While they were there, petitioner came over to drop off a part for his Volkswagen with Carl Carter, Sr. (hereafter Carl. Sr.), who was a car mechanic. Officer William Sims again asked petitioner where he had been and what he might have seen near the time of Carl Jr.'s disappearance. Petitioner said, " ' "I remember now . . . ." ' " (*ibid.*) and

5

explained that, just before dark, he had come up to the Carter residence to talk with Carl Sr. about working on his Volkswagen. Carl Jr. was at the rear of the house and spoke briefly with petitioner. Carl Jr. then left with petitioner to buy some soda. After hearing this story, Officer Sims arrested petitioner for kidnapping.

Police interrogated petitioner three times that evening. At the third interview, he confessed to killing Carl Jr. As petitioner explained, when Carl Jr. said he wanted a soft drink, petitioner invited him into his car and drove to his apartment, where he hoped to take some pictures of Carl Jr. in the nude. At one point, however, Carl Jr. said he wanted to leave. This made petitioner angry. He grabbed a clothesline lying on the nightstand, put it around Carl Jr.'s neck, and choked him. He then threw him on the bed, took off all his clothes but his shirt, and taped his hands behind his back. According to petitioner, he then tried to sodomize the child's dead body but was unsuccessful. Afterward, he wrapped Carl Jr. in a blanket and dumped his body over the side of a rural road. The next morning, after a troubled sleep, he went to work. (*Memro II*, *supra*, 11 Cal.4th at pp. 812-813.)

At the interrogating officer's invitation to unburden himself further, petitioner also confessed that about two years earlier he had visited John Anson Ford Park in Bell Gardens to take pictures of young boys. Around dusk, he saw two boys walking toward a pond with fishing poles. One of the boys, Scott, was blond, White, and about 13 years old. His friend Ralph was Hispanic and about 12 years old. Petitioner lingered with the boys and thought about sexually molesting Scott. Later, after Ralph had fallen asleep, Scott and petitioner walked to the other side of the pond, where Scott said something to make petitioner angry. Petitioner grabbed a knife out of his pocket, bent Scott backwards, and slit his throat. The commotion apparently woke Ralph, who

6

started screaming. Petitioner ran to the other side of the pond, caught up with Ralph, and slit his throat as well. (*Memro II*, *supra*, 11 Cal.4th at pp. 813-814.)

According to the interrogating officer, petitioner " 'started crying and sobbing, and he said, "Let's go find Carl, Jr.'s, body." ' " (*Memro II*, *supra*, 11 Cal.4th at p. 814.) The police took petitioner to the area he had described and found Carl Jr.'s decomposing body with the cord still around his neck. (*Id.* at pp. 811, 814.)

Officers then went to petitioner's apartment, where they found a boy's shoes, socks, and clothing in a suitcase underneath a workbench, as well as a length of clothesline similar to that used to strangle Carl Jr. Police also found sexually explicit magazines featuring unclothed young men and boys, and hundreds of photographs of boys, including neighborhood children. (*Memro II*, *supra*, 11 Cal.4th at p. 814.) The next day, petitioner spoke with an officer from the Bell Gardens Police Department and repeated his confession to having killed Scott Fowler and Ralph Chavez. (*Id.* at pp. 814-815.) At trial, petitioner presented an alibi defense to the charges involving Fowler and Chavez and attempted to show that two other men seen near or talking to the victims were the perpetrators. (*Id.* at pp. 815-816.) He conceded he had killed Carl Jr. (*Id.* at p. 816.) The jury convicted petitioner as charged and sentenced him to death.

### B. Legal Proceedings

Petitioner's first judgment (convicting him of three murders and imposing the death penalty) was reversed by this court for *Pitchess* error. (*People v. Memro* (1985) 38 Cal.3d 658 (*Memro I*); see *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.) On retrial in 1987, the jury convicted petitioner of two counts of first degree murder (Carl Jr., Chavez) and one count of second degree murder (Fowler), found

true a multiple-murder special circumstance, and again returned a verdict of death. We affirmed those convictions and the death sentence in November 1995 (*Memro II*, *supra*, 11 Cal.4th 786), and the United States Supreme Court subsequently denied a petition for writ of certiorari (*Memro v. California* (1996) 519 U.S. 834).

Petitioner timely filed a petition for a writ of habeas corpus on January 19, 1995, his first such petition in this court. The petition raised 12 claims, with some additional subclaims. We summarily denied this petition in June of that same year. (*In re Memro on Habeas Corpus*, S044437.) Our denial was solely on the merits; as is our standard practice, the denial was by order with no opinion. (See generally *People v. Romero* (1994) 8 Cal.4th 728, 737 ["If the court determines that the petition does not state a prima facie case for relief or that the claims are all procedurally barred, the court will deny the petition outright, such dispositions being commonly referred to as 'summary denials.' "]; *Crittenden v. Ayers* (9th Cir. 2010) 624 F.3d 943, 960 [a summary denial by the Cal. Supreme Ct. "is a denial on the merits"].) Unless otherwise stated in the order, such summary denials indicate this court has considered and rejected the merits of each claim raised. (*In re Clark* (1993) 5 Cal.4th 750, 769, fn. 9; see *Walker v. Martin* (2011) 562 U.S. ___, ___ [131 S.Ct. 1120, 1124] [in California, an order "denying a petition without explanation or citation ordinarily ranks as a disposition on the merits"]; *Harrington v. Richter* (2011) 562 U.S. ___, ___ [131 S.Ct. 770, 784-785] ["When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."].)

On September 8, 1998, petitioner filed a petition for a writ of habeas corpus in federal district court, raising 74 claims for relief. (*Reno v. Calderon, Warden*, CV 96-2768 (RT).) In 1999, that court struck "many"[3] of the unexhausted claims from the federal petition, held the matter in abeyance, and directed petitioner to file a new petition in state court, exhausting those claims that had not yet been presented to a state court. Reno's federally appointed counsel did not do so and instead withdrew from the case in 2001. In September 2002, this court appointed present counsel to represent Reno.

On May 10, 2004, petitioner filed the present habeas corpus petition, his second in this court. Far from the 12 claims he originally raised in this court in 1995, the current petition raises 143 claims for relief,[4] is 521 pages long, and is supported by two volumes of exhibits. After receiving the People's informal response in May 2005 and petitioner's informal reply in February 2006 (Cal.

---

[3]  The petition for a writ of habeas corpus currently before us nowhere states which claims were deemed unexhausted for federal purposes. The return merely states "*many* of the 74 grounds for relief" were stricken by the federal court, but does not list which ones. The traverse similarly does not identify which claims were deemed unexhausted by the federal court. We may surmise that not all of the 143 claims now raised were found to be unexhausted in federal court. From this we may further infer that many of the 143 claims now raised were considered exhausted by the federal court, raising the possibility that their re-presentation here, without a specific, articulated, and justifiable reason for doing so, was done for purposes of delay. In the future, as a judicially declared rule of criminal procedure, we require that such exhaustion petitions clearly and affirmatively allege which claims were deemed by the federal court to be exhausted, and which were not. Such allegations must be supported by "reasonably available documentary evidence" (*People v. Duvall* (1995) 9 Cal.4th 464, 474), such as a copy of the district court's order.

[4]  In 2007, the federal district court temporarily lifted its stay to allow petitioner to file a second amended petition in that court, increasing the claims raised from 74 to 143. The court then reimposed the stay.

9

Rules of Court, rule 8.385(b); *People v. Romero*, *supra*, 8 Cal.4th at p. 737 [court may request informal response from petitioner's custodian]), we issued the following order in September 2010:

"The Secretary of the Department of Corrections and Rehabilitation is ordered to show cause before this court, when the matter is placed on calendar, whether the petition for writ of habeas corpus filed in this case should be considered an abuse of the writ (*In re Clark* (1993) 5 Cal.4th 750, 769-770), for the following reasons:

"(1) For failure to allege sufficient facts indicating the claims in the petition are timely or fall within an exception to the rule requiring timely presentation of claims (*In re Robbins* (1998) 18 Cal.4th 770, 780-781; *In re Clark*, *supra*, 5 Cal.4th at pp. 797-798);

"(2) For failure to allege sufficient facts indicating certain claims in the petition are cognizable despite having been raised and rejected on appeal (*In re Waltreus* (1965) 62 Cal.2d 218, 225; *In re Harris* (1993) 5 Cal.4th 813, 829-841);

"(3) For failure to allege sufficient facts indicating certain claims in the petition are cognizable despite the fact they could have been raised on appeal but were not (*In re Dixon* (1953) 41 Cal.2d 756, 759; *In re Harris*, *supra*, 5 Cal.4th at pp. 829-841);

"(4) For failure to allege sufficient facts indicating certain claims in the petition are cognizable despite having been raised and rejected in petitioner's first habeas corpus proceeding, *In re Memro on Habeas Corpus*, S044437, petition denied June 28, 1995 (*In re Miller* (1941) 17 Cal.2d 734, 735);

"(5) For failure to allege sufficient facts indicating certain claims in the petition are cognizable despite the fact they could have been raised in the first petition (*In re Clark*, *supra*, 5 Cal.4th at pp. 774-775; *In re Horowitz* (1949) 33 Cal.2d 534, 546-547);

10

"(6) For failure to allege sufficient facts indicating that claims of insufficient evidence at trial to support a conviction are cognizable in a petition for a writ of habeas corpus (*In re Lindley* (1947) 29 Cal.2d 709, 723);

"(7) For failure to allege sufficient facts indicating that claims based on the Fourth Amendment are cognizable in a petition for a writ of habeas corpus (*In re Sterling* (1965) 63 Cal.2d 486, 487-488; *In re Sakarias* (2005) 35 Cal.4th 140, 169); and

"(8) For raising legal issues related to petitioner's first trial, when his conviction and sentence resulting from that trial were reversed by this court (*People v. Memro* (1985) 38 Cal.3d 658), absent any plausible explanation why such alleged errors affected the fairness of his subsequent retrial.

"The return is to be served and filed in this court on or before October 16, 2010.

"The traverse is to be served and filed within 30 days after the return is filed.

"All discussion or briefing of the merits of any claim set forth in the petition is deferred pending further order of this court."

The Secretary of the Department of Corrections and Rehabilitation, represented by the Attorney General, thereafter filed a return, and petitioner filed his traverse. (*People v. Duvall*, *supra*, 9 Cal.4th at pp. 475-477; see Cal. Rules of Court, rule 8.386.) Following oral argument on May 1, 2012, we directed the parties, and interested amici curiae, to submit letter briefs addressing whether imposing financial sanctions on counsel was an appropriate response for abuse of the writ, and whether this court should impose page limits on exhaustion petitions.

## II. DISCUSSION

### A. Habeas Corpus and Abuse of the Writ

The right to habeas corpus is guaranteed by the state Constitution and "may not be suspended unless required by public safety in cases of rebellion or invasion." (Cal. Const., art. I, § 11.)[5] Frequently used to challenge criminal convictions already affirmed on appeal, the writ of habeas corpus permits a person deprived of his or her freedom, such as a prisoner, to bring before a court evidence from outside the trial or appellate record, and often represents a prisoner's last chance to obtain judicial review. " ' "[H]abeas corpus cuts through all forms and goes to the very tissue of the structure. It comes in from the outside . . . and although every form may have been preserved opens the inquiry whether they have been more than an empty shell." ' " (*In re Harris*, *supra*, 5 Cal.4th at p. 828, fn. 6, quoting *Frank v. Mangum* (1915) 237 U.S. 309, 346.) "Historically, habeas corpus provided an avenue of relief for only those criminal defendants confined by a judgment of a court that lacked fundamental jurisdiction, that is, jurisdiction over the person or subject matter" (*Harris*, at p. 836), but that view has evolved in modern times and habeas corpus now "permit[s] judicial inquiry into a variety of constitutional and jurisdictional issues" (*People v. Duvall*, *supra*, 9 Cal.4th at p. 476). "Despite the substantive and procedural protections afforded those accused of committing crimes, the basic charters governing our society wisely hold open a final possibility for prisoners to prove their convictions were obtained unjustly. [Citations.] A writ of '[h]abeas corpus may thus provide an avenue of relief to those unjustly incarcerated when the normal method of relief—i.e., direct

---

[5] The United States Constitution has a similar provision. (U.S. Const., art. I, § 9, cl. 2 ["The privilege of the writ of habeas corpus shall not be suspended, unless when in cases of rebellion or invasion the public safety may require it."].)

appeal—is inadequate.' " (*In re Sanders* (1999) 21 Cal.4th 697, 703-704; see *In re Robbins*, *supra*, 18 Cal.4th at p. 777 ["there may be matters that undermine the validity of a judgment or the legality of a defendant's confinement or sentence, but which are not apparent from the record on appeal" for which habeas corpus is appropriate].)

Although habeas corpus thus acts as a "safety valve" (see Ledewitz, *Habeas Corpus as a Safety Valve for Innocence* (1990-1991) 18 N.Y.U. Rev. L. & Soc. Change 415) or "escape hatch" (Comment, *Repetitive Post-Conviction Petitions Alleging Ineffective Assistance of Counsel: Can the Pennsylvania Supreme Court Tame the "Monster"?* (1981-1982) 20 Duq. L.Rev. 237) for cases in which a criminal trial has resulted in a miscarriage of justice despite the provision to the accused of legal representation, a jury trial, and an appeal, this "safety valve" role should not obscure the fact that "habeas corpus is an extraordinary, *limited* remedy against a presumptively fair and valid final judgment" (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1260, italics added). Courts presume the correctness of a criminal judgment (*In re Lawley* (2008) 42 Cal.4th 1231, 1240), for before the state may obtain such a judgment, "a defendant is afforded counsel and a panoply of procedural protections, including state-funded investigation expenses, in order to ensure that the trial proceedings provide a fair and full opportunity to assess the truth of the charges against the defendant and the appropriate punishment" (*In re Robbins*, *supra*, 18 Cal.4th at p. 777). Following a conviction, the defendant has the right to an automatic appeal, assisted by competent counsel. (*Ibid*.) If a criminal defendant has unsuccessfully tested the state's evidence at trial and appeal and wishes to mount a further, collateral attack, " 'all presumptions favor the truth, accuracy, and fairness of the conviction and sentence; *defendant* thus must undertake the burden of overturning them. Society's interest in the finality of criminal proceedings so demands, and

due process is not thereby offended.' " (*People v. Duvall*, *supra*, 9 Cal.4th at p. 474, quoting *Gonzalez*, at p. 1260.)

This limited nature of the writ of habeas corpus is appropriate because use of the writ tends to undermine society's legitimate interest in the finality of its criminal judgments, a point this court has emphasized many times. In *In re Clark*, *supra*, 5 Cal.4th at page 776, for example, we explained: " '[T]he writ strikes at finality. One of the law's very objects is the finality of its judgments. Neither innocence nor just punishment can be vindicated until the final judgment is known. "Without finality, the criminal law is deprived of much of its deterrent effect." [Citation.] And when a habeas petitioner succeeds in obtaining a new trial, the " 'erosion of memory' and 'dispersion of witnesses' that occur with the passage of time," [citation], prejudice the government and diminish the chances of a reliable criminal adjudication. . . ." (Quoting *McCleskey v. Zant* (1991) 499 U.S. 467, 491.) More recently, this court opined that "[o]ur cases have long emphasized that habeas corpus is an extraordinary remedy 'and that the availability of the writ properly must be tempered by the necessity of giving due consideration to the interest of the public in the orderly and reasonably prompt implementation of its laws and to the important public interest in the finality of judgments.' " (*In re Morgan* (2010) 50 Cal.4th 932, 944.)

"As one legal scholar put it: 'A procedural system which permits an endless repetition of inquiry into facts and law in a vain search for ultimate certitude implies a lack of confidence about the possibilities of justice that cannot but war with the effectiveness of the underlying substantive commands [punishing criminal acts]. . . . There comes a point where a procedural system which leaves matters perpetually open no longer reflects humane concern but merely anxiety and a desire for immobility.' (Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners* (1963) 76 Harv. L.Rev. 441, 452–453.)" (*In re*

14

*Clark*, *supra*, 5 Cal.4th at p. 805.) " ' "No one, not criminal defendants, not the judicial system, not society as a whole is benefited by a judgment providing a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation." ' " (*In re Harris*, *supra*, 5 Cal.4th at p. 831, quoting *Mackey v. United States* (1971) 401 U.S. 667, 691 (conc. & dis. opn. of Harlan, J.).)

Given the ample opportunities available to a criminal defendant to vindicate statutory rights and constitutional guarantees, and consistent with the importance of the finality of criminal judgments, this court has over time recognized certain rules limiting the availability of habeas corpus relief. Sometimes called "procedural bars" (see, e.g., *In re Martinez* (2009) 46 Cal.4th 945, 950, fn. 1; *In re Lawley*, *supra*, 42 Cal.4th at p. 1239; *People v. Kelly* (2006) 40 Cal.4th 106, 121; *Jackson v. Roe* (9th Cir. 2005) 425 F.3d 654, 656, fn. 2), these rules require a petitioner mounting a collateral attack on a final criminal judgment by way of habeas corpus to prosecute his or her case without unreasonable delay, and to have first presented his or her claims at trial and on appeal, if reasonably possible. Strict limits exist for claims not raised in a litigant's first habeas corpus petition. These rules establish what the high court, addressing a similar issue, described as "a background norm of procedural regularity binding on the petitioner" (*McCleskey v. Zant*, *supra*, 499 U.S. at p. 490), and permit the resolution of legitimate claims in the fairest and most efficacious manner possible. Untimely claims, or claims already presented to this court and resolved on the merits, are as a general matter barred from consideration. Claims alleging the evidence was insufficient to convict, or that police violated a litigant's Fourth Amendment rights, are not cognizable on habeas corpus for other, nonprocedural reasons. These rules, essentially barriers to access deemed necessary for institutional reasons, are of course subject to exceptions designed to ensure fairness and orderly

15

access to the courts, but the judicial machinery is structured to allow one accused or convicted of a crime—in the vast majority of cases—to vindicate his or her rights well before a postconviction, postappeal writ of habeas corpus becomes necessary. Because a criminal defendant enjoys the right to appointed trial counsel, to a jury trial, and to an appeal, the various procedural limitations applicable to habeas corpus petitions are designed to ensure legitimate claims are pressed early in the legal process, while leaving open a "safety valve" for those rare or unusual claims that could not reasonably have been raised at an earlier time. The procedural rules applicable to habeas corpus petitions are thus "a means of protecting the integrity of our own appeal and habeas corpus process" (*In re Robbins*, *supra*, 18 Cal.4th at p. 778, fn. 1, italics omitted) and vindicate "the interest of the public in the orderly and reasonably prompt implementation of its laws and to the important public interest in the finality of judgments" (*id*. at p. 778). In short, our procedural rules "are necessary . . . to deter use of the writ to unjustifiably delay implementation of the law . . . ." (*In re Clark*, *supra*, 5 Cal.4th at p. 764.)[6]

Insisting on the prompt presentation of legal claims, most normally at trial and on appeal, but certainly by the time of the first habeas corpus petition, also works to conserve scarce judicial resources, for collateral challenges to final criminal judgments exact a heavy cost on the judiciary. "Successive petitions . . . waste scarce judicial resources as the court must repeatedly review the record of the trial in order to assess the merits of the petitioner's claims and assess the prejudicial impact of the constitutional deprivation of which he complains." (*In re Clark*, *supra*, 5 Cal.4th at p. 770; cf. *McCleskey v. Zant*, *supra*, 499 U.S. at p. 491

---

[6]      We discuss these procedural bars in more detail below.

16

["Federal collateral litigation places a heavy burden on scarce federal judicial resources, and threatens the capacity of the system to resolve primary disputes."].) The United States Supreme Court has recently recognized the heavy burden this court shoulders in reviewing the "staggering number of habeas petitions each year" in noncapital cases. (*Walker v. Martin*, *supra*, 562 U.S. at p. ___ [131 S.Ct. at pp. 1125-1126].) These concerns are magnified in capital cases, where the appellate records typically are longer, the habeas corpus petitions filed are more extensive, and the legal fees paid are substantially higher than in noncapital cases. Repetitive petitions consume finite judicial resources, and evaluating them delays this court from turning its attention to timely filed first petitions that may raise an issue of potential merit. As Justice Robert Jackson once observed when commenting on the "flood[] of stale, frivolous and repetitious petitions inundat[ing] the docket of the lower courts and swell[ing] our own": "It must prejudice the occasional meritorious application to be buried in a flood of worthless ones. He who must search a haystack for a needle is likely to end up with the attitude that the needle is not worth the search." (*Brown v. Allen* (1953) 344 U.S. 443, 536, 537 (conc. opn. of Jackson, J.).)

With this background in mind, we conclude a petitioner's failure, in a second or successive habeas corpus petition before this court, both to acknowledge the limitations of habeas corpus as an avenue of collateral attack and to make a plausible effort to explain why the claims raised are properly before the court, can be considered an abuse of the writ process. In this way, habeas corpus is no different from other types of civil writs that constitute extraordinary relief. (See *People v. Kim* (2009) 45 Cal.4th 1078, 1094 [" 'The writ of error *coram nobis* is not a catch-all by which those convicted may litigate and relitigate the propriety of their convictions *ad infinitum*.' "]; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 1989) ¶ 15:1.2, p. 15-1 (rev. #1, 2011)

17

[addressing civil writs: "Unlike appeals, which are heard as a matter of right, relief through writ review is deemed *extraordinary . . .*"].)

The abuse of the writ concept is not new; this court invoked it 100 years ago in *Matter of Ford* (1911) 160 Cal. 334. In that case, the defendant was at liberty, having posted bail before trial. Wishing to challenge the trial court's failure to grant his motion to dismiss the charges on speedy trial grounds, the defendant maneuvered to submit himself to the sheriff's custody for a short time so as to prosecute a petition for a writ of habeas corpus.[7] "It was evidently intended that the custody should endure no longer than was necessary to make this application and was solely for the purpose of making out a case to support the issuance of the writ." (*Id*. at pp. 340-341.) Although his speedy trial issue likely had merit, this court nevertheless denied relief by relying on an abuse of the writ rationale: "[V]oluntary imprisonment, had for the sole purpose of making a case on habeas corpus, was contrary to the spirit, purpose, and object of the writ *and was an abuse of it*." (*Id*. at p. 342, original italics omitted, italics added.)

Although we have had few occasions to address the abuse of the writ doctrine in the decades following *Matter of Ford*, *supra*, 160 Cal. 334 (but see *In re Swain* (1949) 34 Cal.2d 300, 303 ["It should be noted that no question of the abuse of the writ of habeas corpus is before us . . ."]), our cases have repeatedly said we do not condone abusive writ petitions. (*In re Sanders*, *supra*, 21 Cal.4th at

---

[7] "In previous eras, the custody requirement [for habeas corpus] was interpreted strictly to mean actual physical detention. [Citations.] This view has since been somewhat relaxed. Thus, 'the decisional law of recent years has expanded the writ's application to persons who are determined to be in constructive custody. Today, the writ is available to one on . . . bail (*In re Petersen* (1958) 51 Cal.2d 177 [331 P.2d 24]) . . . .' " (*People v. Villa* (2009) 45 Cal.4th 1063, 1069.)

p. 721 [noting that this court " 'has never condoned abusive writ practice' "]; *In re Clark*, *supra*, 5 Cal.4th at p. 769 [same]; see also *In re Gallego* (1998) 18 Cal.4th 825, 842 (conc. & dis. opn. of Brown, J.) [stating she does not "countenance abuse of the writ"]; *Sanders*, at p. 731 (dis. opn. of Baxter, J.) [noting this court's timeliness rules "discourage abuse of the writ"].) "[C]ourts have regularly applied the doctrine of 'abuse of the writ' and refused to entertain a claim presented for the first time in a second or subsequent petition for writ of habeas corpus." (*In re Bittaker* (1997) 55 Cal.App.4th 1004, 1012, fn. 3.)

We addressed the abuse of the writ doctrine in a comprehensive way in *In re Clark*, *supra*, 5 Cal.4th 750. In that capital case, we had on April 5, 1990, affirmed both the guilt and penalty judgments on appeal (*People v. Clark* (1990) 50 Cal.3d 583) and thereafter, on May 15, 1991, denied Clark's first habeas corpus petition. Three months after our denial, Clark filed a second petition raising several claims that were merely "restatements or reformulations of arguments made and rejected on appeal or in the prior habeas corpus petition." (*In re Clark*, at p. 763.) Although he presented other claims for the first time, these could have been raised on appeal or in the first habeas corpus petition because they were based on facts long known to Clark. This repetitive petition included no allegations suggesting why Clark was renewing stale claims, or why the new claims had not been presented to the court previously, either on appeal or in the first habeas corpus petition. (*Ibid.*)

We concluded: "This court has never condoned abusive writ practice or repetitious collateral attacks on a final judgment. Entertaining the merits of successive petitions is inconsistent with our recognition that delayed and repetitious presentation of claims is an abuse of the writ. [¶] 'It is the policy of this court to deny an application for habeas corpus which is based upon grounds urged in a prior petition which has been denied, where there is shown no change in

19

the facts or the law substantially affecting the rights of the petitioner.' " (*In re Clark*, *supra*, 5 Cal.4th at p. 769.) Regarding the presentation of new grounds based on matters known to the petitioner at the time of a previous petition, we observed that " 'in *In re Drew* (1922) 188 Cal. 717, 722 [207 P. 249], it was pointed out that the applicant for habeas corpus "not only had his day in court to attack the validity of this judgment, but . . . had several such days, on each of which he could have urged this objection, but did not do so"; it was held that "The petitioner cannot be allowed to present his reasons against the validity of the judgment against him piecemeal by successive proceedings for the same general purpose." ' " (*Clark*, at p. 770.) Our conclusion, we noted, was consistent with the abuse of the writ doctrine as applied in the federal courts, as explained in *McCleskey v. Zant*, *supra*, 499 U.S. 467 (*Clark*, at pp. 755-780, 787-790), as well as the rules in other states (*id*. at pp. 791-795).

*Clark* thus reiterated the abuse of the writ doctrine in the modern era and established a strict pleading standard: "[T]he petitioner . . . bears the initial burden of alleging the facts on which he relies to explain and justify delay and/or a successive petition." (*In re Clark*, *supra*, 5 Cal.4th at p. 798, fn. 35.) Because the petitioner in *Clark* did not "state[] specific facts to establish that his newly made claims were presented without substantial delay" or explain why any of the claims were based on a legal error involving "a fundamental miscarriage of justice," this court denied the petition without "consider[ing] the merits of any of the claims." (*Id*. at p. 799.) Subsequent cases have echoed *Clark*'s strict pleading standard. (*In re Robbins*, *supra*, 18 Cal.4th at p. 805 [citing the *Clark* pleading requirement with approval when addressing a delayed petition]; *In re White* (2004) 121 Cal.App.4th 1453, 1481 [same].)

Despite its in-depth discussion of the abuse of the writ doctrine, the consequences for the petitioner and his counsel in *In re Clark*, *supra*, 5 Cal.4th

20

750, were relatively mild. Faced with a petitioner who had filed a successive and repetitive petition raising untimely claims, all of which had been either raised and rejected on appeal or in a prior habeas corpus petition, or which could have been (but were not) presented on appeal or in the first habeas corpus petition, we simply denied the petition summarily and did not consider the substantive merits of the claims. (*Id*. at p. 799.)

In the years following *In re Clark*, however, perhaps out of an abundance of caution, this court has in capital cases continued to address the substantive merits of abusive and potentially abusive habeas corpus petitions. That is, when considering second and subsequent habeas corpus petitions, in addition to denying claims on procedural grounds (signified by the citation of various procedural bars in our denial orders), we have assessed the substantive merits of barred claims and denied them on those merits as well.

In a capital case, a detailed and comprehensive *first* state habeas corpus petition serves an important purpose, for courts can rest assured that, between the trial, the appeal, and the habeas corpus petition, the defense[8] has had ample opportunity to raise all meritorious claims, the adversarial process has operated correctly, and both this court and society can be confident that, before a person is put to death, the judgment that he or she is guilty of the crimes and deserves the ultimate punishment is valid and supportable. Indeed, a system of justice that does not allow for the fair and timely presentation of claims of innocence or the absence of fair procedure would lack credibility. These concerns perhaps underlie the decision of this court, and this state, to assume a generous postconviction position:

_____

[8] Our standards for counsel who are eligible for appointment to represent capital defendants on habeas corpus are high. (See *In re Morgan*, *supra*, 50 Cal.4th at p. 938, fn. 4.)

21

vis-à-vis other states, we authorize more money to pay postconviction counsel,[9] authorize more money for postconviction investigation,[10] allow counsel to file

---

[9]     In California, attorney fees for habeas corpus counsel in capital cases is governed by the Supreme Court Policies Regarding Cases Arising From Judgments of Death (hereafter Supreme Court Policies), policy 3, standard 2-1 et seq.  Those standards in turn refer to the Payment Guidelines for Appointed Counsel Representing Indigent Criminal Appellants in the California Supreme Court.  Guideline II.A provides for a per hour rate of $145.  Guideline II.I.3.ii sets forth the benchmarks for particular tasks in habeas corpus cases.  For separate habeas corpus counsel, the upper benchmark for client contact, investigation, and preparation of the petition and an informal reply is 690 hours, or over $100,000, excluding the fee for reviewing the appellate record, for which counsel can bill at 50 pages per hour.  In a typical case in which the record (clerk's and reporter's transcripts) is about 10,000 pages, that translates into 200 hours of record review, totaling an additional $29,000.  In our experience, counsel appointed to prepare and file habeas corpus petitions for death row inmates quite often earn well over the upper benchmark of $130,000.  In many cases, capital habeas corpus counsel earn over $200,000 for a single case.

In Florida, by contrast, capital habeas corpus counsel receives $100 per hour, up to $2,500 prior to filing the petition.  Upon filing the petition in the trial court, counsel can receive up to an additional $20,000 (at $100 per hour) and can bill an additional $20,000 after the trial court grants or denies the petition.  Thus, counsel can presumably earn up to $42,500, and more if he or she takes the case to the Florida Supreme Court.  (Fla. Stat., § 27.711, subd. (4)(a)-(f).)

In Texas, habeas corpus counsel is entitled to no more than $25,000 from the state in "[c]ompensation and expenses" combined (Tex. Code Crim. Proc., art. 11.071, § 2A, subd. (a)), although an individual county can pay more.

[10]     Under our rules, habeas corpus counsel is preauthorized to spend up to $50,000 investigating a postconviction habeas corpus petition.  (Supreme Ct. Policies, *supra*, policy 3, std. 2-2.1.)

In Florida, the same attorney may spend, *with trial court approval*, $40 per hour for investigator services, up to a total of $15,000 (Fla. Stat., § 27.711, subd. (5)) and may spend, *with court approval*, up to $15,000 in miscellaneous expenses investigating postconviction claims (*id*., § 27.711, subd. (6)).  More is available upon a showing that "extraordinary circumstances" exist.  (*Ibid.*)

In Texas, habeas corpus counsel is entitled to no more than $25,000 from the state in "[c]ompensation and expenses" combined.  (Tex. Code Crim. Proc., art. 11.071, § 2A, subd. (a).)

habeas corpus petitions containing more pages,[11] and permit more time following conviction to file a petition for what is, after all, a request for collateral relief.[12] Any such justification for tolerating a detailed and comprehensive first petition all but disappears for second and subsequent petitions in this court. Absent the unusual circumstance of some critical evidence that is truly "newly discovered"

_____

[11] There is no page limit for habeas corpus petitions in California. (See discussion, *post*.)

In Florida, a first habeas corpus petition "shall not exceed 75 pages (Fla. Rules Crim. Proc., § 3.851(e)(1)), and subsequent petitions "shall not exceed 25 pages" (*id*., subd. (e)(2)).

There is no page limit in Texas, but the strict time limits for filing postconviction habeas corpus petitions probably act to constrain the length of such petitions. (Tex. Code Crim. Proc., art. 11.071, § 4, subd. (a) [petition must be filed within 180 days after counsel is appointed or 45 days after the state's brief on appeal, whichever is later].) The same is probably true in Pennsylvania, where a petition for postconviction relief must be filed "within one year of the date the judgment becomes final." (Pa. Rules of Crim. Proc., rule 901(A).)

[12] Supreme Court Policies, policy 3, standard 1-1.1 provides that, to be considered presumptively timely, a habeas corpus petition must be filed within 180 days of the final due date for the reply brief on appeal or within 36 months after counsel is appointed. Due to the difficulty in finding counsel, in many cases habeas corpus counsel is not even appointed until long after the appeal, meaning we may receive a first habeas corpus petition five or more years after deciding the appeal and still be required, under our rules, to consider the petition as timely.

In Florida, by contrast, the petition must be filed within one year of the judgment's finality (Fla. Rules Crim. Proc., § 3.851(d)(1)), which in most cases occurs when the United States Supreme Court denies certiorari (*id*., subd. (d)(1)(A)). Florida apparently does not have the time lag in appointing counsel that we experience, as their rules provide for the appointment of institutional counsel or private conflict counsel "[u]pon issuance of the mandate affirming a judgment and sentence of death on direct appeal." (*Id*., § 3.851(b)(1); cf. *Herrera v. Collins* (1993) 506 U.S. 390, 410 ["Texas is one of 17 States that requires a new trial motion based on newly discovered evidence to be made within 60 days of judgment."].)

23

under our law,[13] or a change in the law,[14] such successive petitions rarely raise an issue even remotely plausible, let alone state a prima facie case for actual relief. In the 18 years since *In re Clark*, *supra*, 5 Cal.4th 750, experience has taught that in capital cases, petitioners frequently file second, third, and even fourth habeas corpus petitions raising nothing but procedurally barred claims.

As we explain below, the petition for a writ of habeas corpus in the present case is an example of an abusive writ practice:  voluminous in size and abounding in detail, the petition nevertheless raises claims almost all of which are procedurally barred.  Many claims are barred for more than one reason.  Counsel have an ethical duty to notify the court if an issue in the petition is procedurally barred.  (Bus. & Prof. Code, § 6068 ["It is the duty of an attorney to do all of the following:  [¶] . . .  [¶] (d) To employ, for the purpose of maintaining the causes confided to him or her those means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law."].)  Petitioner was permitted three opportunities to allege facts explaining why a particular procedural bar did not apply:  in the petition proper, in

---

**13** To support a collateral attack, newly discovered evidence of innocence must cast fundamental doubt on the accuracy of the trial and, if believed, must undermine the prosecution's entire case and point " ' "unerringly to innocence." ' " (*In re Lawley*, *supra*, 42 Cal.4th at p. 1239.)  New evidence also may relate to claims of jury or prosecutorial misconduct, or occasionally to other issues.

**14** For example, following the high court's decision in *Atkins v. Virginia* (2002) 536 U.S. 304, which held that execution of mentally retarded persons violated the Eighth Amendment to the United States Constitution, some death row inmates whose initial habeas corpus petitions had already been denied by this court filed new petitions alleging they were ineligible for execution due to their retardation.  This court issued orders to show cause in some of those cases despite the successive nature of the petitions involved, recognizing *Atkins* represented a change in the law excusing both the delay and successive nature of the petitions.

24

the informal reply (Cal. Rules of Court, rule 8.385(b)(3)), and in the traverse filed in response to the People's return (*People v. Duvall*, *supra*, 9 Cal.4th at pp. 476-477). Although normally the justification for raising a claim must be stated in the petition itself and not in later pleadings such as the informal reply or the traverse,[15] in this case we will consider arguments raised for the first time in the

---

[15] We explained the proper procedure in *In re Clark*, *supra*, 5 Cal.4th at page 781, footnote 16: "The court determines *on the basis of the allegations of the original petition* . . . , as well as the supporting documentary evidence and/or affidavits, which should be attached if available, whether a prima facie case entitling the petitioner to relief if the allegations are proven has been stated. If so, the court issues an order directing the respondent to show cause why the relief sought should not be granted based on those allegations. When an order to show cause does issue, it is limited to the claims raised in the petition and the factual bases for those claims alleged in the petition. It directs the respondent to address only those issues. *While the traverse may allege additional facts in support of the claim on which an order to show cause has issued, attempts to introduce additional claims or wholly different factual bases for those claims in a traverse do not expand the scope of the proceeding which is limited to the claims which the court initially determined stated a prima facie case for relief.*" (Italics added; see *People v. Duvall*, *supra*, 9 Cal.4th at p. 478 [quoting italicized passage with approval]; *Board of Prison Terms v. Superior Court* (2005) 130 Cal.App.4th 1212, 1235 [same].)

For similar reasons, belatedly raising new claims or theories for the first time in the informal reply brief (see Cal. Rules of Court, rule 8.385(b)(3)) is also improper. "If the imprisonment is alleged to be illegal, *the petition* must also state in what the alleged illegality consists." (Pen. Code, § 1474, italics added.) Although *Clark* spoke in terms of evaluating the petition along with "the amended or supplemental petition, if any," (*In re Clark*, *supra*, 5 Cal.4th at p. 781, fn. 16), *Clark* also said that we will not "routinely delay action on a filed petition to permit amendment and supplementation" (*id*. at p. 781). We have thereafter followed a policy to deny permission to file supplemental or amended petitions in capital cases and to require that new claims be raised in a separate petition. Supplements to shell petitions are excepted from this rule. (*In re Morgan*, *supra*, 50 Cal.4th at pp. 940-941.)

The rule that a claim for relief must be supported by factual allegations in the petition itself, and not in the traverse, logically applies to a petitioner's contention that a particular procedural bar is inapplicable. Just as a habeas corpus

*(footnote continued on next page)*

25

traverse because our order to show cause specifically directed petitioner to provide the court with such information.

### B. Application to This Case

#### 1. Timeliness

##### a. *Introduction*

A criminal defendant mounting a collateral attack on a final judgment of conviction must do so in a timely manner. "It has long been required that a petitioner explain and justify any significant delay in seeking habeas corpus relief." (*In re Clark*, *supra*, 5 Cal.4th at p. 765.) "By requiring that such challenges be made reasonably promptly, we vindicate society's interest in the finality of its criminal judgments, as well as the public's interest 'in the orderly and reasonably prompt implementation of its laws.' [Citation.] Such timeliness rules serve other salutary interests as well. Requiring a prisoner to file his or her

---

*(footnote continued from previous page)*

petition is defective for failing to allege the petitioner's custodial status (see *People v. Villa*, *supra*, 45 Cal.4th at p. 1069), or for failing to allege facts showing why allegedly new evidence " 'could not have been discovered with reasonable diligence prior to judgment' " (*In re Hardy* (2007) 41 Cal.4th 977, 1016, quoting Pen. Code, § 1473.6, subd. (b)), the petition, not the informal reply or traverse, must include specific allegations indicating why a seemingly applicable procedural bar does not apply, or why the case falls within an exception to the procedural bar. "[T]he petitioner filing a petition for writ of habeas corpus . . . bears the initial burden of alleging the facts on which he relies to explain and justify delay and/or a successive petition." (*In re Clark*, *supra*, 5 Cal.4th at p. 798, fn. 35.) Indeed, in most cases there is no return or traverse, and we may deny relief without requesting an informal response and reply. Although in this case the traverse has given petitioner an opportunity to allege additional facts in support of his claims, new theories addressing the applicability of various procedural bars are, in the usual case, improper when raised for the first time in the traverse. Moreover, by waiting until his traverse to raise new justifications for raising claims barred by various procedural rules, petitioner has deprived the People of any opportunity to respond to or rebut the argument.

26

challenge promptly helps ensure that possibly vital evidence will not be lost through the passage of time or the fading of memories. In addition, we cannot overestimate the value of the psychological repose that may come for the victim, or the surviving family and friends of the victim, generated by the knowledge the ordeal is finally over. Accordingly, we enforce time limits on the filing of petitions for writs of habeas corpus in noncapital cases [citation], as well as in cases in which the death penalty has been imposed." (*In re Sanders*, *supra*, 21 Cal.4th at p. 703.)

The filing of a habeas corpus petition containing untimely—and thus noncognizable—claims wastes scarce judicial resources. The sheer number of such improper claims in the petition before us, and in other similar petitions, imposes a tremendous burden on the judicial system that obstructs the orderly administration of justice. As we explain, the filing of untimely claims without any serious attempt at justification is an example of abusive writ practice.

### b. *The applicable law*

Our rules establish a three-level analysis for assessing whether claims in a petition for a writ of habeas corpus have been timely filed. First, a claim must be presented without *substantial delay*. Second, if a petitioner raises a claim after a substantial delay, we will nevertheless consider it on its merits if the petitioner can demonstrate *good cause* for the delay. Third, we will consider the merits of a claim presented after a substantial delay without good cause if it falls under one of *four narrow exceptions*: "(i) that error of constitutional magnitude led to a trial that was so fundamentally unfair that absent the error no reasonable judge or jury would have convicted the petitioner; (ii) that the petitioner is actually innocent of the crime or crimes of which he or she was convicted; (iii) that the death penalty was imposed by a sentencing authority that had such a grossly misleading profile

27

of the petitioner before it that, absent the trial error or omission, no reasonable judge or jury would have imposed a sentence of death; or (iv) that the petitioner was convicted or sentenced under an invalid statute." (*In re Robbins*, *supra*, 18 Cal.4th at pp. 780-781.)  The petitioner bears the burden to plead and then prove all of the relevant allegations.  (*Ibid*.)

The United States Supreme Court recently, and accurately, described the law applicable to habeas corpus petitions in California:  "While most States set determinate time limits for collateral relief applications, in California, neither statute nor rule of court does so.  Instead, California courts 'appl[y] a general "reasonableness" standard' to judge whether a habeas petition is timely filed. *Carey* v. *Saffold*, 536 U.S. 214, 222, . . . (2002).  The basic instruction provided by the California Supreme Court is simply that 'a [habeas] petition should be filed as promptly as the circumstances allow . . . .' " (*Walker v. Martin*, *supra*, 562 U.S. at p. ___ [131 S.Ct. at p. 1125].)  "A prisoner must seek habeas relief without 'substantial delay,' [citations], as 'measured from the time the petitioner or counsel knew, or reasonably should have known, of the information offered in support of the claim and the legal basis for the claim,' [citation]." (*Ibid*.; see also *In re Robbins*, *supra*, 18 Cal.4th at p. 780 ["Substantial delay is measured from the time the petitioner or his or her counsel knew, or reasonably should have known, of the information offered in support of the claim and the legal basis for the claim."].)

### c. *Absence of substantial delay*

The first step in assessing whether a claim has been filed without substantial delay is determining whether the claim is presumptively timely.  For capital cases, our rules establish a safe harbor for litigants to show their petition has been filed without substantial delay.  "A petition for a writ of habeas corpus

[in a capital case] will be presumed to be filed without substantial delay if it is filed within 180 days after the final due date for the filing of appellant's reply brief on the direct appeal or within 36 months after appointment of habeas corpus counsel, whichever is later." (Supreme Ct. Policies, policy 3, std. 1-1.1.) Petitioner filed the present petition in 2004, nine and one-half years after the 1994 due date for the reply brief in the automatic appeal. He thus cannot qualify under the 180-day rule. Moreover, although present counsel was appointed in September 2002 and the petition was filed in May 2004, petitioner is not entitled to rely on the 36-month safe harbor, as the rule (Supreme Ct. Policies, policy 3, std. 1-1.1), read in context, applies only to a petitioner's first state habeas corpus petition.[16] But even were we to assume the rule is ambiguous in this regard, it has been the rule since 1993, when we decided *In re Clark*, *supra*, 5 Cal.4th 750, that changes in counsel do not reset the clock for timeliness purposes. (*Id*. at p. 779.) We conclude the petition before us today obviously is not presumptively timely under our rules.

Aside from his ineligibility for the safe harbor provision in policy 3, standard 1-1.1 of the Supreme Court Policies, petitioner argues his claims were filed without substantial delay. "Substantial delay is measured from the time the petitioner or his or her counsel knew, or reasonably should have known, of the information offered in support of the claim and the legal basis for the claim. A

---

**16** Occasionally this court must, for reasons of ill health, conflict, or other factors, vacate the appointment of habeas corpus counsel and appoint a new attorney to investigate, prepare, and file an inmate's first habeas corpus petition. In such cases, our order of appointment will specifically note how long new counsel will have to file the petition and still be entitled to a finding of presumptive timeliness. The appointment of counsel in the present case included no such notation.

29

petitioner must allege, *with specificity*, facts showing when information offered in support of the claim was obtained, and that the information neither was known, nor reasonably should have been known, at any earlier time.  It is not sufficient simply to allege in general terms that the claim recently was discovered, to assert that second or successive postconviction counsel could not reasonably have discovered the information earlier, or to produce a declaration from present or former counsel to that general effect.  A petitioner bears the burden of *establishing*, through his or her specific allegations, which may be supported by any relevant exhibits, the absence of substantial delay." (*In re Robbins*, *supra*, 18 Cal.4th at p. 780.)  Specific allegations should be succinct and to the point; there is no need for them to be lengthy.

As discussed in more detail, *post*, the majority of petitioner's claims face procedural bars for which petitioner offers patently meritless explanations.  (Our discussion speaks of the "inadequacy" of the allegations, meaning that what petitioner has provided frequently is so patently lacking in weight and merit under our standards that they offer no plausible basis for granting relief.)  The claims are based either on the appellate record (and thus the factual basis of the claim was known at the time of his retrial in 1987) or on information known at the time he filed his first habeas corpus petition in 1995.[17]  The petition alleges that present

---

**17**    All of petitioner's claims are untimely, with these 16 exceptions: Claim Nos. 123, 128, 129, 130, 133, 134, 135, 136, 137, 138 and 139 (challenges to the constitutionality of the California death penalty law will not be denied as untimely (*In re Clark*, *supra*, 5 Cal.4th at p. 765, fn. 4));
   Claim Nos. 125 and 127 (challenges to the efficacy of this court's review will not be denied as untimely because they could not have been raised until after this court has ruled on the appeal and first habeas corpus petition);
   Claim No. 131 (challenge to lethal injection is premature and thus not untimely (*People v. Boyer* (2006) 38 Cal.4th 412, 485));

*(footnote continued on next page)*

30

counsel did not learn the bases of these claims until they were appointed to represent petitioner by the federal district court in 2001, and that the claims were "presented as quickly as possible after the legal and factual bases for them became known" to counsel. He also alleges that in light of the multiple changes in attorneys over the years,[18] he has "acted as diligently as possible," and that the petition was filed "as soon as he gathered sufficient legal and factual bases for a *prima facie* case for each of the potentially meritorious claims." These stock justifications fail to undermine our conclusion the petition is substantially, and fatally, untimely. We reiterate that a petitioner bears the burden of demonstrating timeliness (*In re Robbins*, *supra*, 18 Cal.4th at pp. 780, 787), and "[t]he burden . . . is not met by an assertion of counsel that he or she did not represent the petitioner earlier" (*In re Clark*, *supra*, 5 Cal.4th at p. 765). "Were the rule otherwise, the

---

*(footnote continued from previous page)*

Claim No. 132 (claim that prolonged preexecution confinement is cruel and unusual is premature and thus not untimely);

Claim No. 143 (claim that cumulative effect of all errors requires relief is not untimely because it incorporates some timely claims).

[18]     For his first habeas corpus petition in state court, which we denied in 1995, petitioner was represented by Attorneys Thomas Nolan and Andrew Parnes. In 1996, the federal district court appointed Attorney Stanley Greenberg to represent petitioner. A year later, the same court appointed Nicholas Arguimbau as cocounsel. Later in 1997, the federal court granted Greenberg leave to withdraw and appointed Attorney Michael Abzug to replace him. Abzug and Arguimbau filed petitioner's federal petition in 1998. Abzug withdrew in 2001, and the federal court appointed current counsel Peter Giannini to replace him. Later in 2001, Arguimbau withdrew and the court appointed Attorneys James Thomson and Saor Stetler as cocounsel. In 2002, this court allowed Attorney Nolan to withdraw and we appointed Giannini, Thomson, and Stetler to represent petitioner in this court. In 2011, we vacated the appointment of Stetler as associate counsel. Petitioner is currently represented by Attorneys James Thomson and Peter Giannini.

potential for abuse of the writ would be magnified as counsel withdraw or are substituted and each successor attorney claims that a petition was filed as soon as the successor attorney became aware of the new basis for seeking relief." (*Id.* at pp. 765-766, fn. 6.)

We therefore conclude that with the exception of those claims listed in footnote 17, *ante*, the claims contained in the petition were all filed after a substantial delay.

### d. *Good cause for the delay*

Petitioner alleges that if we find the claims in the petition are substantially delayed, as we now do, he has shown good cause for the delay because the facts were unknown and present counsel only recently discovered the bases of the claims. These attempted justifications largely echo the arguments previously made and addressed above and are patently meritless for the same reasons; that is, it appears the facts were known either at the time of trial or the first habeas corpus petition, and a change in attorneys does not reset the clock for habeas corpus purposes. Petitioner's further complaint that he is unschooled in the law is irrelevant, as he has been represented by legal counsel throughout the postconviction period.

Petitioner also avers that ineffective assistance of prior counsel demonstrates good cause for the delay. He claims he was "unable" to raise these claims earlier because Attorney Thomas Nolan, who represented him on appeal and in his first habeas corpus petition, was ineffective for failing to raise these issues either on appeal or in that first petition.

"[A] petitioner who is represented by counsel when a petition for writ of habeas corpus is filed has a right to assume that counsel is competent and is presenting all potentially meritorious claims." (*In re Clark*, *supra*, 5 Cal.4th at

p. 780, italics omitted.) Thus, "[i]n limited circumstances, consideration may be given to a claim that prior habeas corpus counsel did not competently represent a petitioner" (*id.* at p. 779) which, if established, "may be offered in explanation and justification of the need to file another petition" (*id.* at p. 780).

The pleading required for a claim that prior habeas corpus counsel was ineffective in omitting a particular issue tracks what a habeas corpus petitioner must plead and prove in order to obtain relief on a claim of ineffective assistance of counsel generally. The basic standard of performance is whether the conduct of counsel—including counsel in capital cases—"fell below an objective standard of reasonableness," " under prevailing professional norms." (*Strickland v. Washington* (1984) 466 U.S. 668, 688; see *In re Hardy*, *supra*, 41 Cal.4th at p. 1018.) Thus, "[t]he petitioner must . . . allege with specificity the facts underlying the claim that the inadequate presentation of an issue or omission of any issue reflects incompetence of counsel, i.e., that the issue is one which would have entitled the petitioner to relief had it been raised and adequately presented in the initial petition, and that counsel's failure to do so reflects a standard of representation falling below that to be expected from an attorney engaged in the representation of criminal defendants." (*In re Clark*, *supra*, 5 Cal.4th at p. 780.) The mere fact that prior counsel omitted a particular nonfrivolous claim, however, is not in itself sufficient to establish prior counsel was incompetent. Habeas corpus counsel, like appellate counsel, "performs *properly* and *competently* when he or she exercises discretion and presents *only* the strongest claims instead of every conceivable claim." (*In re Robbins*, *supra*, 18 Cal.4th at p. 810.)

Many of the claims now before us were actually raised on appeal or in petitioner's first habeas corpus petition; as to these claims, the allegations of ineffectiveness of prior counsel are belied by the record. For most of the remaining claims (what petitioner terms the "non-repetitive" claims), the facts in

33

support were known, or should have been known, earlier, rendering it possible prior counsel knew of the facts and unreasonably failed to assert claims based on them.

Indeed, petitioner alleges prior counsel Nolan had no tactical reason for failing to raise these claims, a fact Nolan asserts—but does not explain—in his declaration accompanying the traverse. But the "mere omission of a claim 'developed' by new counsel does not raise a presumption that prior habeas corpus counsel was incompetent, or warrant consideration of the merits of a successive petition. Nor will the court consider on the merits successive petitions attacking the competence of . . . prior habeas corpus counsel which reflect nothing more than the ability of present counsel with the benefit of hindsight, additional time and investigative services, and newly retained experts, to demonstrate that a different or better defense could have been mounted had . . . prior habeas corpus counsel had similar advantages." (*In re Clark*, *supra*, 5 Cal.4th at p. 780; accord, *Harrington v. Richter*, *supra*, 562 U.S. at p. ___ [131 S.Ct. at p. 788].) Therefore, Nolan's asserted lack of a tactical reason for omitting certain claims does not necessarily establish that he was ineffective for failing to raise them on appeal or in the first habeas corpus petition. Unless counsel's failure to raise the issue earlier was objectively unreasonable *and* the omission caused the petitioner actual prejudice, counsel's omission of the claim does not justify the presentation of the claim in a subsequent petition. Petitioner contends it was objectively unreasonable that Nolan did not bring certain omitted claims because those claims were "potentially meritorious." (*Clark*, at p. 780.) But, as discussed further below, the omission of these claims did not constitute ineffective assistance of counsel within the meaning of *Clark*.

The mere fact that present counsel has identified some legal claims not previously pressed on appeal or in a prior habeas corpus petition does not

34

necessarily suggest prior counsel was constitutionally ineffective, for we presume such unraised claims exist in all cases. For example, because the range of permissible mitigating evidence admissible in the penalty phase of a capital trial is "virtually unlimited" (*People v. Dunkle* (2005) 36 Cal.4th 861, 916), the mere fact that new counsel has discovered some background information concerning a defendant's family, educational, scholastic or medical history that was not presented to the jury at trial in mitigation of penalty is insufficient, standing alone, to demonstrate prior counsel's actions fell below the standard of professional competence. Even if we could conclude prior counsel knew, or should have known, of such information, counsel's decision regarding which issues to raise and how vigorously to investigate them given time and funding restraints " 'falls within the wide range of reasonable professional assistance' " (*People v. Lewis* (2001) 25 Cal.4th 610, 674, quoting *Strickland v. Washington*, *supra*, 466 U.S. at p. 689) and is entitled to great deference. In short, the omission of a claim, whether tactical or inadvertent, does not of itself demonstrate ineffectiveness unless it was *objectively unreasonable*, meaning that the omitted claim was one that any reasonably competent counsel would have brought. Even if the omission of a claim was objectively unreasonable, a petitioner must further show that the claim entitles him or her to relief. Absent such a showing supported by specific facts, repeated and continual filings based on the justification that one's prior attorney was ineffective are, in the end, infinitely reductive and thus untenable.

Petitioner contends the duty to raise all potentially meritorious claims required prior habeas corpus counsel to raise claims that had been previously rejected in other cases because the law might change in petitioner's favor. (See, e.g., *Roper v. Simmons* (2005) 543 U.S. 551 [Eighth Amend. prohibits execution of those who were under 18 years of age when they committed their crime], overruling *Stanford v. Kentucky* (1989) 492 U.S. 361; *Atkins v. Virginia*, *supra*,

35

536 U.S. 304 [Eighth Amend. prohibits execution of the mentally retarded], overruling *Penry v. Lynaugh* (1989) 492 U.S. 302; *Hitchcock v. Dugger* (1987) 481 U.S. 393 [Florida jury instruction limiting jury to mitigating circumstances specifically enumerated by statute is unconstitutional], reversing *Cooper v. State* (Fla. 1976) 336 So.2d 1133.)

This argument ignores the rule that, should the law change while a defendant is still pressing his or her appeal or seeking postconviction relief, the defendant is entitled to file a new petition to take advantage of a change in the law. For example, we held in *In re Harris*, *supra*, 5 Cal.4th 813, that a habeas corpus petitioner may raise "an issue previously rejected on direct appeal when there has been a change in the law affecting the petitioner." (*Id.* at p. 841, and cases cited.) A change in the law will also excuse a successive or repetitive habeas corpus petition. (*In re Martinez*, *supra*, 46 Cal.4th at p. 950 & fn. 1.) The possibility that an inmate could be executed before an appellate court at some future date changes the law in his favor is not a reason to repeatedly present a claim *to the same court* that has previously rejected it, absent a legitimate and asserted ground for revisiting the issue, rooted in the doctrine of stare decisis. (See, e.g., *People v. Drew* (1978) 22 Cal.3d 333, 347-348 [explaining the court's abandonment of the M'Naghten test for insanity].) Thus, prior counsel's failure to raise claims that we have previously rejected in other cases does not justify the inclusion of such claims in a successive petition.

Petitioner argues both the California Rules of Professional Conduct and the American Bar Association Model Rules of Professional Conduct (ABA Model Rules) support the notion that counsel is ethically obligated to raise defaulted claims. He is mistaken. The Rules of Professional Conduct merely require counsel to act competently, that is, with "diligence," "learning and skill," and "mental, emotional, and physical ability reasonably necessary for the performance

36

of [legal] service." (Rules Prof. Conduct, rule 3-110(B).) As noted, ethical and diligent counsel may winnow the available claims so as to maximize the likelihood of obtaining relief. (See *Jones v. Barnes* (1983) 463 U.S. 745, 751-754.)

Considering the ABA Model Rules requires a different analysis. California has not formally adopted those rules as an ethical standard (*General Dynamics Corp. v. Superior Court* (1994) 7 Cal.4th 1164, 1190, fn. 6), but rule 1-100(A) of the Rules of Professional Conduct, applicable to California attorneys, provides that "[e]thics opinions and rules and standards promulgated by . . . bar associations may also be considered" when judging the actions or omissions of an attorney. "Thus, the ABA Model Rules of Professional Conduct *may* be considered as a collateral source, particularly in areas where there is no direct authority in California and there is no conflict with the public policy of California." (*State Comp. Ins. Fund v. WPS, Inc.* (1999) 70 Cal.App.4th 644, 656.) "[C]ourts and attorneys find the [ABA Model Rules] helpful and persuasive in situations where the California rules are unclear or inadequate." (Witkin, 1 Cal. Procedure (5th ed. 2008) Attorneys, § 407(3), p. 521.)

Our state's ethical rules concerning counsel in capital cases are neither unclear nor inadequate, rendering resort to the ABA Model Rules unnecessary. Although counsel for petitioner and amici curiae point especially to the American Bar Association's *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (Feb. 2003 rev.) (ABA Guidelines) as the source of their ethical obligation to raise defaulted claims,[19] those standards are not congruent with constitutional standards for effective legal representation. For

---

[19] <http://www.americanbar.org/content/dam/aba/migrated/legalservices/downloads/sclaid/deathpenaltyguidelines2003.authcheckdam.pdf> [as of Aug. 30, 2012].

example, guideline 10.15.1(C) of the ABA Guidelines provides:  "Post-conviction counsel should seek to litigate all issues, whether or not previously presented, that are arguably meritorious under the standards applicable to high quality capital defense representation, including challenges to any overly restrictive procedural rules.  Counsel should make every professionally appropriate effort to present issues in a manner that will preserve them for subsequent review."  (ABA Guidelines, p. 123, italics added.)  Commentary to this guideline states:  "As with every other stage of capital proceedings, collateral counsel has a duty in accordance with Guideline 10.8 to raise and preserve all arguably meritorious issues.  These include not only challenges to the conviction and sentence, but also issues which may arise subsequently.  Collateral counsel should assume that any meritorious issue not contained in the initial application will be waived or procedurally defaulted in subsequent litigation, or barred by strict rules governing subsequent applications."  (*Id.* at pp. 128-129, italics added, fns. omitted.)

Along these same lines, commentary accompanying guideline 10.8 states: " 'One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of *any and all conceivable errors* for each stage of appellate and post-conviction review.  Failure to preserve an issue may result in the client being executed even though reversible error occurred at trial.' "  (ABA Guidelines, p. 87, italics added.)

The United States Supreme Court recently addressed the ABA Guidelines in *Bobby v. Van Hook* (2009) 558 U.S. ___ [130 S.Ct. 13] (*per curiam*).  In that case, the Sixth Circuit Court of Appeals had reversed a death penalty judgment after finding the defendant's attorneys constitutionally ineffective, citing the ABA Guidelines.  The high court recognized that "[r]estatements of professional standards . . . can be useful as 'guides' to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation

38

took place." (*Van Hook*, at p. ___ [130 S.Ct. at p. 16].) But the court criticized the Sixth Circuit's treatment of the ABA Guidelines "not merely as evidence of what reasonably diligent attorneys would do, but as inexorable commands with which all capital defense counsel ' "must fully comply." ' " (*Van Hook*, at p. ___ [130 S.Ct. at p. 17].) " '[W]hile States are free to impose whatever specific rules they see fit to ensure that criminal defendants are well represented, we have held that the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices.' " (*Ibid.*)

We agree with the high court's characterization of the ABA Guidelines. California, consistent with federal law, requires that counsel—including in capital cases—make objectively reasonable choices according to prevailing professional norms. (*In re Hardy*, *supra*, 41 Cal.4th at p. 1018, citing *Strickland v. Washington*, *supra*, 466 U.S. at pp. 687-688.) To the extent petitioner relies on the ABA Guidelines' directives that "[p]ost-conviction counsel should seek to litigate *all issues, whether or not previously presented*" (ABA Guidelines, guideline 10.15.1(C), italics added), and that counsel is required to preserve " '*any and all conceivable errors*' " (ABA Guidelines, p. 87, italics added), to justify his position that postconviction counsel in capital cases is ethically bound to raise defaulted claims in an exhaustion petition, we reject the point because the ABA Guidelines require much more of counsel than is required by state and federal law governing ineffective assistance of counsel.

With respect to habeas corpus counsel's duty to investigate legal claims in capital cases, the ABA Guidelines also are inconsistent with this court's standards. Thus, policy 3, standard 1-1 of the Supreme Court Policies provides: "The duty to investigate is limited to investigating potentially meritorious grounds for relief that come to [habeas corpus] counsel's attention in the course of reviewing appellate counsel's list of potentially meritorious habeas corpus issues, the transcript notes

39

prepared by appellate counsel, the appellate record, trial counsel's existing case files, and the appellate briefs, and in the course of making reasonable efforts to discuss the case with the defendant, trial counsel and appellate counsel. *The duty to investigate does not impose on counsel an obligation to conduct, nor does it authorize the expenditure of public funds for, an unfocused investigation having as its object uncovering all possible factual bases for a collateral attack on the judgment. Instead, counsel has a duty to investigate potential habeas corpus claims only if counsel has become aware of information that might reasonably lead to actual facts supporting a potentially meritorious claim.*" (Italics added.)

By contrast, the ABA Guidelines seem to require habeas corpus counsel to reinvestigate the entire case from the ground up, irrespective of the strength of the evidence (ABA Guidelines, guideline 10.7(A)(1) ["The investigation regarding guilt should be conducted regardless of any admission or statement by the client concerning the facts of the alleged crime, or overwhelming evidence of guilt . . ."]) or the client's wishes (*id.*, guideline 10.7(A)(2) ["The investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented."]). For state habeas corpus proceedings, commentary to ABA guideline 1.1 notes that habeas corpus counsel "must be prepared to *thoroughly reinvestigate the entire case . . . .*" (*Id.*, p. 12, italics added.) The ABA Guidelines thus recommend a higher level of rigor than does this court or the United States Constitution.

Petitioner fails to demonstrate that counsel was deficient in failing to raise any of the nonrepetitive claims in the petition before us (that is, claims prior counsel *did not* raise) or that the omission caused him prejudice. Petitioner attempts to justify his presentation of untimely claims by asserting that Nolan, who represented petitioner on appeal and in his 1995 habeas corpus proceeding, was unreasonably ignorant of certain undescribed triggering facts that underlie

some claims. Petitioner's allegations of Nolan's supposed deficient performance are for the most part vague, conclusory, and bereft of persuasive supporting factual allegations, relying largely on Nolan's blanket, generic assertion of his own alleged failings. Nor does petitioner in his traverse add anything of note regarding why he believes Nolan's performance fell short.

To the extent petitioner points to particular pieces of allegedly "new" evidence to suggest Nolan was constitutionally ineffective, we have examined them and found them wanting. For example, claim No. 20 in the present petition alleges the prosecution failed to disclose evidence in its possession that could have been used to impeach fellow inmates who testified against petitioner. Nolan raised this claim in the first habeas corpus petition in 1995. To justify the renewed presentation of the same claim, petitioner now cites exhibit C, a 1990 Los Angeles County grand jury report on the subject of jailhouse informants. The report comprising exhibit C was available five years before petitioner filed his first petition, and petitioner suggests Nolan was ineffective for failing to rely on it to show the prosecution's alleged dereliction of its duty to disclose potentially exculpatory evidence. But Nolan's declaration omits any mention of this piece of evidence, so we have no way of knowing whether he was or was not aware of it. In any event, Nolan's failure to rely on the report was not objectively unreasonable.

Nor do the allegations show prejudice. Anthony Cornejo was the principal inmate who provided evidence against petitioner, and on cross-examination before the jury, "he was thoroughly impeached as a notorious jailhouse informant." (*Memro II*, *supra*, 11 Cal.4th at p. 827.) Exhibit C is thus cumulative to the evidence presented at trial, and petitioner does not show he would have obtained a more favorable result had Nolan discovered and relied on exhibit C in his 1995

41

habeas corpus petition. Petitioner thus fails to demonstrate that ineffective assistance of counsel justifies the untimely presentation of claim No. 20.

As another example, petitioner argues he has presented new evidence supporting claim No. 68, i.e., that the prosecution's evidence he premeditated and deliberated the murders of Fowler and Chavez was insufficient.[20] The purportedly "new" evidence is a psychiatrist's 1998 opinion that, due to alleged mental problems, petitioner could not have premeditated and deliberated the crimes 22 years earlier in 1976. Skeptical as one might be of an opinion regarding someone's mental state more than two decades earlier, the petition in any event does not specifically allege this information was available at the time petitioner filed his first habeas corpus petition in 1995. Nor does the petition explain why, if the information was available in 1995, Attorney Nolan's failure to discover and rely on it "fell below an objective standard of reasonableness" under "prevailing professional norms." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 688; see *In re Hardy*, *supra*, 41 Cal.4th at p. 1018.) Nolan was clearly aware of the premeditation issue, having challenged the sufficiency of the evidence of premeditation on appeal. (*Memro II*, *supra*, 11 Cal.4th at pp. 862-864.) And trial counsel in closing argument at the penalty phase "emphasized defendant's mental problems." (*Id*. at p. 817.) The 1998 psychiatrist's opinion is thus revealed as cumulative to evidence presented at trial, and "reflect[s] nothing more than the ability of present counsel with the benefit of hindsight, additional time and investigative services, *and newly retained experts*, to demonstrate that a different or better defense could have been mounted had trial counsel or prior habeas corpus

---

[20] As we discuss, *post*, in part II.B.6., this issue is not cognizable on habeas corpus in any event.

42

counsel had similar advantages." (*In re Clark*, *supra*, 5 Cal.4th at p. 780, italics added.)

Petitioner's further attempt at demonstrating good cause for the delay requires more discussion. He alleges he has shown good cause for the delay because in preparing his first habeas corpus petition, he was denied adequate funds to investigate his case. Prefatory to the entire petition and apparently intended to apply to all 143 claims raised therein, petitioner alleges he "needs and is entitled to adequate funding [and] discovery," and that "[f]urther investigation must be conducted." We observed in *In re Gallego* that "a petitioner who earlier presented a [habeas corpus] petition containing a claim supported by certain information, and who later presents a subsequent petition raising the same or an analogous claim supported by *additional* information" may be excused from our timeliness rules if he pleads specific facts showing he "reasonably failed to discover the additional information—as a result of a denial of a request for funds to investigate the claim . . . ." (*In re Gallego*, *supra*, 18 Cal.4th at p. 835, fn. 8.)

Petitioner's allegations regarding the denial of investigative funds are wholly inadequate to satisfy his pleading burden, as he fails to state he "timely file[d] a request for funding of a *specific* proposed investigation, fully disclosing all asserted triggering information in support of the proposed investigation." (*In re Gallego*, *supra*, 18 Cal.4th at p. 828, italics added.) Instead of addressing the untimeliness of any particular claim, petitioner presents a scattershot defense he apparently intends to apply to all claims. This global approach is insufficient to come within the *Gallego* rule. For example, for each claim, petitioner fails to allege *when* he learned the pertinent triggering information, *when* he sought investigative funds, and *when* this court denied them. Instead, petitioner's briefing discloses but a generalized lament that he desired more investigative funds, a complaint untethered to any specific set of claims or issues. These types of

43

general allegations do not demonstrate good cause for delay under *Gallego*. We conclude the denial of investigatory funding in connection with petitioner's first petition does not provide good cause for the untimely presentation of claims.

Because *Gallego* was decided in 1998, we take this opportunity to announce a modification of the *Gallego* rule permitting denial of investigative funds to justify delay in the presentation of a claim. At the time counsel were preparing the habeas corpus petition at issue in *Gallego*, habeas corpus counsel in capital cases were authorized to spend only $3,000 in investigative funds without prior authorization. (Supreme Ct. Policies, former policy 3, std. 2-2.3.) Under that scheme, counsel could file requests for additional investigative funds with no set ceiling. Now, under the present scheme, habeas corpus counsel in capital cases may (under most circumstances) spend up to $50,000 to investigate the case without preauthorization from this court (*id.*, policy 3, std. 2-2.1), but will not be reimbursed for more than that amount unless this court issues an order to show cause. (See Gov. Code, § 68666, subd. (b) ["The Supreme Court may set a guideline limitation on investigative and other expenses allowable for counsel to adequately investigate and present collateral claims of up to fifty thousand dollars ($50,000) without an order to show cause."].) Although this amount of investigative funds may not be sufficient for counsel to comply with the ABA Guidelines' directive to reinvestigate the entire case from the ground up (nor is it intended to be sufficient in that regard), it should suffice for counsel to investigate potentially meritorious issues outside the record and thereby comply with the duty to investigate set forth in policy 3 of the Supreme Court Policies. Attorneys appointed in capital cases are expected to make tactical decisions on how to most prudently use this generous allocation of public funds and to prioritize which issues are most likely to bear fruit, and this court will not second-guess counsel's reasonable tactical decisions in this regard. Therefore, in light of post-*Gallego*

44

rule changes, a claim that counsel was denied additional funding after exhausting his or her $50,000 in allotted investigative funds will be carefully scrutinized by this court, and a formulaic allegation of insufficient funds will not justify untimely presentation of a claim on habeas corpus.

### e. *Exceptions*

Petitioner contends that should we find he presented the claims in the petition after a substantial delay and without good cause, as we do, we should also find that the claims fall within several exceptions set forth in our previous cases. First announced in *In re Clark*, *supra*, 5 Cal.4th at pages 797-798, and later endorsed in *In re Robbins*, *supra*, 18 Cal.4th at pages 780-781, we have explained that, at least in capital cases, "[t]he magnitude and gravity of the penalty of death persuades us that the important values which justify limits on untimely . . . petitions are outweighed by the need to leave open this avenue of relief. Thus, for purposes of the exception to the procedural bar against successive or untimely petitions, a 'fundamental miscarriage of justice' will have occurred in any proceeding in which it can be demonstrated: (1) that error of constitutional magnitude led to a trial that was so fundamentally unfair that absent the error no reasonable judge or jury would have convicted the petitioner; (2) that the petitioner is actually innocent of the crime or crimes of which the petitioner was convicted; (3) that the death penalty was imposed by a sentencing authority which had such a grossly misleading profile of the petitioner before it that absent the trial error or omission no reasonable judge or jury would have imposed a sentence of death; [or] (4) that the petitioner was convicted or sentenced under an invalid statute. These claims will be considered on their merits even though presented for the first time in a successive petition . . . ." (*Clark*, at pp. 797-798, fns. omitted.) The words used to articulate the *Clark* exceptions to our timeliness rules—

45

"*fundamentally* unfair," "*actually* innocent," "*grossly* misleading profile," "*invalid* statute" (*ibid.*, italics added)—indicate how high the bar is to a litigant's successfully invoking these narrow exceptions.

Seeking to come within the exceptions, petitioner alleges his claims demonstrate his retrial was a fundamental miscarriage of justice and his jury received a grossly misleading profile of him at the penalty phase. He also alleges that his petition "raises substantial claims of constitutional magnitude" and "involve[s] constitutional questions of extraordinary importance." Such general allegations are wholly inadequate: With the possible exception of claim Nos. 107 to 109, which concern mitigating evidence not presented to the penalty jury,[21] the petition alleges no *facts* suggesting why we should conclude his claims fall within the *Clark* exceptions and fails to connect the many other claims raised to this

---

[21] In support of claim Nos. 107, 108 and 109 (alleging trial counsel was ineffective for failing to investigate and present evidence both of petitioner's mental problems and his dissolute and violent family background), petitioner submits the declarations of nine family members who were available to testify at trial about the physical and mental abuse petitioner suffered as a child at the hands of a violent, alcoholic father, petitioner's emotional outbursts, and his extended family's history of alcoholism and financial difficulties. He also presents the declaration of Gretchen White, Ph.D., who prepared a posttrial social history of petitioner based on two interviews with him in 1998 (11 years after his retrial) and family members' declarations. White notes that in a prison psychiatrist's 1980 evaluation following petitioner's first conviction in 1978 (subsequently reversed in *Memro I*, *supra*, 38 Cal.3d 658), the expert viewed petitioner's attraction to young males as a pathologically motivated wish to experience love and that the crimes occurred because petitioner was overwhelmed by rage. Finally, petitioner provides the declaration of George Woods, M.D., who interviewed him four times, also in 1998. Based on those interviews and his review of petitioner's social history and medical and psychiatric records, Woods diagnosed petitioner with borderline personality disorder and posttraumatic stress disorder. In Dr. Woods's opinion, "competent professionals would have drawn the same conclusions at the time of trial."

46

allegedly new evidence.  In short, the petition fails to demonstrate that these claims fall within one of the narrow *Clark* exceptions.

The same analysis applies to the informal reply which, like the petition, merely states in conclusory terms that errors of "constitutional magnitude" occurred, that the jury was presented with a grossly misleading profile of petitioner at the penalty phase, and that he was sentenced under an invalid statute. None of these allegations is sufficiently specific, or states facts sufficient, to come within one of the four narrow exceptions to our timeliness rules.

Prompted by our order to show cause, the traverse contains more detail. Petitioner contends in his traverse that he has raised "eighteen (18) non-repetitive appellate claims premised on fundamental constitutional error that strikes at the heart of the trial process," identifying those claims simply as "See Claims 11, 12, 13, 42, 43, 45, 72, 74, 75, 76, 77, 78, 79, 83, 84, 116, 117, and 124." This list matches generally those claims that could have been, but were not, raised on direct appeal. (See discussion of claims barred by the *Dixon* rule *post*.) Petitioner thus contends that those appellate claims he could have, but did not, raise on appeal, all have a constitutional basis and therefore all fall within *Clark*'s exception to our timeliness rules for claims raising "error[s] of constitutional magnitude [that] led to a trial that was so fundamentally unfair that absent the error no reasonable judge or jury would have convicted the petitioner." (*In re Clark*, *supra*, 5 Cal.4th at p. 797.)  He is mistaken.  As noted, the exception is a narrow one, and merely asserting, without more, that a claim has a plausible constitutional basis does not satisfy the pleading burden to allege that an otherwise untimely claim addresses a fundamental constitutional error such that no reasonable judge or jury would have convicted petitioner absent the error.  We explained in *Clark* that to qualify under this narrow exception, the claim "must be such that it would 'undermine the entire prosecution case and point unerringly to innocence or reduced culpability.' " (*Id.*

47

at p. 797, fn. 32.) Petitioner's bare allegations, unadorned as they are by factual allegations and argument, do not demonstrate that any of these claims fall within this narrow exception.

We reach the same conclusion for another 42 claims petitioner lists, but does not discuss, save for asserting without explanation that all 42 claims "include constitutional errors that are fundamental in nature." But even were we to accept petitioner's unsupported claim that 60 (18 plus 42) of his claims, although untimely, should be considered because they fall within the exception for fundamental constitutional errors, dozens of claims remain for which no exception applies, and as to which petitioner does not even attempt to justify an untimely presentation. To raise so many untimely claims with no explanation is an example of an abusive writ practice.

The second of the *Clark* exceptions to our timeliness rules allows for a court to consider an otherwise untimely claim that "the petitioner is actually innocent of the crime or crimes of which [he] was convicted." (*In re Clark*, *supra*, 5 Cal.4th at pp. 797-798.) Petitioner contends his petition falls within this exception because he is innocent of murdering Fowler and Chavez in 1976 and Carl Jr. in 1978. The argument need not long detain us, for petitioner's allegations of innocence do not approach the high bar this court has set for such claims; that is, the allegations do not cast fundamental doubt on the accuracy and reliability of the trial proceedings, nor undermine the prosecution's entire case and " ' "point unerringly to innocence or reduced culpability." ' " (*In re Lawley*, *supra*, 42 Cal.4th at p. 1239; see *Clark*, at p. 798, fn. 33.) Although the passage of time and the application of defense counsel's energy and money have allowed counsel to raise some questions at the periphery of the body of evidence against petitioner, such questions do not strike at the heart of the prosecution's case. "Evidence relevant only to an issue already disputed at trial, which does no more than

conflict with trial evidence, does not constitute ' "new evidence" that fundamentally undermines the judgment.' " (*Clark*, at p. 798, fn. 33.) Rather, a petitioner must show "the evidence of innocence could not have been, and presently cannot be, refuted." (*Ibid*.) We conclude the untimeliness of the claims raised in the present petition cannot be excused by reliance on the exception for claims of actual innocence.

The third of the *Clark* exceptions to our timeliness rules is that "the death penalty was imposed by a sentencing authority which had such a grossly misleading profile of the petitioner before it that absent the trial error or omission no reasonable judge or jury would have imposed a sentence of death." (*In re Clark*, *supra*, 5 Cal.4th at p. 798.) Petitioner contends his petition falls within this exception because his trial attorney performed deficiently in presenting available mitigating evidence to the jury. Accordingly, he contends claim Nos. 107, 108, 109 (which concern the alleged failure to present mitigating evidence at the penalty phase), 110 (alleging counsel's failure to argue lingering doubt) and 111 (alleging counsel's failure to effectively cross-examine a prosecution witness at the penalty phase) should be considered despite their manifest untimeliness.

We explained the contours of this exception in *Clark*: "[A] 'grossly misleading profile' is not one which simply fails to alert the jury to some potentially mitigating evidence. The picture of the defendant painted by the evidence at trial must differ so greatly from his or her actual characteristics that the court is satisfied that no reasonable judge or jury would have imposed the death penalty had it been aware of the defendant's true personality and characteristics." (*In re Clark*, *supra*, 5 Cal.4th at p. 798, fn. 34.) Here, the defense called a single witness at the penalty phase: petitioner's youngest sister, Kathy Klabunde. She testified that their father was a violent alcoholic who verbally abused his children. Their mother was a strict Catholic who disapproved

49

of petitioner's homosexuality. Klabunde also testified that petitioner had suffered from severe migraine headaches since he was young, which resulted in his being quick to anger. Petitioner was shocked to discover Klabunde intended to testify on his behalf, and he was "very adamant" that she not do so. Although petitioner was represented by counsel, he interrupted Klabunde's testimony at several points with objections, which the court overruled. When Klabunde testified that petitioner had cried when she called him several years earlier to say their mother had died, petitioner yelled out, "You're lying!" After Klabunde's testimony, petitioner successfully sought to reopen the case so that he could testify. He then read a statement to the jury, asking for a death verdict. "At closing argument, counsel emphasized [petitioner's] mental problems" as well as the "positive aspects of his background and character, including his remorse when he was discovered." (*Memro II*, *supra*, 11 Cal.4th at p. 817.)

Although petitioner now presents allegations of additional facts relevant to his abusive childhood and his mental illness, and supports them with declarations from nine family members and social historian Dr. Gretchen White, this allegedly new evidence fails to reach the high standard of showing that the jury was presented with such a "grossly misleading profile" at the penalty phase that "no reasonable judge or jury would have imposed the death penalty had it been aware of the defendant's true personality and characteristics." (*In re Clark*, *supra*, 5 Cal.4th at p. 798, fn. 34.) Instead, it merely elaborates upon and embellishes Klabunde's testimony. We conclude the untimeliness of claim Nos. 107, 108, 109, 110 and 111 cannot be excused by reliance on the third *Clark* exception.

The fourth and final of the *Clark* exceptions permits consideration of a delayed claim that alleges the petitioner was convicted under an invalid statute. (*In re Clark*, *supra*, 5 Cal.4th at p. 798.) In an attempt to qualify under this exception, petitioner argues he has "raised twelve (12) non-repetitive claims

50

challenging the validity of the California death penalty statutes." Accordingly, he contends claim Nos. 128 through 139—all of which concern the constitutionality of the death penalty law—should be considered despite the untimeliness of their presentation. (See fn. 17, *ante*.)

As we noted in footnote 17, *ante*, we agree claim Nos. 123, 128, 129, 130, 133, 134, 135, 136, 137, 138 and 139 fall within *Clark*'s fourth exception. (*In re Clark*, *supra*, 5 Cal.4th at p. 765, fn. 4; *id*. at p. 798.) Claim Nos. 125 and 127 attack the efficacy of this court's prior review and are similarly not untimely. Claim Nos. 131 and 132 do not challenge the validity of a statute but are not untimely because both claims are premature: claim No. 131 alleges the unconstitutionality of execution by lethal injection (*People v. Boyer*, *supra*, 38 Cal.4th at p. 485), and claim No. 132 alleges the unconstitutionality of execution after a prolonged confinement. Finally, claim No. 143, alleging the cumulative effect of all errors, is not untimely because it incorporates some claims that are timely.

In sum, of petitioner's 143 claims, 16 are not barred as untimely. (See fn. 17, *ante*.) The balance of his 143 claims are untimely under the standards set forth in our precedents. To raise a multitude of untimely claims without making a plausible effort to demonstrate a proper justification of timeliness, or without any justification at all, is an example of abusive writ practice.

### 2. *Waltreus*

There may be no more venerable a procedural rule with respect to habeas corpus than what has come to be known as the *Waltreus* rule; that is, legal claims that have previously been raised and rejected on direct appeal ordinarily cannot be reraised in a collateral attack by filing a petition for a writ of habeas corpus. The origins of the rule may be traced at least as far back as 1945, where in *In re Byrnes*

(1945) 26 Cal.2d 824 we suggested that a criminal defendant could not properly file a petition for a writ of habeas corpus in lieu of directly appealing a conviction, noting that "[i]t is well settled that a writ of habeas corpus ordinarily may not be employed as a *substitute* for an appeal" (*id*. at p. 827, italics added).  Relying on *Byrnes*, we later refined the concept, opining that habeas corpus "will not lie ordinarily as a substitute for an appeal [citation] *nor as a second appeal*."  (*In re Winchester* (1960) 53 Cal.2d 528, 532, italics added.)  These authorities led to the decision from which the *Waltreus* rule draws its name.  In *Waltreus*, a defendant filed a petition for a writ of habeas corpus, repeating several legal issues this court had already considered and found lacking in merit on direct appeal.  We declined to address those renewed claims, noting simply that "[t]hese arguments were rejected on appeal, and habeas corpus ordinarily cannot serve as a second appeal." (*In re Waltreus*, *supra*, 62 Cal.2d at p. 225.)

We stated the rule plainly in *In re Harris*, *supra*, 5 Cal.4th at page 825: "[W]hen a criminal defendant raises in a petition for a writ of habeas corpus an issue that was raised and rejected on direct appeal, this court usually has denied the petition summarily, citing *Waltreus*, *supra*, 62 Cal.2d 218. . . .  By citing *Waltreus* in our summary denial orders, we have intended to communicate that because the issue was previously raised and rejected on direct appeal, and because the petitioner does not allege sufficient justification for the issue's renewal on habeas corpus, the issue is procedurally barred from being raised again."  The *Waltreus* rule is thus consistent with the very nature of habeas corpus; that is, an extraordinary remedy applicable when the usual channels for vindicating rights— trial and appeal—have failed.  If an issue has been raised and rejected first at trial and then on appeal, no reason exists to permit what amounts to a third bite of the apple.  Indeed, in this age of dramatically increased filings and shrinking judicial resources, the justification for the *Waltreus* rule retains continued, if not enhanced,

power, and the rule has been cited consistently and continuously since 1965 when *In re Waltreus* was first decided.  (See, e.g., *In re Sakarias*, *supra*, 35 Cal.4th at p. 145; *In re Seaton* (2004) 34 Cal.4th 193, 199; *Marks v. Superior Court* (2002) 27 Cal.4th 176, 188; *In re Gay* (1998) 19 Cal.4th 771, 780, fn. 4; *In re Robbins*, *supra*, 18 Cal.4th at p. 778, fn. 1; *In re Harris*, *supra*, 5 Cal.4th at p. 824 et seq.; *In re Jackson* (1992) 3 Cal.4th 578, 586, fn. 2; *In re Foss* (1974) 10 Cal.3d 910, 930; *In re Walker* (1974) 10 Cal.3d 764, 781.)

We continued in *In re Harris*, *supra*, 5 Cal.4th 813, to describe the four exceptions to the *Waltreus* rule.  As we explained there, a petitioner can renew a legal issue, despite having raised the issue unsuccessfully on appeal, in four circumstances:  (1) where the issue constitutes a fundamental constitutional error; that is, "where the claimed constitutional error is both clear and fundamental, and strikes at the heart of the trial process" (*Harris*, at p. 834); (2) where the judgment of conviction was rendered by a court lacking fundamental jurisdiction, described as "an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties" (*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 288; see *Harris*, at p. 836 [citing *Abelleira* in support]);[22] (3) where the court acted in excess of its jurisdiction, such as when it

---

[22]     *Abelleira* gave these examples of situations in which a court fundamentally lacks jurisdiction:  "A state court has no jurisdiction to determine title to land located outside its territorial borders, for the subject matter is entirely beyond its authority or power.  [Citation.]  A court has no jurisdiction to adjudicate upon the marital status of persons when neither is domiciled within the state.  [Citations.]  A court has no jurisdiction to render a personal judgment against one not personally served with process within its territorial borders . . . .  [Citation.]  A court has no jurisdiction to hear or determine a case where the type of proceeding or the amount in controversy is beyond the jurisdiction defined for that particular court by statute or constitutional provision.  [Citation.]" (*Abelleira v. District Court of Appeal*, *supra*, 17 Cal.2d at p. 288.)

imposes an illegal sentence (*Harris*, at pp. 838-839); and (4) "when there has been a change in the law affecting the petitioner" (*id.* at p. 841).

In the present petition, petitioner raises numerous claims subject to the *Waltreus* rule and for which no exception applies.[23] Claim No. 8, in which he

---

[23] To give the reader an idea of the scope of the problem, we note that in addition to the double jeopardy argument raised in claim No. 8, which we address in depth below, petitioner's habeas corpus petition alleges the following claims that, *by his own admission*, were raised and rejected on appeal:

Claim No. 1 (lack of probable cause to arrest; see *Memro II*, *supra*, 11 Cal.4th at pp. 838-843);

Claim No. 2 (his confession was coerced; *Memro II*, at pp. 822-827);

Claim No. 3 (illegal search of his apartment; *Memro II*, at pp. 846-847);

Claim No. 4 (invalid *Miranda* waiver; *Memro II*, at pp. 826-827);

Claim No. 6 (his second confession was tainted by his first confession; *Memro II*, at pp. 834-835);

Claim No. 9 (court's failure in *Memro I*, *supra*, 38 Cal.3d 658, to decide sufficiency of evidence of premeditation; *Memro II*, at p. 822);

Claim No. 10 (retrial violated double jeopardy because he was acquitted of premeditation murder in *Memro I*; *Memro II*, at pp. 820-821);

Claim No. 12 (same claim as claim No. 10);

Claim No. 16 (admission of Cornejo's perjurious testimony at the Evid. Code, § 402 hearing; *Memro II*, at pp. 827-828);

Claim No. 17 (error under *Pitchess v. Superior Court*, *supra*, 11 Cal.3d 531; *Memro II*, at pp. 829-832);

Claim No. 18 (destruction of police personnel records; *Memro II*, at pp. 829-832);

Claim No. 19 (discovery violation; *Memro II*, at pp. 836-838);

Claim No. 24 (speedy trial violation; *Memro II*, at pp. 852-853);

Claim No. 27 (denial of motion to exclude police witnesses from courtroom; *Memro II*, at p. 844);

Claim No. 28 (seizure of legal materials from petitioner's jail cell; *Memro II*, at pp. 835-836);

Claim No. 29 (Cornejo's testimony violated petitioner's right to counsel because he was a government agent when he questioned petitioner; *Memro II*, at pp. 827-828);

Claim No. 30 (denial of motion to renew suppression motion; *Memro II*, at pp. 844-845);

Claim No. 31 (denial of motion to sever counts; *Memro II*, at pp. 847-851);

*(footnote continued on next page)*

Claim No. 32 (denial of motion for an in camera hearing on inconsistent defenses; *Memro II*, at pp. 848-849, 851);

Claim No. 33 (denial of motion to substitute counsel; *Memro II*, at pp. 853-859);

Claim No. 37 (Cornejo's testimony violated petitioner's Sixth Amend. rights; *Memro II*, at pp. 827-828);

Claim No. 39 (failure to obtain waivers before counsel conceded guilt of Carl Jr.'s murder; (*Memro II*, at pp. 857-858);

Claim No. 40 (admission of postmortem photographs; *Memro II*, at pp. 865-866);

Claim No. 41 (admission of photographs and magazines seized at petitioner's home; *Memro II*, at pp. 864-865);

Claim No. 47 (failure to give CALJIC No. 2.91; *Memro II*, at pp. 868-869);

Claim No. 48 (failure to instruct on lesser offenses for lewd act; *Memro II*, at pp. 870-873);

Claim No. 49 (failure to instruct jurors they must unanimously agree on nature of lewd act; *Memro II*, at pp. 869-870);

Claim No. 56 (granting motion to waive jury for penalty trial; *Memro II*, at p. 875);

Claim No. 57 (counsel's failure to inform petitioner of the defense strategy; *Memro II*, at pp. 875-877);

Claim No. 58 (allowing petitioner to testify at the penalty phase without cautioning him or admonishing the jury; *Memro II*, at p. 878);

Claim No. 59 (failure to omit Pen. Code, § 190.3, factors (e) & (j) as mitigating circumstances; *Memro II*, at p. 880);

Claim No. 60 (failure to instruct on elements of uncharged offense; *Memro II*, at pp. 880-881);

Claim No. 61 (inadequacy of Pen. Code, § 190.3, factor (k) instruction; *Memro II*, at p. 881);

Claim No. 62 (failure to instruct on consequences of jury deadlock at the penalty phase; *Memro II*, at p. 882);

Claim No. 63 (refusal to instruct on lingering doubt; *Memro II*, at p. 883);

Claim No. 65 (improper denial of motion to modify the death verdict; *Memro II*, at pp. 883-886);

Claim No. 66 (trial court improperly considered the probation report before it ruled on the modification motion; *Memro II*, at p. 886);

Claim No. 67 (insufficient evidence petitioner killed Carl Jr. in the course of a lewd act; *Memro II*, at pp. 861-862);

*(footnote continued on next page)*

alleges his prosecution for murdering Carl Jr. constituted double jeopardy in violation of his constitutional and statutory rights,[24] is representative of the abusive nature of these renewed claims.  In petitioner's first trial, the prosecution relied on two theories to support the charge of first degree murder:  petitioner killed with premeditation and deliberation, and he killed during the commission of a felony, i.e., a lewd and lascivious act on a child (Pen. Code, § 288).  In addition, the prosecution charged two special circumstance allegations:  multiple murder and felony murder, identifying the aforementioned lewd act crime as the triggering felony.  (Pen. Code, § 190.2, former subd. (c)(3)(iv), (5), now see subd. (a)(3), (17)(E).)  The trial court, sitting as the trier of fact, convicted petitioner of two

---

*(footnote continued from previous page)*

Claim No. 68 (insufficient evidence petitioner premeditated the killing of Carl Jr. and Chavez; *Memro II*, at pp. 862-864);

Claim No. 70 (prosecutorial misconduct in failing to inform the defense the prosecution would rely on a felony-murder theory; *Memro II*, at p. 869);

Claim No. 73 (comment on petitioner's failure to testify; *Memro II*, at pp. 873-874);

Claim No. 80 (improper cross-examination of petitioner at the penalty phase; *Memro II*, at pp. 878-879);

Claim No. 81 (inadequate notice of aggravating evidence; *Memro II*, at pp. 877-878).

In addition, to the extent claim No. 78, which alleges the prosecutor's argument impermissibly shifted the burden of proof to petitioner, also alleges the prosecutor impermissibly commented on petitioner's failure to testify, it, too, is barred by the *Waltreus* rule.  (*Memro II*, *supra*, 11 Cal.4th at pp. 873-874.)  To the extent claim No. 37, above, alleges counsel was ineffective, it is not barred by the *Waltreus* rule.  (See *In re Robbins*, *supra*, 18 Cal.4th at p. 814, fn. 34; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 267.)

[24] Fifth Amendment to the United States Constitution ("No person shall be . . . subject for the same offense to be twice put in jeopardy of life or limb . . ."); *Benton v. Maryland* (1969) 395 U.S. 784 (federal double jeopardy clause applicable to the states); *People v. Gurule* (2002) 28 Cal.4th 557, 646 (recognizing same); California Constitution, article 1, section 15; Penal Code section 1023.

56

counts of first degree murder (victims Carl Jr. and Chavez) and one count of second degree murder (victim Fowler), sustained a multiple-murder special-circumstance allegation, *but found the felony-murder (lewd conduct with a child) special-circumstance allegation not true*. (*Memro I*, *supra*, 38 Cal.3d at p. 666.) As noted above, we reversed the entire judgment due to a pretrial discovery violation.

On retrial, the prosecution again charged petitioner with the first degree murder of Carl Jr. and Chavez and the second degree murder of Fowler. For the retrial, the prosecution charged petitioner with a multiple-murder special circumstance, but did not reallege the lewd act felony-murder special-circumstance allegation. (*Memro II*, *supra*, 11 Cal.4th at p. 811.) Regarding the theory of the murder, however, the prosecution argued—as before—to the jury that petitioner had either premeditated and deliberated Carl Jr.'s murder or killed him while committing a lewd act, or both. (*Id.* at p. 820.) A jury convicted petitioner on all counts.

On appeal to this court, petitioner claimed his prosecution for murdering Carl Jr., presented to the jury in part on a felony-murder theory that he had committed a lewd act on the victim, violated his double jeopardy rights because the trial court in *Memro I* had found the felony-murder special circumstance untrue. We disagreed: "Defendant was *convicted* of [Carl Jr.'s] murder at his first trial. Retrying him on a charge of murder did not place him twice in jeopardy for that offense. ' "It has long been settled . . . that the Double Jeopardy Clause's general prohibition against successive prosecutions does not prevent the government from retrying a defendant who succeeds in getting his first conviction set aside, through direct appeal or collateral attack, because of some error in the proceedings leading to conviction." ' " (*Memro II*, *supra*, 11 Cal.4th at p. 821, quoting *People v. Santamaria* (1994) 8 Cal.4th 903, 910-911.)

Petitioner's petition, however, fails to reveal that the double jeopardy issue was resolved against him on direct appeal. Raising this issue in the instant petition thus directly implicates our rule in *In re Waltreus*, *supra*, 62 Cal.2d 218.[25]

The petition also fails to allege any facts suggesting the double jeopardy issue falls within one of the narrow exceptions to the *Waltreus* rule, i.e., facts suggesting the double jeopardy claim involves a fundamental constitutional error, or that the trial court lacked fundamental jurisdiction, or that the court acted in excess of jurisdiction, or that there has been a postappeal change in the law. (*In re Harris*, *supra*, 5 Cal.4th at pp. 829-841.) Indeed, the allegations in the petition related to this claim read as if the claim is being presented to the court for the very first time.

Just as a petitioner bears the burden in a habeas corpus petition to allege why the petition is timely (*In re Robbins*, *supra*, 18 Cal.4th at p. 780 [regarding the timeliness of the petition, "the *petitioner* has the burden of establishing (i) absence of substantial delay, (ii) good cause for the delay, or (iii) that the claim falls within an exception to the bar of untimeliness"]), the petitioner must also allege why a claim raised and rejected on appeal is not barred by the *Waltreus* rule. Petitioner concedes as much, noting in his traverse that, "[a]s with all other procedural default exceptions, [he] has the burden of establishing a *prima facie* case that the *Waltreus* bar does not apply." Yet the petition now before the court,

---

**25**     Because petitioner failed to raise this issue in his first petition for a writ of habeas corpus (*In re Memro*, S044437), the claim is procedurally barred for that reason as well. (*In re Clark*, *supra*, 5 Cal.4th at pp. 774-775; *In re Horowitz*, *supra*, 33 Cal.2d at pp. 546-547.) In addition, because the facts underlying the claim were known at the time of retrial in 1987, petitioner presents the claim after a substantial and unexplained delay. (See *In re Robbins*, *supra*, 18 Cal.4th 770.) For purposes of illustration, however, we will focus on the *Waltreus* issue.

despite its marked prolixity, is lacking in any proper allegation satisfying this pleading burden.

Petitioner's only attempt in his petition to explain why he is raising the double jeopardy issue again is his global prefatory statement, apparently designed to apply to all procedurally barred claims but not made specifically applicable to claim No. 8, that he "has included all known claims of constitutional error related to his trial, convictions, sentence and imprisonment for the sake of a clear presentation and so this Court can assess the cumulative effect [of any errors] and determine that a miscarriage of justice occurred. *This includes claims that have been previously presented.*" (Italics added.) In his informal reply, petitioner asserts that he has presented otherwise barred claims again "for the purpose of incorporation into the cumulative error claims, claims 140 through 143, and to exhaust the cumulative error claims" for federal court purposes.

This purported "cumulative error" explanation is patently inadequate, as petitioner's global assertion does not satisfy his pleading burden. Indeed, claim No. 8 is misleadingly phrased as if it is being raised for the first time and not simply to be considered in conjunction with other claims. We require a litigant seeking relief on habeas corpus to "state fully and with particularity the facts on which relief is sought" (*People v. Duvall*, *supra*, 9 Cal.4th at p. 474; see *In re Swain*, *supra*, 34 Cal.2d at pp. 303-304 [warning against "vague, conclusionary allegations" in a habeas corpus petition]), and this pleading requirement logically applies to explaining why a specific claim is cognizable in the first place. Merely inserting a general, catchall allegation at the beginning of a petition, asserting that all substantive claims (including procedurally improper claims) are being raised anew, despite having been previously considered in various forms and rejected by this court, to allow us to assess the "cumulative effect" of all possible errors, fails to acknowledge that for those claims previously rejected on appeal on their merits

59

(as opposed to a lack of prejudice), we have already concluded no error occurred. The petition does not explain how actions or omissions by the prosecutor and/or the trial court that have been found not to be error may later be aggregated to comprise a new claim that falls outside the *Waltreus* rule. (See *People v. Hovarter* (2008) 44 Cal.4th 983, 1030 ["Having found no errors and certainly no prejudicial ones," appellate claim that the "cumulative effect of the errors" requires reversal rejected]); *People v. McDermott* (2002) 28 Cal.4th 946, 1005 [same].)

This affirmative pleading rule is similar to the rule followed in other states that have a death penalty. For example, in order to gain postconviction relief under Pennsylvania statutory law, "the petitioner must plead and prove by a preponderance of the evidence . . . [t]hat the allegation of error has not been previously litigated or waived." (42 Pa. Cons. Stat. § 9543(a)(3); see 3 Wilkes, State Postconviction Remedies and Relief Handbook (2011) § 41:12, pp. 506-507 (Wilkes).) Similarly, Texas requires that "(a) If a subsequent application for writ of habeas corpus is filed after final disposition of an initial application challenging the same conviction, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that: [¶] (1) the current claims and issues have not been and could not have been presented previously in an original application or in a previously considered application filed under this article because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application; or [¶] (2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt." (Tex. Code of Crim. Proc., art. 11.07, § 4(a); 4 Wilkes, *supra*, § 46:14, pp. 13-14.) In Florida, a postconviction motion to vacate or set aside a sentence after conviction must state "whether a previous postconviction motion has been filed, and if so, how many," as well as allege "the reason or

60

reasons the claim or claims in the present motion were not raised in the former motion or motions." (Fla. Rules of Crim. Proc., rule 3.850(c)(3), (4); 1 Wilkes, *supra*, § 12:3, p. 460.) The same Florida rule states specifically that the motion must include this statement: "This rule does not authorize relief based on grounds that could have or should have been raised at trial and, if properly preserved, on direct appeal of the judgment and sentence." (Fla. Rules of Crim. Proc., rule 3.850(c); 1 Wilkes, *supra*, § 12:3, p. 460.)

In theory, the aggregate prejudice from several different errors occurring at trial could require reversal even if no single error was prejudicial by itself. "[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (See *People v. Hill* (1998) 17 Cal.4th 800, 844.) To the extent these errors are based on the appellate record, however, a petitioner cannot wait and raise the cumulative error claim for the first time on habeas corpus; he must raise the claim on appeal. (*In re Dixon*, *supra*, 41 Cal.2d at p. 759.) Alternatively, if a petitioner has a previously unraised claim based on newly discovered evidence that was not reasonably discoverable at the time of trial (or even the first habeas corpus petition), the cumulative prejudice flowing from that single error, when combined with the prejudice from other errors already raised and rejected on appeal *for lack of individual prejudice*, could rise to a level at which a court could conclude the petitioner was denied a fair trial, even if no single error required reversal. (*In re Jones* (1996) 13 Cal.4th 552, 583, and cases cited.) As noted, claims previously rejected on their substantive merits—i.e., this court found no legal error—cannot logically be used to support a cumulative error claim because we have already found there was no error to cumulate.

But even admitting the possibility that a litigant could renew past claims previously rejected solely for lack of prejudice, our consideration of a cumulative error claim (or more precisely, a cumulative *prejudice* claim) does not require a petitioner to restate the entirety of his appellate briefing.  If petitioner has a *new* claim, the exhaustion petition should state clearly what is factually or legally new, i.e., not presented before, either on appeal or in a previous petition.  When evaluating an exhaustion petition, we will assume nothing is new except what is clearly and specifically identified as such.  If a previously raised and rejected claim is being reasserted as part of a cumulative prejudice claim, that fact should be made clear, not obscured as it was in this case.

To add previously rejected claims to a new claim, petitioners should simply raise their new claims, clearly identify them as "new," and then in a table or chart accompanying the petition identify which appellate claims, previously denied for lack of prejudice, are being reraised to support a cumulative prejudice claim.  The table should state where these prior claims appear in the petitioner's appellate briefs and include citations to the part in our opinion where we rejected them.  We anticipate this table should not be longer than 10 pages and in many cases will be shorter.  (See pp. 3-4, *ante*, and p. 112, *post*.)

Petitioners need not separately or specifically request judicial notice of all documents connected with their past appeals and habeas corpus proceedings, as in capital cases this court routinely consults prior proceedings irrespective of a formal request.  This rule will help streamline consideration of habeas corpus petitions in capital cases and eliminate a potential trap for the unwary, as rules 8.252(a) and 8.520(g) of the California Rules of Court require, among other things, that requests for judicial notice be served and filed under separate cover with a proposed order, something petitioner did not do here.

We have examined petitioner's previous appeal in *Memro II*, *supra*, 11 Cal.4th 786, and have identified five appellate claims arguably denied for lack of prejudice only. First, we determined that "even if [trial] counsel were deficient for not questioning each potential juror—an unlikely prospect—we cannot conclude that defendant was prejudiced." (*Id*. at p. 819.) Second, in responding to petitioner's claim that following his first trial authorities improperly confiscated his personal legal papers, we agreed with the trial court that presided over the retrial that "even if there was intentional interference with [petitioner's Sixth Amendment right to counsel], [he] had been able to show no prejudice." (*Id.* at p. 836.) Third, regarding petitioner's claim that trial counsel was ineffective for failing to better brief the suppression motion, we found the claim meritless because "there was no reasonable probability" of a different outcome had counsel submitted a better brief. (*Id*. at p. 845.) Fourth, concerning the lawfulness of the search of petitioner's apartment, we concluded any error was harmless in light of the overwhelming evidence of guilt. (*Id*. at p. 847.) Fifth, we found the trial court's consideration of the probation report when ruling on the motion to modify the verdict was harmless because it played no part in the trial court's ruling. (*Id*. at p. 886.) Petitioner could theoretically reraise these claims as part of a cumulative prejudice claim despite the *Waltreus* rule, arguing that any prejudice flowing from those alleged errors, when combined with the alleged prejudice resulting from any legitimately new claim, justifies relief. Such a claim, however, would require careful pleading to make clear the prior claims were being reraised not on their own behalf, but in support of a cumulative prejudice claim comprised of the earlier claims and a legitimately new and timely claim of error. Were we to reject such a properly pleaded cumulative prejudice claim, the rejection would necessarily imply that we also reject a cumulative prejudice claim encompassing any prior claims previously rejected on the merits and not solely for lack of prejudice.

Instead of such pinpoint allegations, however, petitioner has reraised *all* prior appellate claims *en masse*. In his words, he "has included *all known claims* of constitutional error related to his trial, convictions, sentence and imprisonment for the sake of clear presentation and so this Court can assess the cumulative effect [of any errors] and determine that a miscarriage of justice occurred." (Italics added.) This conception of cumulative prejudice, which incorporates all past claims including those rejected on the merits, does not come within any exception to the *Waltreus* rule. (See *In re Harris*, *supra*, 5 Cal.4th at pp. 829-841.)

Were we to accept petitioner's attempt to evade the *Waltreus* rule on the proffered ground that reconsideration of all previously denied claims is necessary in order to assess his cumulative prejudice argument, we would undermine the very purpose of the rule. We reiterate that habeas corpus is an extraordinary remedy, a safety valve for those unlikely and rare instances in which the usual trial and appellate process proves inadequate to vindicate a defendant's right to a fair trial. Allowing a litigant to repeatedly reopen his case would undermine the finality of criminal judgments and denigrate society's legitimate expectation that judgments will be carried out. We thus reject petitioner's cumulative prejudice argument as procedurally deficient and also as lacking any basis evident in this petition.

After filing his petition, petitioner had two additional opportunities to allege facts suggesting why he is entitled to renew a claim specifically rejected on appeal. First, following the filing of the petition, the People highlighted in their informal response that claim No. 8 alleging double jeopardy had been raised and rejected on appeal; that is, that the claim was barred by the *Waltreus* rule. In his informal reply, petitioner responded to the People's argument simply by repeating the assertion that claim No. 8 was included "for the purpose of incorporation into the cumulative error claims, Claims 140 through 143, and to exhaust [those claims

64

for purposes of federal court review].” As noted above, this assertion fails to establish the cognizability of the claim in a successive habeas corpus petition.

In the same informal reply, petitioner added the global assertion, with no argument or factual allegations specific to claim No. 8 (or any other claim), that the *Waltreus* rule does not apply because the claim comes within one of the narrow exceptions to the rule described in *In re Harris*, *supra*, 5 Cal.4th at pages 829-841.[26] The petition fails to allege which of the four exceptions applies or why any of them might apply. As we have explained, the exceptions to *Waltreus* described in *Harris* are narrow and require particular allegations; they are easy to allege, but difficult to establish. (*Harris*, at p. 834 [“Where an issue was available on direct appeal, the mere assertion that one has been denied a ‘fundamental’ constitutional right can no longer justify a postconviction, postappeal collateral attack . . .”].) As neither the petition nor the informal reply makes any attempt to allege facts suggesting one of the *Harris* exceptions applies here, we ascribe no weight to these assertions, unadorned as they are by factual allegations or legal argument.

Following issuance of the order to show cause in this case, the People filed a return in which they again argued claim No. 8 was procedurally barred by the *Waltreus* rule. In his traverse, petitioner renews his meritless argument that reconsideration of the double jeopardy claim is necessary to evaluate his cumulative prejudice claim. In addition—for the first time—he makes specific

---

[26]    Although this argument quite plainly references *Waltreus*, the argument resides in a section of the brief addressing *In re Dixon*, *supra*, 41 Cal.2d 756, i.e., claims that were not but should have been raised on appeal. (See discussion, *post*, pt. II.B.3.)

allegations that claim No. 8 falls within several of the exceptions to the *Waltreus* rule, but as we explain, his contentions are meritless.

Petitioner first alleges a change in the law has occurred since his appeal (*In re Harris*, *supra*, 5 Cal.4th at p. 841) and that he has "substantially altered" his double jeopardy claim to take advantage of this new authority. But he neither cites nor discusses any *new* authority (that is, any authority decided after the finality of our November 30, 1995, decision in *Memro II*, *supra*, 11 Cal.4th 786). Instead he merely lists 12 appellate decisions in a long footnote and implies the cited authorities constitute new authority, unavailable at the time of his appeal, supporting his claim. This assertion is frivolous. All of the authorities he cites as demonstrating a change in the law were cited in his opening brief on appeal in 1993 or in his reply brief on appeal in 1994.[27] The petition's allegations of a change in the law, allegedly bringing his case outside the *Waltreus* rule, are grossly misleading. Petitioner has not demonstrated a change in the law has occurred.

As a further exception to the *Waltreus* rule, petitioner contends his double jeopardy claim constitutes a fundamental constitutional error. (*In re Harris*, *supra*, 5 Cal.4th at pp. 829-836.) We explained in *Harris* that the *Waltreus* rule did not apply to errors that were "both clear and fundamental, and strike[] at the

---

[27] Petitioner cites the following authorities, implying they constitute a change in the law: *United States v. Dixon* (1993) 509 U.S. 688; *Smalis v. Pennsylvania* (1986) 476 U.S. 140; *Richardson v. United States* (1984) 468 U.S. 317; *Bullington v. Missouri* (1981) 451 U.S. 430; *Brown v. Ohio* (1977) 432 U.S. 161; *United States v. Morrison* (1976) 429 U.S. 1; *Ashe v. Swenson* (1970) 397 U.S. 436; *Benton v. Maryland*, *supra*, 395 U.S. 784; *Blockburger v. United States* (1932) 284 U.S. 299; *People v. McDonald* (1984) 37 Cal.3d 351; *People v. Superior Court* (*Engert*) (1982) 31 Cal.3d 797; *People v. Asbury* (1985) 173 Cal.App.3d 362.

heart of the trial process." (*Harris*, at p. 834.) To suggest how such claims differ from the quotidian type of trial errors, we cited *Arizona v. Fulminante* (1991) 499 U.S. 279, 309, which discusses errors amounting to a structural defect for which a harmless error assessment is impossible (*id.* at pp. 308-310). Petitioner's renewed double jeopardy claim does not rise to this level. Indeed, other than reasserting that his trial in *Memro II* violated his double jeopardy rights, and that those rights find their genesis in the United States Constitution, petitioner alleges no facts nor provides any argument why this error is so serious and fundamental that we should entertain it now, after he failed to take advantage of the opportunity before his retrial to plead "[o]nce in jeopardy" (Pen. Code, § 1016) but then raised the legal issue on appeal (*Memro II*, *supra*, 11 Cal.4th at pp. 820-822). Legal counsel can generally plead some plausible constitutional basis for any type of trial error, but this exception to the *Waltreus* rule is reserved for those errors so serious and fundamental that setting aside the state's weighty interest in the finality of criminal judgments would be justified. Petitioner's allegations in this regard are wholly inadequate.

Aside from the *Harris* exceptions to the *Waltreus* rule, petitioner contends generally in his traverse that he is entitled to present his double jeopardy claim a second time because his appellate counsel's presentation of the issue on appeal was "inadequate," thereby violating his right to the effective assistance of appellate counsel. This claim, too, is meritless. The claim of ineffective assistance of appellate counsel (IAAC) does not raise the same substantive issue, but is instead a new, independent claim (see *In re Harris*, *supra*, 5 Cal.4th at p. 833 ["claims of 'fundamental' constitutional error come to this court clothed in 'ineffective assistance of counsel' raiment"]), a point petitioner recognizes by raising an independent claim of IAAC in claim No. 141. Assessing that independent claim requires the application of settled law. "[A] criminal defendant

67

is guaranteed the right to effective legal representation on appeal" (*In re Sanders*, *supra*, 21 Cal.4th at p. 715; see also *In re Smith* (1970) 3 Cal.3d 192, 202-203 ["the inexcusable failure of petitioner's appellate counsel to raise crucial assignments of error, which arguably might have resulted in a reversal, deprived petitioner of the effective assistance of appellate counsel . . ."]); to be competent, appellate counsel must " 'prepare a legal brief containing citations to the . . . appropriate authority, and set[] forth all arguable issues' " (*People v. Barton* (1978) 21 Cal.3d 513, 519, fn. omitted), but need not raise all nonfrivolous issues (*Sanders*, at pp. 715-716, citing *Jones v. Barnes*, *supra*, 463 U.S. 745).  Even if petitioner could demonstrate his appellate attorney acted unreasonably, he must still show prejudice.  (*Smith v. Robbins* (2000) 528 U.S. 259, 285-286; *In re Harris*, *supra*, 5 Cal.4th at p. 833.)

Assuming we could review the double jeopardy claim as reflected through a claim of IAAC, the traverse's allegations fail both prongs of the foregoing test. Petitioner first alleges appellate counsel failed to "conduct a diligent review of the appellate record," "identify triggering facts in the trial record," identify the "controlling law" applicable to the double jeopardy issue, investigate the claim based on "triggering facts outside the record," and include the issue in the opening brief on appeal.  Most of these allegations are demonstrably untrue on their face. Appellate counsel in fact raised the double jeopardy issue in the briefing before this court and cited appropriate authority.  To the extent petitioner now claims appellate counsel failed to investigate the issue, he cites no facts suggesting what counsel did, what counsel should have done, and what counsel would have found with a more vigorous investigation.  These pro forma allegations, which the petition apparently intends to apply to all the *Waltreus*-barred claims, are inadequate.

Second, the petition includes no allegations regarding how petitioner was prejudiced. Inasmuch as appellate counsel raised the double jeopardy issue on appeal, petitioner is left with the argument that appellate counsel's presentation of the issue was so inadequate that, had it been better presented, this court would have accepted it and reversed the judgment. The petition makes no factual allegations approaching such a claim. Accordingly, the claim that appellate counsel was constitutionally ineffective is devoid of appropriate supporting allegations and thus cannot justify the repetitive presentation of the issue here.

Petitioner adds several other meritless arguments why his double jeopardy claim is, or should be, excepted from the *Waltreus* rule. First, he argues that reraising the double jeopardy claim is necessary to exhaust it for federal court purposes. We are unconvinced such duplicative briefing is necessary for exhaustion purposes. "Before a state prisoner may file a federal petition for a writ of habeas corpus, the petitioner must exhaust state court remedies by presenting all federal claims *to the highest state court*." (*In re Marquez* (2007) 153 Cal.App.4th 1, 13, italics added.) Because this court—California's highest state court—has rejected the double jeopardy issue on appeal, the claim is already exhausted for federal purposes. (*In re Robbins*, *supra*, 18 Cal.4th at p. 815, fn. 34 ["Our imposition of the bar of *Waltreus*, in this context, signals that the claim has been exhausted in timely fashion on appeal."]; *Carter v. Giurbino* (9th Cir. 2004) 385 F.3d 1194, 1198 ["If the claim barred from relitigation by *Waltreus* has already been decided by the California Supreme Court, that claim is properly exhausted for federal habeas corpus review. Thus, a citation to *Waltreus* does not prevent federal habeas review."]; *Fields v. Calderon* (9th Cir. 1997) 125 F.3d 757, 762, fn. 5 [same]; cf. *O'Sullivan v. Boerckel* (1999) 526 U.S. 838, 845 [for federal exhaustion purposes, "state prisoners must give the state courts one full

69

opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."].)

We note the United States Supreme Court has acknowledged that invocation of the *Waltreus* rule when denying a claim means further *state review* of the claim is precluded, and that federal courts will " 'look[] through' " a *Waltreus* denial to determine whether the federal issue was exhausted on the "last reasoned decision" on the merits, i.e., direct appeal. (*Ylst v. Nunnemaker* (1991) 501 U.S. 797, 804, fn. 3.) In short, even if petitioner's ability to exhaust claims for federal purposes were a reason to overlook a procedural default under state law, that purported justification does not apply to claims barred by the *Waltreus* rule. (To the extent a petitioner wishes to exhaust a procedurally defaulted claim, he or she should place it in a table or chart accompanying the petition, along with a summary description of the issue. (See pp. 3-4, *ante*.))

Second, petitioner contends this court should exercise its "discretionary power of review" to reconsider our prior denial of the double jeopardy issue. Even assuming we have such power, the petition fails to explain why we should do so. Third, petitioner contends renewal of the issue is justified because the current iteration of the issue "is more complete and detailed" than in prior pleadings or briefs. No doubt with additional time, effort, thought and money, a previously raised issue might be more clearly or persuasively articulated, but that is scant justification to undermine the finality of a criminal judgment. Accepting that justification would lead to perpetual renewals of claims with no judgment ever considered final. Fourth, petitioner contends he has reraised the issue "to provide context so that this Court may better assess the prejudice stemming from the multitude of errors infecting petitioner's capital proceedings." We have already discussed this "cumulative prejudice" justification and found it wanting; thus, on

70

these pleadings, we reject the cumulative prejudice justification for relitigating the same claim.

In sum, petitioner's claim that his prosecution for murder in *Memro II*, *supra*, 11 Cal.4th 786, constituted double jeopardy has been raised and rejected on appeal. Because the habeas corpus petition falls short of demonstrating that this claim falls within a recognized exception to the rule in *In re Waltreus*, *supra*, 62 Cal.2d 218, prohibiting raising such claims on habeas corpus, this claim is barred by the *Waltreus* rule. In addition, the petition alleges dozens of other claims we have determined were similarly raised and rejected on appeal, and for which petitioner similarly fails to allege sufficient facts showing the claim is excepted from the *Waltreus* rule (see fn. 23, *ante*), and a separate discussion of each of these claims would be fruitless. To raise a multitude of *Waltreus*-barred claims without demonstrating those claims qualify for an exception to the rule is an example of an abusive writ practice.

### 3. *Dixon*

Closely related to the *Waltreus* rule is the analogous one set forth in *In re Dixon*, *supra*, 41 Cal.2d at page 759: "[T]he writ [of habeas corpus] will not lie where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction." By insisting on presentation of claims on appeal if reasonably possible, the *Dixon* rule speeds resolution of claims, avoids delay, and encourages the finality of judgments. Prompt presentation on appeal makes sense because the evidence is relatively fresh; "[i]t would obviously be improper to permit a collateral attack because of claimed errors in the determination of the facts after expiration of the time for appeal when evidence may have disappeared and witnesses may have become unavailable." (*Id.* at p. 761.) Like the *Waltreus* rule, the *Dixon* rule is consistent with the concept of

71

habeas corpus as an extraordinary remedy available in those infrequent and unusual situations in which regular appellate procedures prove inadequate.  In short, a litigant is not entitled to raise an issue on habeas corpus after having failed to raise the same issue on direct appeal.

This rule is firmly established in law (*People v. Abilez* (2007) 41 Cal.4th 472, 536; *In re Sakarias*, *supra*, 35 Cal.4th at p. 169; *In re Seaton*, *supra*, 34 Cal.4th at p. 199; *In re Robbins*, *supra*, 18 Cal.4th at p. 778, fn. 1; *People v. Mendoza Tello*, *supra*, 15 Cal.4th at p. 267; *In re Harris*, *supra*, 5 Cal.4th at p. 825, fn. 3; *People v. Jones* (1973) 9 Cal.3d 546, 556, fn. 7) and is subject to the same four exceptions that apply to the *Waltreus* rule (*Robbins*, at p. 814, fn. 34, fifth par.; *Harris*, at p. 825, fn. 3).

Petitioner raises numerous claims subject to the *Dixon* rule and for which no exception applies.[28]  Claim No. 35 is representative of the claims now raised

---

[28]     By his own admission, petitioner concedes the following claims could have been, but were not, raised on appeal:
Claim No. 11 (failure to charge lewd-conduct felony in support of felony-murder charge);
Claim No. 12 (reliance on premeditation theory violated double jeopardy);
Claim No. 13 (reliance on felony-murder theory violated double jeopardy);
Claim No. 22 (written stipulation to be tried by court commissioner not knowing and intelligent);
Claim No. 23 (commissioner was biased);
Claim No. 34 (commissioner's rejection of petitioner's request for high security housing);
Claim No. 35 (commissioner's failure to order that petitioner be separately transported to court);
Claim No. 36 (consideration of evidence from Cornejo, a fellow inmate);
Claim No. 37 (error in admitting Cornejo's testimony);
Claim No. 42 (confining petitioner in marked patrol car during jury view of crime scene);
Claim No. 43 (improper shackling during trial);

*(footnote continued on next page)*

Claim No. 44 (admission of photos of nude boys was improper character evidence);

Claim No. 45 (admission of nude photos and magazines improperly allowed conviction based on petitioner's status as a sufferer of mental illness);

Claim No. 72 (prosecutor committed misconduct during argument by misstating the law);

Claim No. 74 (prosecutor committed misconduct during argument by taking advantage of erroneous jury instructions);

Claim No. 75 (prosecutor committed misconduct during argument by commenting on petitioner's sexuality);

Claim No. 76 (prosecutor committed misconduct during argument by arguing erroneous definitions of second degree murder);

Claim No. 77 (prosecutor committed misconduct during argument by arguing theories of murder prohibited by double jeopardy);

Claim No. 78 (prosecutor committed misconduct during argument by shifting burden of proof onto petitioner, except to the extent this claim alleges impermissible comment on petitioner's failure to testify);

Claim No. 79 (prosecutor committed misconduct during argument by making a fleeting comment on retrial);

Claim No. 83 (prosecutor committed misconduct during penalty phase argument by arguing theories of murder prohibited by double jeopardy);

Claim No. 84 (prosecutor committed misconduct during penalty phase argument by repeating petitioner's stated wish that he wanted the death penalty);

Claim No. 101 (trial court failed to inquire into a possible conflict);

Claim No. 116 (trial court was biased during pretrial jury selection, rehabilitating death-leaning jurors while summarily dismissing life-leaning jurors, resulting in a jury biased in favor of the death penalty);

Claim No. 117 (trial court improperly informed the jury there had been a previous trial);

Claim No. 124 (failure to preserve a complete appellate record);

Claim No. 125 (this court failed to provide a meaningful appeal, committing numerous legal and factual errors in deciding the appeal).

In addition, we have determined presentation of the following claims are also precluded by the *Dixon* rule:

Claim No. 50 (trial court's failure to instruct on shackling);

Claim No. 51 (instructing the jury sua sponte to presume petitioner's confession was voluntary);

Claim No. 52 (instructing the jury to presume petitioner's confession was voluntary improperly vouched for a prosecution witness);

*(footnote continued on next page)*

that are subject to the *Dixon* rule. In that claim, petitioner contends the trial court erred by failing to order the sheriff to transport him to court proceedings separately from other inmates who might be potential jailhouse snitches of questionable veracity. Apparently concerned that Anthony Cornejo, a fellow jail inmate, would testify he had overheard statements petitioner allegedly made while the two were together in a sheriff's van being transported to the courthouse (see *Memro II*, *supra*, 11 Cal.4th at p. 825), trial counsel moved to have petitioner transported separately so as not to have contact with certain inmates known to be informers. The court granted the request for the next hearing date, ordering "special transportation," but did not promise to establish separate transportation for all future court dates. When counsel later renewed the request and sought to

*(footnote continued from previous page)*

    Claim No. 53 (failure to instruct that the Fowler murder could be second degree at most);
    Claim No. 54 (instructing with CALJIC No. 8.31 unconstitutionally reduced the People's burden of proof);
    Claim No. 55 (instructing with CALJIC No. 8.75 was misleading);
    Claim No. 64 (failure to instruct the jury to disregard CALJIC No. 1.00 at the penalty phase);
    Claim No. 82 (prosecutor committed misconduct during penalty phase argument by misstating the definition of reasonable doubt);
    Claim No. 85 (alleged falsification of Sergeant Carter's notes; see pt. II.B.5., *post*);
    Claim No. 110 (failure to instruct that the jury could consider lingering doubt);
    Claim No. 115 (juror misconduct, based on a juror's responses on voir dire);
    Claim No. 126 (failure of then Chief Justice Lucas to recuse himself based on his support for gubernatorial candidate Daniel Lungren, who was then Attorney General and thus opposing counsel on appeal);
    To the extent claim Nos. 42, 44, 78, 79, 85 and 110 allege counsel was ineffective, they are not barred by the *Dixon* rule. (See *In re Robbins*, *supra*, 18 Cal.4th at p. 814, fn. 34; *People v. Mendoza Tello*, *supra*, 15 Cal.4th at p. 267.)

have petitioner brought to the courthouse in a van that did not include certain inmates, the court noted the logistical problems with that proposal and ruled its previous order (granting special transportation for Dec. 5, 1987, only) would remain in effect. When defense counsel renewed the request a second time at a later hearing, the court denied it.

The facts supporting this claim are fully spread upon the appellate record, yet the petition provides no reason why this issue could not have been raised on appeal. Indeed, the allegations associated with this claim betray no awareness that the issue should have been raised on appeal or that the claim is procedurally barred by the *Dixon* rule. To the extent the petition and the traverse rely on the general allegation that "all known claims of constitutional error" have been raised "so this Court can assess the cumulative effect [of all errors] and determine that a miscarriage of justice occurred," it fails for the same reason previously discussed in connection with the *Waltreus* rule. Such issues may be raised on habeas corpus in only two limited circumstances: (a) by coming within an exception to the *Dixon* rule (*In re Harris*, *supra*, 5 Cal.4th at pp. 825, fn. 3, 829-841); or (b) derivatively through a claim of IAAC, which requires a showing of appellate counsel's deficient performance and resulting prejudice (*id.* at p. 833 [applying *Strickland v. Washington*, *supra*, 466 U.S. 668, "to measure the performance of appellate counsel"]; *Smith v. Robbins*, *supra*, 528 U.S. at pp. 285-286 [same]). There is no general cumulative prejudice exception to the *Dixon* rule.

Petitioner first addresses the *Dixon* rule in a more particularized way in his informal reply brief. There he raises a number of purported justifications for his failure to raise claim No. 35 on appeal. First, he asserts that if we find the claim falls within the *Dixon* rule, we should find it also falls within an exception to the rule because the violation is "clear and fundamental" and "strike[s] at the heart of the trial process." Even were we to conclude this allegation invokes one of the

75

recognized exceptions to the *Dixon* rule, it is much too vague and nonspecific; missing from the petition are factual allegations suggesting why the sheriff's arrangements for transporting petitioner from the jail to court undermined his fundamental constitutional rights. We reiterate that conclusory allegations without specific factual allegations do not warrant relief. (*People v. Duvall*, *supra*, 9 Cal.4th at p. 474.)

Second, petitioner alleges the *Dixon* rule is inapplicable because claim No. 35 is based on "significant evidentiary materials not found within the record on appeal." Specifically, he argues this claim, as alleged in the petition, "refers to numerous matters outside the record, including problems between petitioner and Anthony Cornejo, as well as the procedures for transporting prisoners employed by the Los Angeles County Sheriff's Office." The argument is specious. The purportedly new, nonrecord material is not "significant," and the extrarecord matters on which petitioner relies are not "numerous." The petition itself cites nothing but the record on appeal, and that Cornejo was considered a snitch was mentioned prominently to the trial court. The petition fails to allege any new facts unknown at the time of trial, and petitioner has not submitted any new documentary evidence in support of this claim. Even had petitioner submitted new supporting evidence, such evidence would not bring the case outside the *Dixon* rule unless it was both unavailable at the time of trial and significant in scope. "When a petitioner attempts to avoid the bars of *Dixon*, *supra*, 41 Cal.2d 756, or *Waltreus*, *supra*, 62 Cal.2d 218, by relying upon an exhibit (in the form of a declaration or other information) from outside the appellate record, we nevertheless apply the bar if the exhibit contains nothing of substance not already

76

in the appellate record." (*In re Robbins*, *supra*, 18 Cal.4th at p. 814, fn. 34.)**29** In any event, any new evidence—that is, evidence that was not presented to the trial court—would not undermine the trial court's ruling, and would instead be relevant, if at all, to a claim of ineffectiveness of trial counsel.

In his traverse, petitioner argues for the first time that claim No. 35 should be excused from application of the *Dixon* rule because his appellate counsel was constitutionally ineffective for failing to raise the issue on appeal. We usually would find this contention procedurally improper for having been raised for the first time in the traverse (see discussion, *ante*, at pp. 25-26, fn. 15), but in any event it fails on its merits. As noted above, criminal defendants are guaranteed the right to effective legal representation on appeal, but counsel need not raise all

---

**29** Claim No. 22 is a good example of an unsuccessful attempt to bolster a barred claim with allegedly "new" evidence. That claim alleges petitioner's trial by a court commissioner instead of a superior court judge was improper under the California Constitution, and that his written stipulation to allow a commissioner to try his case was not a valid waiver of his rights. As his written waiver appears in the appellate record, and his then trial attorney, in a pretrial hearing, informed Judge Long that "I . . . have a stipulation that's been signed by [petitioner] for all purposes to have [the case] sent to Commissioner Torribio," this is an issue that normally should have been raised at trial and on appeal. (After petitioner's trial was held, this court decided that counsel could properly waive a criminal defendant's right to be tried by a judge and agree to trial by a court commissioner, even in a capital case. (*In re Horton* (1991) 54 Cal.3d 82.))

In his informal reply, however, petitioner supports claim No. 22 with portions of a declaration by psychiatrist George Woods, M.D., who opines that petitioner suffered from a mental illness at the time of trial, and this illness prevented petitioner from rationally assisting in his own defense. The petition fails to explain, however, why trial counsel could not have obtained Dr. Woods's declaration in time to present the claim at the time of trial. As a litigant can usually find additional expert evidence after trial given more time and money, the mere fact petitioner now has an expert willing to give an opinion that petitioner was mentally ill during his retrial in 1987 is insufficient to bring this claim outside the *Dixon* rule.

nonfrivolous issues in order to be deemed competent. (*In re Sanders*, *supra*, 21 Cal.4th at pp. 715-716.) Even if petitioner can demonstrate his appellate attorney acted unreasonably, he must still show prejudice. (*Smith v. Robbins*, *supra*, 528 U.S. at pp. 285-286.)

The traverse suggests petitioner has no facts available that, even if proved, would demonstrate appellate counsel's failure to raise claim No. 35 on appeal was ineffective in the constitutional sense. With regard to whether appellate counsel failed to perform diligently, petitioner globally asserts that "appellate counsel performed ineffectively by failing to identify, investigate, and develop potentially meritorious appellate claims despite the suggestion of triggering facts in the record." Petitioner includes a declaration from his appellate attorney, who declares he did not consider the factual basis of claim No. 35, that he would have included the claim in his opening brief on appeal had he done so, and that he had no strategic or tactical reason for omitting it. A second declaration by a criminal appellate law specialist echoes the point, concluding claim No. 35 would have been raised on appeal by competent counsel. Both attorney declarants aver that claim No. 35 is a potentially meritorious legal issue; in his traverse, petitioner asserts the claim is "*more* than potentially meritorious." (Italics added.)

Missing is any demonstration *why* claim No. 35 is potentially meritorious. Petitioner cites no authority for the proposition that fear of false testimony from a jailhouse snitch entitles a prisoner, as a matter of statutory or constitutional law, to special and individual transportation accommodations, or that the trial court abused its discretion in failing to order the sheriff to provide such special transportation to petitioner. Petitioner's primary concern was with fellow jail inmate Anthony Cornejo and, although Cornejo testified in an Evidence Code section 402 hearing concerning the voluntariness of petitioner's confession, Cornejo did not otherwise testify at trial to statements he allegedly overheard

78

petitioner make in the sheriff's transportation van. Accordingly, even were we to assume appellate counsel should have raised claim No. 35 on appeal, *and remembering that defendant had confessed to police that he killed Fowler, Chavez, and Carl Jr.* (*Memro II*, *supra*, 11 Cal.4th at pp. 813-815), the allegations and argument before this court plainly fail to demonstrate a "reasonable probability" that, but for his appellate counsel's unreasonable failure to raise the issue, petitioner would have prevailed on appeal (*Smith v. Robbins*, *supra*, 528 U.S. at pp. 285-286). Petitioner's contention that he may avoid the *Dixon* rule by resurrecting claim No. 35 now as a claim appellate counsel was ineffective is thus revealed as baseless.

We have examined the balance of the claims listed in footnote 28, *ante*, and reach the same conclusion regarding petitioner's global IAAC claim. That is, even assuming appellate counsel was remiss in failing to raise the listed issues on appeal, he was not constitutionally ineffective because it is not reasonably probable that, had any or all of those issues been raised on appeal, petitioner would have succeeded in obtaining a reversal. Accordingly, petitioner cannot avoid the *Dixon* rule due to IAAC.

To the extent petitioner claims he is entitled to raise claims otherwise barred by the *Dixon* rule so as to exhaust them for federal habeas corpus purposes, we reject that claim as well. Unlike the same claim raised in connection with the *Waltreus* bar (*In re Waltreus*, *supra*, 62 Cal.2d at p. 225), these claims were not previously raised and thus were not actually exhausted. But our procedural rules applicable to habeas corpus petitions exist to implement policies independent from those animating the exhaustion requirements of the federal courts.[30] If a petitioner

---

[30] As we have explained, our procedural rules are designed to regularize the postconviction review process, upholding the finality of judgments while leaving

*(footnote continued on next page)*

desires to seek redress in the federal courts, he or she can exhaust state claims by raising record-based claims at trial and on appeal, and nonrecord-based claims in a first state habeas corpus petition. Were we to allow the presentation of claims piecemeal and without limit merely to facilitate a prisoner's desire to seek relief in the federal courts, we would fatally undermine this state's substantial interest in the finality of its criminal judgments. We thus reject the claim that a desire to exhaust a claim for federal court purposes constitutes an exception to the *Dixon* rule.

In sum, petitioner's claim that the trial court erred by failing to order special transportation from the jail to the courtroom, raised as claim No. 35 in his habeas corpus petition, could have been, but was not, raised on appeal. Neither the habeas corpus petition, nor the informal reply or traverse offers any reason why this claim falls within a recognized exception to the rule in *In re Dixon*, *supra*, 41 Cal.2d 756, prohibiting raising such claims on habeas corpus. This claim is thus barred by the *Dixon* rule. As noted, the petition alleges dozens of other such claims we have determined could similarly have been raised on appeal, and for which petitioner similarly fails to allege sufficient facts showing the claim is excepted from the *Dixon* rule. (See fn. 28, *ante*.) A separate discussion of each

---

*(footnote continued from previous page)*

open a safety valve for the presentation of legitimate claims. By contrast, the federal exhaustion requirement "is grounded in principles of comity and reflects a desire to 'protect the state courts' role in the enforcement of federal law,' [citation]. In addition, the requirement is based upon a pragmatic recognition that 'federal claims that have been fully exhausted in state courts will more often be accompanied by a complete factual record to aid the federal courts in their review.' [Citation.] Codified since 1948 . . . , the exhaustion rule, while not a jurisdictional requirement [citation], creates a 'strong presumption in favor of requiring the prisoner to pursue his available state remedies.' " (*Castille v. Peoples* (1989) 489 U.S. 346, 349, fn. omitted.)

of these claims is unnecessary. To raise a multitude of *Dixon*-barred claims without making a plausible attempt to demonstrate that those claims qualify for an exception to the rule is an example of an abusive writ practice.

### 4. *Miller*

Another basic rule applicable to habeas corpus petitions was articulated in a "By the Court" opinion 60 years ago in *In re Miller*, *supra*, 17 Cal.2d 734. At issue in *Miller* was a petition for a writ of habeas corpus raising the same legal grounds that had been raised and rejected in a prior habeas corpus petition. Our resolution of the claims, and the explanation of our disposition, was brief: "The prior petition was denied on May 25, 1936, and since that time no change in the facts or the law substantially affecting the rights of the petitioner has been disclosed. [¶] The petition is denied." (*Id*. at p. 735.) The *Miller* rule is now, and for many years has been, black letter law applicable to habeas corpus petitions in this state: "It is, of course, the rule that a petition for habeas corpus based on the same grounds as those of a previously denied petition will itself be denied when there has been no change in the facts or law substantially affecting the rights of the petitioner." (*In re Martin* (1987) 44 Cal.3d 1, 27, fn. 3, citing *Miller*; see also *In re Robbins*, *supra*, 18 Cal.4th at p. 778, fn. 1, citing *Miller* with approval; *In re Clark*, *supra*, 5 Cal.4th at p. 767 [same]; *In re Rodriguez* (1975) 14 Cal.3d 639, 654, fn. 18 [same]; *In re Lynch* (1972) 8 Cal.3d 410, 439, fn. 26 [same]; *In re De La Roi* (1946) 28 Cal.2d 264, 275 [same].)

Like the rule in *In re Waltreus*, *supra*, 62 Cal.2d 218, the *Miller* rule recognizes that a litigant should raise a claim at the earliest practicable

opportunity,[31] and cannot—without persuasive justification—keep returning to the court for second and third bites of the same piece of fruit. " 'In this state a defendant is not permitted to try out his contentions piecemeal by successive proceedings attacking the validity of the judgment against him.' " (*In re Clark*, *supra*, 5 Cal.4th at p. 768, quoting *In re Connor* (1940) 16 Cal.2d 701, 705.) To hold otherwise would undermine society's strong and legitimate interest in the finality of its criminal judgments.

Although the *Miller* rule precludes successive habeas corpus petitions raising the same issue, it is subject to the narrow exceptions set forth in *In re Clark*, *supra*, 5 Cal.4th at pages 797-798. Thus, petitioner can avoid the preclusive effect of the *Miller* rule if he can allege facts showing that a claim implicates a fundamental error of constitutional magnitude, that he is actually innocent, that the jury was presented with a grossly misleading profile of him at the penalty phase, or that he was convicted or sentenced under an invalid statute. A claim of ineffective assistance of prior habeas corpus counsel may also excuse compliance with the *Miller* rule. (*Clark*, at p. 780.)

Petitioner raised 12 major claims and some subclaims in his first habeas corpus petition, which we denied in its entirety in 1995, signaling we found no merit to any of the claims. He now reraises 20 claims and subclaims previously denied.[32] Claim No. 21 exemplifies the claims subject to the *Miller* rule. That

---

[31] Indeed, absent unusual circumstances, a repetitive claim—that is, a claim already rejected in a previous habeas corpus petition—is by its nature an untimely claim.

[32] Petitioner concedes he has included in his present petition all 12 of the issues raised and rejected in connection with his 1995 habeas corpus petition. They are:

Claim No. 7 (denial of bail; *In re Memro on Habeas Corpus*, S044437 (*Memro III*), claim No. XXIII);

*(footnote continued on next page)*

*(footnote continued from previous page)*

Claim No. 15 (prosecution's use of jailhouse snitch testimony; *Memro III*, claim No. XV);

Claim No. 16 (prosecution's use of Cornejo's testimony; *Memro III*, claim No. XVII);

Claim No. 18 (destruction of police records; *Memro III*, claim No. XIV);

Claim No. 19 (failure to disclose 400 pages of discovery; *Memro III*, claim No. XII);

Claim No. 20 (failure to disclose benefits to jailhouse snitches; *Memro III*, claim No. XVI);

Claim No. 21 (failure to disclose impeachment evidence for witness Bushea; *Memro III*, claim No. XVIII);

Claim No. 25 (denial of fair suppression hearing on retrial; *Memro III*, claim No. XIX);

Claim No. 26 (denial of fair suppression hearing in first trial; *Memro III*, claim No. XX);

Claim No. 30 (failure to relitigate suppression motion; *Memro III*, claim No. XXI);

Claim No. 121 (lack of available mitigating evidence; *Memro III*, claim No. XXII);

Claim No. 122 (falsification of Sergeant Carter's notes, as discussed at pt. II.B.5.; *Memro III*, claim No. XIII).

In addition to those claims petitioner concedes were raised and rejected in connection with his first habeas corpus petition, these additional claims were also rejected there:

Claim No. 17 (failure to provide *Pitchess* discovery due to destruction of records; *Memro III*, claim No. XIV);

Claim No. 24 (speedy trial; *Memro III*, claim No. XXII.G);

Claim No. 29 (failure to exclude Cornejo's testimony at suppression motion; *Memro III*, claim No. XVII, pp. 24-25);

Claim No. 37 (error in admitting testimony from Cornejo; *Memro III*, claim No. XVII, pp. 24-25);

Claim No. 86 (ineffective assistance of counsel for failing to investigate and present evidence of alternative suspects; *Memro III*, claim No. XXII.E);

Claim No. 93 (ineffective assistance of counsel for failing to raise speedy trial claim; *Memro III*, claim No. XXII.G);

Claim No. 100 (counsel's conflict of interest; *Memro III*, claim No. XXII.C);

Claim No. 120 (lack of access to competent mental health expert; *Memro III*, claim No. XXII.A).

*(footnote continued on next page)*

claim involves the testimony of prosecution witness Scott Bushea. Like victims Fowler and Chavez, Bushea was himself just 10 or 12 years old at the time of the murders. Bushea testified at petitioner's retrial that he was in John Anson Ford Park the night Fowler and Chavez were murdered in 1976, and he remembered seeing the victims in the presence of two adult men. Petitioner alleges the prosecution committed *Brady* error[33] by failing to disclose to the defense that in 1984, eight years after petitioner's crimes against Fowler and Chavez but a few years before petitioner's retrial, Bushea pleaded guilty to two felonies related to his molestation of a five-year-old child. Petitioner contends the prosecution's failure to disclose this impeaching information deprived him of due process of law and a fundamentally fair trial.

Petitioner unsuccessfully raised this claim in his first habeas corpus petition in this court. Although the present habeas corpus petition vaguely admits raising some claims "that have been previously presented" in order to permit an assessment of the cumulative prejudice flowing from the errors, this allegation fails for the reasons previously discussed. (See discussion, *ante*, pt. II.B.2.) To the extent a petitioner has reason to believe a claim was denied in connection with a previous habeas corpus petition not on the substantive merits but for lack of prejudice only, he may include such issues in a table or chart accompanying a later petition, clearly identifying the issue and where it was previously raised. (See

---

*(footnote continued from previous page)*

Although some of these claims are supported by allegations of additional evidence not considered in conjunction with the first petition, the petition either fails to demonstrate the additional evidence was newly discovered or fails to specifically tie the evidence to a claim of ineffective assistance of counsel.

[33]     *Brady v. Maryland* (1963) 373 U.S. 83. See also *United States v. Bagley* (1985) 473 U.S. 667.

pp. 3-4, *ante*.)  This court will then consult its prior disposition to determine if our previous resolution of the issues is relevant to a current claim of cumulative prejudice.

Although petitioner asserts his reiteration of previously denied claims is justified by past inadequate funding for investigation (see *In re Gallego*, *supra*, 18 Cal.4th at p. 835, fn. 8), we reject the contention.  These allegations of inadequate funding are prefatory to the entire petition and are not specifically tied to the 20 claims and subclaims subject to the *Miller* rule.  *Gallego* requires the pleading of *specific facts* showing that a petitioner "reasonably failed to discover the additional information—as a result of a denial of a request for funds to investigate the claim." (*Gallego*, at p. 835, fn. 8.)  A global claim that a general lack of funds led to an overall inability to find all claims is manifestly insufficient.

In his informal reply, petitioner asserts claim No. 21 comes within another exception to the *Miller* rule, stating generally that he is "resubmitting many claims pursuant to respondent's arguments in federal court, and the subsequent rulings of the District Court, which questioned the exhausted nature of *these* claims."  (Italics added.)  The assertion fails for two reasons.  First, he has not filed copies of the federal court's order or a transcript of the hearing; accordingly, he has failed to file "reasonably available documentary evidence" (*People v. Duvall*, *supra*, 9 Cal.4th at p. 474) in support of his allegation that the federal court found "these" claims unexhausted.  (See p. 3, *ante* [judicially declaring a rule of criminal procedure requiring petitions to identify which claims were deemed by the federal court to be exhausted, and which were not, and to support those allegations with a copy of proof such as the federal court's order].)  Second, even were petitioner's desire to exhaust his state court remedies as a prerequisite to his federal proceeding an exception to the *Miller* rule (which it is not), because this claim was specifically denied in connection with petitioner's first habeas corpus petition, petitioner has

already provided this court with one "*fair* opportunity to act on [his] claims." (*O'Sullivan v. Boerckel*, *supra*, 526 U.S. at p. 844.)  The claim is thus already exhausted.

Petitioner's attempt to come within one of the four exceptions recognized in *In re Clark*, *supra*, 5 Cal.4th at pages 797-798 (i.e., a constitutional error that led to a fundamentally unfair trial, actual innocence, a grossly misleading profile of petitioner that led to imposition of the death penalty, or conviction or sentencing under an invalid statute) also fails because he does not explain how claim No. 21 satisfies any of those four narrow exceptions.  We reach the same conclusion with regard to his unadorned and unexplained assertions of ineffective assistance of counsel (*Clark*, at p. 780); petitioner merely states these exceptions in conclusory terms and fails to state any facts, tied to a specific claim, demonstrating prior habeas corpus counsel was in fact ineffective, or what prior habeas corpus counsel did to investigate these claims.  We repeat that conclusory allegations are inadequate to satisfy his pleading burden.  (*People v. Duvall*, *supra*, 9 Cal.4th at p. 474.)

In his traverse, petitioner raises additional explanations for reraising claims denied in his first habeas corpus proceeding.  The arguments are meritless.  He first contends his claims are excepted from the *Miller* rule because he has "significantly developed the legal and factual bases *for three claims* previously raised in the first petition."  (Italics added.)  This of course leaves no explanation for the other 17 claims and subclaims this court rejected in 1995, including claim No. 21.  Moreover, the additional legal authority petitioner cites mostly predates the first petition in 1995 (meaning it was available at the time he filed his first petition), none even marginally changes the analysis, and the allegedly new factual bases for these claims are similarly inconsequential.  Merely alleging some new facts to support a previously rejected claim will not avoid the *Miller* bar, as most

86

counsel, with additional time, effort and money, can often find some additional facts related to a claim. Such additional facts, to qualify as an exception to the *Miller* rule, must either be newly discovered (that is, not actually known and could not have been discovered with due diligence) or specifically tied to a claim of ineffective assistance of counsel.

In his traverse, petitioner revives his assertion, first raised in summary fashion in his informal reply, that prior habeas corpus counsel was constitutionally ineffective for failing to investigate claim No. 21. He contends that prior counsel's performance was "materially deficient" in that he failed to adequately investigate the claim, discover triggering facts, and raise the issue in the first petition. To impugn the professionalism of one's prior attorney is of course easy, but because prior habeas corpus counsel in fact raised claim No. 21 in 1995, we should now expect allegations showing *why* prior counsel's investigation was unreasonable and *what* new facts present counsel have discovered. Instead, the traverse merely alleges in conclusory fashion that prior habeas corpus counsel was ineffective, with no supporting factual allegations. That a comparison of the petition first habeas corpus counsel filed in 1995 (S044437) with the present petition (S124660) reveals claim No. 21 in the present petition is virtually a word-for-word repetition of claim No. XVIII in that earlier petition is telling.

In short, present counsel have essentially copied this issue from the prior petition and relabeled it as claim No. 21, arguing both that they have new law and new facts supporting the claim and that petitioner is entitled to reraise the issue because prior counsel was ineffective. These assertions are demonstrably false, and this unexplained repackaging of a prior claim suggests present habeas corpus counsel have acted in disregard of their duty "never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law." (See Bus. & Prof. Code, § 6068, subd. (d).)

87

The traverse's final arguments—that failure to allow repetitive claims will result in a miscarriage of justice, and that renewal of claim No. 21 is necessary to assess cumulative prejudice—fail to state an exception under *In re Clark*, *supra*, 5 Cal.4th at pages 797-798. Such explanations, were we to accept them, would completely undermine the *Miller* rule (*In re Miller*, *supra*, 17 Cal.2d at p. 735), allow unending litigation, and thus be inconsistent with society's strong interest in the finality of its criminal judgments.

In sum, neither the petition, the informal reply, nor the traverse states sufficient allegations showing claim No. 21 falls within a recognized exception to the *Miller* rule. We have examined the remaining 19 claims subject to the *Miller* rule and find the same analysis applies to those claims as well. To raise so many *Miller*-barred claims without making a plausible attempt to demonstrate that those claims qualify for an exception to the rule is an example of an abusive writ practice.

### 5. *Clark/Horowitz*

In addition to the 20 claims and subclaims that have already been raised and rejected in connection with petitioner's 1995 habeas corpus proceeding, petitioner raises several claims that *could have been raised* in that prior proceeding because their factual basis was known at the time he filed that first petition. This court has long considered such claims improper. As we explained in *In re Horowitz*, *supra*, 33 Cal.2d at pages 546-547: "[A]s to the presentation of new grounds based on matters known to the petitioner at the time of previous attacks upon the judgment, in *In re Drew*[, *supra*,] (1922) 188 Cal. [at p.] 722, it was pointed out that the applicant for habeas corpus 'not only had his day in court to attack the validity of this judgment, but . . . had several such days, on each of which he could have urged this objection, but did not do so'; it was held that 'The

88

petitioner cannot be allowed to present his reasons against the validity of the judgment against him piecemeal by successive proceedings for the same general purpose.' "

We addressed the *Horowitz* rule more recently in *In re Clark*, *supra*, 5 Cal.4th at page 768, explaining that we have "refused to consider newly presented grounds for relief which were known to the petitioner at the time of a prior collateral attack on the judgment. [Citations.] The rule was stated clearly in *In re Connor*, *supra*, 16 Cal.2d 701, 705: 'In this state a defendant is not permitted to try out his contentions piecemeal by successive proceedings attacking the validity of the judgment against him.' "

Petitioner raises dozens of claims whose factual bases were known at the time he filed his first habeas corpus petition in 1995. Claim No. 85 is a good example. It alleges that Sergeant Lloyd Carter of the South Gate Police Department prepared "[a]t least 11 pages of notes" relevant to the crimes and that, although the notes were subject to the trial court's continuing discovery order, they were not disclosed to trial counsel during the first trial or in time to be of use at the suppression hearing held during retrial. According to the petition, "[t]he notes were first made available to petitioner and his counsel at the retrial," and Sergeant Carter used the notes to refresh his recollection during his testimony. The petition suggests the notes were not prepared contemporaneously with the initial investigation, thus permitting the officer time for reflection and embellishment. The petition also claims the notes "falsely enhanced" Sergeant Carter's credibility before the jury and that counsel was constitutionally ineffective for failing to examine the notes.

Petitioner alleged in his first habeas corpus petition in 1995 that Sergeant Carter testified falsely when he claimed to have made the notes at the time of the criminal investigation; we denied that claim on the merits. Petitioner has now

89

reconfigured and reframed the same claim to allege trial counsel was ineffective both for failing to examine the notes and because counsel should have "obtain[ed] expert testimony as to the date on which the notes were likely to have been written." But, as is clear, the facts underlying the claim—that Sergeant Carter allegedly did not prepare his notes at the time of the initial investigation of the crimes—were known at the time of the retrial. In fact, defense counsel cross-examined Sergeant Carter about his notes and when he made them. The ineffective assistance issue could thus have been raised in petitioner's first habeas corpus petition.

The present petition fails to address the *Clark/Horowitz* rule for claim No. 85 (or for any other claim) other than to rely on its global assertion at the beginning of the petition that "all known claims" have been included "for the sake of clear presentation" so as to permit this court to "assess the cumulative effect" of the errors in this case. We have already discussed the inadequacy of this purported justification in detail with respect to the *Waltreus*, *Dixon* and *Miller* rules, and will not reiterate it here.

Petitioner's informal reply alleges nothing to justify the belated assertion of claim No. 85. Prompted by our order to show cause, the traverse is somewhat more specific, but similarly fails to justify the piecemeal presentation of the claim. The traverse alleges petitioner has provided " 'satisfactory reasons' for not presenting his non-repetitive claims [including claim No. 85] in the first petition," but his purported reasons amount to no more than unsupported assertions that Attorney Nolan, who represented petitioner in his first habeas corpus proceeding, was constitutionally ineffective.

We recognized in *Clark* that ineffective assistance of counsel may justify piecemeal presentation of claims on habeas corpus, but cautioned that, to come within this exception, "[t]he petitioner must . . . allege *with specificity* the facts

90

underlying the claim that the inadequate presentation of an issue or omission of any issue reflects incompetence of counsel . . . ." (*In re Clark*, *supra*, 5 Cal.4th at p. 780, italics added.) The only facts petitioner alleges in support consist of (1) Attorney Nolan's general declaration that, on reflection, claim No. 85 is potentially meritorious and he had no tactical reason for failing to raise it in petitioner's first habeas corpus petition, and (2) Attorney Wesley Van Winkle's declaration asserting his professional opinion that Nolan was ineffective for failing to raise several dozen claims on appeal or in the 1995 habeas corpus petition. But Nolan's declaration is woefully lacking in detail, and that same lack of specificity also undermines Van Winkle's declaration. In other words, neither declaration provides a basis to conclude that competent counsel should have raised claim No. 85 in particular or that "the issue is one which would have entitled the petitioner to relief had it been raised and adequately presented in the initial petition, and that counsel's failure to do so reflects a standard of representation falling below that to be expected from an attorney engaged in the representation of criminal defendants." (*Clark*, at p. 780.) We reiterate that the "mere omission of a claim 'developed' by new counsel does not raise a presumption that prior habeas corpus counsel was incompetent, or warrant consideration of the merits of a successive petition." (*Ibid*.) In short, the mere fact Attorney Nolan failed to include this issue in his prior petition (or failed to frame it as one of ineffectiveness of trial counsel) does not demonstrate Nolan's representation was constitutionally ineffective.

Claim No. 85 aside, petitioner alleges that nine of his claims are based on newly discovered evidence and thus could not have been raised earlier. For example, he asserts in claim No. 71 that the prosecutor committed misconduct by failing to disclose impeaching information regarding witness Anthony Cornejo. (See *Brady v. Maryland*, *supra*, 373 U.S. 83; *Kyles v. Whitley* (1995) 514 U.S.

419.)  In support of this allegation, petitioner relies on various memoranda and documents from the district attorney's office that describe Cornejo's attempts to ingratiate himself with prosecutors in other cases and that refer to Cornejo as "one of the most unscrupulous snitches that I have ever run across in 14 years as a deputy district attorney."  But the documents on which petitioner now relies are dated 1980 (exhibit F), 1982 (exhibit F) and 1989 (exhibits H, I)—i.e., well before he filed his first habeas corpus petition in 1995—and he fails to allege *when* he learned of this information.  In any event, as Cornejo's mendacity was a major issue in the case, and he was at trial "impeached as a notorious jailhouse informant who had repeatedly testified about fellow inmates' statements in jail for the prosecution in state and federal court" (*Memro II*, *supra*, 11 Cal.4th at p. 825), we cannot conclude this evidence is newly discovered under our rules.  That is, the allegedly "new" evidence of Cornejo's flexible relationship with the truth is cumulative to what was already known and thus does not " 'cast[] "fundamental doubt on the accuracy and reliability of the proceedings." ' " (*In re Lawley*, *supra*, 42 Cal.4th at p. 1239.)  As the evidence is not newly discovered under our rules, its presentation now does not excuse petitioner's failure to raise claim No. 71 at an earlier time.

We have examined the other eight claims for which petitioner argues he has new evidence and find them similarly wanting.

Rightly assuming the *Clark* exceptions apply, petitioner attempts to come within those exceptions for the dozens of claims subject to the prohibition of piecemeal presentation.  The effort fails.  His allegations in this regard are conclusory and fail to show there occurred a constitutional error that resulted in a "fundamentally unfair" trial, that he is factually innocent, that the evidence at his penalty phase produced a "grossly misleading profile" of him, or that he was

92

convicted or sentenced under an invalid statute. (*In re Clark*, *supra*, 5 Cal.4th at pp. 797-798.)

Petitioner next argues he should be excused from the *Clark/Horowitz* rule because he was personally unaware of the factual basis of the claims. This contention is not tied particularly to any one claim and, as such, fails for lack of specificity. It is also at least partially untrue; we note, for example, that as to claim No. 85, petitioner and counsel necessarily were aware of Sergeant Carter's notes as trial counsel cross-examined Carter about them at trial, and a claim related to the notes was raised in petitioner's first habeas corpus petition in 1995.

Petitioner finally argues he should be excused from the *Clark/Horowitz* rule because raising these procedurally barred claims is necessary to exhaust them for federal court purposes. We have discussed and rejected this explanation elsewhere in this opinion.

In sum, claim No. 85 (which asserts petitioner's trial counsel was ineffective for failing to examine Sergeant Carter's notes and for failing to have hired an expert to determine when the notes were prepared) could have been, but was not, raised in his first habeas corpus petition in 1995. Petitioner provides nothing but patently meritless explanations for why this claim should fall outside the *Clark/Horowitz* rule prohibiting piecemeal presentation of claims. This claim is thus barred by the *Clark/Horowitz* rule. (*In re Horowitz*, *supra*, 33 Cal.2d at pp. 546-547; *In re Clark*, *supra*, 5 Cal.4th at pp. 767-768.) In addition, the petition alleges dozens of other such claims we have determined could similarly have been raised in the previous petition and for which petitioner similarly offers patently meritless explanations for why the claim should be excepted from the *Clark/Horowitz* rule. A separate discussion of each of these claims is unnecessary. To raise so many *Clark*/*Horowitz*-barred claims without making a plausible

attempt to demonstrate that those claims qualify for an exception to the rule is an example of an abusive writ practice.

### 6. *Lindley*

For the first degree murder of Carl Jr., the prosecutor relied on two theories: the killing was premeditated and deliberated, and it occurred during the commission of a felony, i.e., a lewd act on a child. For the murder of Ralph Chavez, the prosecutor relied solely on the theory of premeditation and deliberation. The jury returned verdicts of first degree murder on both counts. In the habeas corpus petition now before this court, petitioner alleges in claim Nos. 67 and 68 the evidence adduced at trial was insufficient to support these convictions. Because these exact claims were raised and rejected on appeal, they are procedurally barred by the *Waltreus* rule. (*In re Waltreus*, *supra*, 62 Cal.2d at p. 225.) They are also improper for another reason: claims of the insufficiency of evidence to support a conviction are not cognizable in a habeas corpus proceeding. (*In re Lindley*, *supra*, 29 Cal.2d at p. 723.)

The rule of *Lindley* recognizes that the job of sifting the evidence and weighing the credibility of witnesses is for the trier of fact, usually the jury, at the time of trial (see *People v. Farris* (1977) 66 Cal.App.3d 376, 383), and that claims of evidentiary insufficiency must be raised in either a motion for a new trial,[34] on appeal, or both. Aside from a claim of newly discovered evidence, that is, evidence *not* presented at trial, which is itself subject to strict limits (see *In re*

---

[34] Penal Code section 1181 provides: "When a verdict has been rendered or a finding made against the defendant, the court may, upon his application, grant a new trial, in the following cases only: [¶] . . . [¶] 6. When the verdict or finding is contrary to law or evidence . . . ."

*Lawley*, *supra*, 42 Cal.4th at p. 1239), routine claims that the evidence presented at trial was insufficient are not cognizable in a habeas corpus petition.

The *Lindley* rule is a venerable one, having been cited consistently over several decades. (*In re Adams* (1975) 14 Cal.3d 629, 636; *In re Giannini* (1968) 69 Cal.2d 563, 577, fn. 11; *In re Manchester* (1949) 33 Cal.2d 740, 744; *In re White*, *supra*, 121 Cal.App.4th at p. 1481, fn. 21; *People v. Espinoza* (2002) 95 Cal.App.4th 1287, 1322; *In re Spears* (1984) 157 Cal.App.3d 1203, 1209-1210.)

The petition raises claim Nos. 67 and 68 with no apparent awareness the claims are barred by the *Lindley* rule, and neither the petition nor the informal reply includes any allegations attempting to justify their presentation here. In his traverse, petitioner argues claim Nos. 67 and 68 are properly before the court because they are "related to [his] claim of actual innocence," prior appellate counsel "ineffectually presented the claims on direct appeal," the prosecution should have been precluded from proving certain facts by the doctrines of res judicata and collateral estoppel, and presentation of the claims will allow this court to consider them when assessing the cumulative impact of all the errors.

These allegations are uniformly meritless. The only "new" evidence alleged—that is, evidence not presented to the jury in 1987—is a 1998 declaration from Dr. George Woods, a psychiatrist, who opines petitioner suffers from mental problems that precluded him from premeditating and deliberating the crimes against Fowler and Chavez. (The jury convicted petitioner of only second degree murder of Fowler in any event.) This evidence does not show petitioner is actually innocent; that is, it does not cast fundamental doubt on the accuracy and reliability of the trial proceedings, nor undermine the prosecution's entire case and " ' "point unerringly to innocence or reduced culpability." ' " (*In re Lawley*, *supra*, 42 Cal.4th at p. 1239.) Moreover, appellate counsel raised on appeal the claim that insufficient evidence of premeditation supported the murder convictions

95

(*Memro II*, *supra*, 11 Cal.4th at p. 862), and petitioner does not show how or why prior appellate counsel was ineffective in doing so. Petitioner's res judicata claims should have been raised at trial and on appeal; his failure to do so forfeited those claims. We have previously explained why the cumulative prejudice argument is unpersuasive.

We find petitioner raised claim Nos. 67 and 68 notwithstanding they are noncognizable in a habeas corpus proceeding. Further, the petition includes no allegations justifying their presentation now, nor does the traverse contain any allegations plausibly justifying how the claims fall outside the *Lindley* rule. This is an example of an abusive writ practice.

### 7. *Lessard*, *Sterling*, and Fourth Amendment Claims

A further limitation on the availability of habeas corpus relief was set forth in *In re Lessard* (1965) 62 Cal.2d 497, 503, and *In re Sterling*, *supra*, 63 Cal.2d at page 489: claims the police violated a petitioner's rights under the Fourth Amendment to the United States Constitution are not cognizable in a habeas corpus proceeding. (See also *In re Sakarias*, *supra*, 35 Cal.4th at p. 169 [citing *Sterling* with approval]; *In re Harris*, *supra*, 5 Cal.4th at p. 830 [same].) "We do not believe that petitioner may at this date employ the writ of habeas corpus to attack the introduction of evidence which allegedly has been illegally obtained." (*Lessard*, at p. 503.)

We explained the *Lessard*/*Sterling* rule in *In re Clark*, *supra*, 5 Cal.4th at page 767: "[T]he erroneous admission of unlawfully seized evidence presented no risk that an innocent defendant might be convicted, and '[t]he risk that the deterrent effect of the [exclusionary] rule will be compromised by an occasional erroneous decision refusing to apply it is far outweighed by the disruption of the orderly administration of justice that would ensue if the issue could be relitigated

96

over and over again on collateral attack.' ([*In re Harris* (1961) 56 Cal.2d 879,] 884, conc. opn. of Traynor, J.) That reasoning persuaded the court that Fourth Amendment violations need not be considered on habeas corpus even when the issue had not been raised on appeal. 'Failure to exercise these readily available remedies will ordinarily constitute such a deliberate bypassing of orderly state procedures as to justify denial of federal as well as state collateral relief.' "

Petitioner in claim No. 1 alleges South Gate police officers arrested him without probable cause and in claim No. 3 that they conducted an unjustified warrantless search of his apartment, both in violation of his right under the Fourth Amendment to the United States Constitution to be free of unreasonable searches and seizures. Both claims were raised and rejected on appeal (see *Memro II*, *supra*, 11 Cal.4th at pp. 838-843, 846-847) and so are, in any event, barred by the *Waltreus* rule (*In re Waltreus*, *supra*, 62 Cal.2d at p. 225). They are also barred by the *Lessard/Sterling* rule. (*In re Lessard*, *supra*, 62 Cal.2d 497; *In re Sterling*, *supra*, 63 Cal.2d 486.)[35] Neither the petition nor the informal reply betrays any awareness that claim Nos. 1 and 3 are noncognizable claims.

---

[35] The People contend the following additional claims are also subject to the *Lessard/Sterling* rule:

Claim No. 25 (challenging the fairness of the hearing on petitioner's suppression motion because the trial judge was biased and counsel was ineffective);

Claim No. 26 (challenging the fairness of the same hearing because the prosecutor introduced misleading information);

Claim No. 27 (challenging the fairness of the same hearing because the trial court failed to exclude some witnesses from the hearing);

Claim No. 30 (refusal to allow relitigation of the suppression motion on retrial);

Claim No. 89 (counsel's failure to use a missing-juvenile report to impeach police officer witnesses);

*(footnote continued on next page)*

Prompted by our order to show cause, petitioner now addresses the cognizability of these claims in the traverse. He claims not to have ignored the *Lessard*/*Sterling* rule, although he concedes claim Nos. 1 and 3 are "arguably" subject to the rule. Despite this apparent concession, he argues that, for a number of reasons, claim Nos. 1 and 3 are nevertheless cognizable. His arguments are unpersuasive. He first argues "this Court may review the merits of all claims" because he was "not granted a fair and adequate hearing on his motion to suppress"; however, not only was the fairness of the hearing addressed in the trial court and on appeal, this justification implicates his right to procedural due process (which he has raised in other claims) and not his rights under the Fourth Amendment to the United States Constitution. He next claims we should review claim Nos. 1 and 3 due to "inadequate representation by trial, appellate and prior habeas counsel," referring the reader to the claims in which he contends trial counsel was ineffective.[36] (Petitioner, however, makes no specific allegations concerning the actions and omissions of prior appellate and habeas corpus counsel.) But although claims of ineffective assistance of counsel are independent arguments that are not barred by the *Lessard*/*Sterling* rule (cf. *In re Robbins*,

---

*(footnote continued from previous page)*

Claim No. 94 (alleged ineffective assistance of counsel at the suppression hearing).

Although these six claims concern the conduct of the hearing on petitioner's suppression motion, the claims, as alleged, rely on petitioner's right to a fair trial (U.S. Const., 5th & 14th Amends.) and his right to counsel (U.S. Const., 6th & 14th Amends.) and so do not implicate the *Lessard*/*Sterling* rule.

[36] See claim No. 85 (alleging trial counsel was ineffective for failing to examine police notes), claim No. 88 (alleging trial counsel was ineffective for failing to impeach police witnesses), and claim Nos. 89 and 94 (alleging trial counsel was ineffective for failing to use the report of a missing juvenile to impeach a police officer witness).

98

*supra*, 18 Cal.4th at p. 814, fn. 34 [discussing the intersection of the *Waltreus* rule and a claim of ineffective assistance of counsel]; *In re Harris*, *supra*, 5 Cal.4th at pp. 834-835, fn. 8 [same]), claim Nos. 1 and 3 are direct Fourth-Amendment-based attacks on the constitutionality of petitioner's arrest and the search of his apartment and garage. Those claims are barred by the *Lessard/Sterling* rule.

Petitioner finally argues we should consider claim Nos. 1 and 3 despite the *Lessard/Sterling* rule so that we might "view the totality of the circumstances in assessing [his] claims." We have previously discussed and rejected this asserted cumulative prejudice justification and will not discuss it further.

In sum, we conclude petitioner raised claim Nos. 1 and 3 despite their being noncognizable claims under the *Lessard/Sterling* rule, and his briefing contains no plausible reason justifying their presentation. This is an example of an abusive writ practice.

### 8. Issues Originating in Petitioner's First Trial

In petitioner's first trial, he successfully moved to have his trial counsel removed and replaced with new counsel prior to the penalty phase. Petitioner objected to new counsel almost immediately, new counsel sought to withdraw, and the trial court granted his request. The court then refused petitioner's further requests to appoint new counsel, and petitioner represented himself at the penalty phase. Petitioner now contends in both claim No. 14 and claim No. 99 that the trial court *in his first trial* erred by refusing to appoint new counsel to represent him at the penalty phase after his original trial counsel was discharged and petitioner's first replacement attorney was allowed to withdraw. But we reversed the judgment in *Memro I* in its entirety (*Memro I*, *supra*, 38 Cal.3d 658), so any error in failing to appoint counsel at the first penalty phase could not have affected

petitioner's rights at his second trial, when he was represented by different counsel.

Petitioner does not, in his petition, explain how this purported error in the first trial violated his constitutional rights in connection with his retrial. He asserts that "allowing a retrial of the penalty phase against [him] after what was done at the prior penalty phase was a 'constitutionally intolerable event,' "[37] and that he "should have been subject to, at most, a sentence of life in prison without parole." The authorities he cites in support, however, are inapt because they concern the consequences of a prisoner proving he or she is factually innocent. (*Herrera v. Collins*, *supra*, 506 U.S. 390; *Lambert v. Blackwell* (E.D.Pa. 1997) 962 F.Supp. 1521, 1529, revd. on other grounds, *Lambert v. Blackwell* (3d Cir. 1997) 134 F.3d 506.) Petitioner has not demonstrated factual innocence.

In his informal reply, petitioner alleges that, had the trial court appointed replacement counsel in his first trial, he would have been sentenced to only life in prison, precluding a retrial in which the death penalty was possible. (See *Bullington v. Missouri*, *supra*, 451 U.S. 430.) But in addition to having failed to raise this issue on appeal in *Memro II*, *supra*, 11 Cal.4th 786, thereby implicating the *Dixon* rule (*In re Dixon*, *supra*, 41 Cal.2d at p. 759), petitioner does not show why the jury would have returned a life sentence in his first trial had he been represented by counsel at the penalty phase. Indeed, given the strong, even overwhelming evidence he was guilty of killing three young boys, that he forcibly sodomized one young victim (possibly after he was dead), and that he represented a continuing threat to the safety of children in the neighborhood (inferable from

---

[37]     See *Herrera v. Collins*, *supra*, 506 U.S. at page 419 (conc. opn. of O'Connor, J.) ("the execution of a legally and factually innocent person would be a constitutionally intolerable event.").

the discovery by police that petitioner possessed hundreds of photographs of young children (*Memro II*, at p. 814)), the assertion a hypothetical new counsel would nevertheless have convinced the jury to spare petitioner's life is unduly speculative.

We reject petitioner's further argument that forcing him to face the death penalty on retrial prejudiced him by permitting the prosecution to "death qualify" the jurors, which he claims produced a jury prone to conviction. We have repeatedly rejected the claim that death qualification of the jury in a capital case produces a conviction-prone jury. (*People v. Gurule*, *supra*, 28 Cal.4th at pp. 597-598; *People v. Carrera* (1989) 49 Cal.3d 291, 331.) The petition neither acknowledges nor attempts to refute or distinguish this binding authority.

Finally, petitioner reiterates his argument that we should consider claim Nos. 14 and 99 "to allow this Court to view the totality of errors affecting his trial." But the claims, as alleged, do not state they are being reraised in a limited manner merely to support a cumulative prejudice claim. Instead, claim Nos. 14 and 99 allege petitioner was denied his rights to counsel and to due process. In any event, we have already explained that the alleged need to consider all claims in the aggregate does not justify the raising of procedurally barred claims.

In sum, we conclude petitioner raised claim Nos. 14 and 99 despite their having no connection to his conviction and penalty judgment in his retrial, and his briefing contains no plausible reason justifying raising them in the present petition. This is an example of an abusive writ practice.

### III. REMEDIES FOR ABUSE OF THE WRIT

Attorneys are officers of the court and have an ethical obligation to advise the court of legal authority that is directly contrary to a claim being pressed. (*Batt v. City and County of San Francisco* (2007) 155 Cal.App.4th 65, 82, fn. 9.) Rule 5-200 of the Rules of Professional Conduct addresses the issue and provides that,

101

"[i]n presenting a matter to a tribunal, a member:  [¶] (A) Shall employ . . . such means only as are consistent with truth; [and] [¶] (B) Shall not seek to mislead the judge . . . by an artifice or false statement of fact or law. . . ."  (See also *Southern Pacific Transp. v. P.U.C. of State of Cal.* (9th Cir. 1983) 716 F.2d 1285, 1291 [failure to cite opposing authority is a "dereliction of duty to the court"].)

These rules logically require an attorney (or a party if proceeding without an attorney) to disclose whether a particular claim, raised in a petition for a writ of habeas corpus, is subject to a procedural bar such as the *Waltreus* rule (*In re Waltreus*, *supra*, 62 Cal.2d at p. 225), the *Dixon* rule (*In re Dixon*, *supra*, 41 Cal.2d at p. 759), or one of the other rules mentioned in this opinion.  We held as much in *Clark*, explaining that "the petitioner . . . bears the initial burden of alleging the facts on which he relies to explain and justify delay and/or a successive petition."  (*In re Clark*, *supra*, 5 Cal.4th at p. 798, fn. 35.)  Although *Clark* did not involve claims barred by rules other than those involving timeliness and successiveness, the principle is the same:  If a petition raises a claim that according to controlling legal authority is procedurally improper, the petition must disclose that fact and forthrightly address why the court should nevertheless consider the claim.  In this way, the rules governing habeas corpus are no different than in other areas of the law.  For example, in a typical civil matter, "when a complaint shows on its face . . . that a pleaded cause of action is apparently barred by the statute of limitations, plaintiff must plead facts which show an excuse, tolling, or other basis for avoiding the statutory bar . . . ."  (*Spray, Gould & Bowers v. Associated Internat. Ins. Co.* (1999) 71 Cal.App.4th 1260, 1266, fn. 4; see *Union Carbide Corp. v. Superior Court* (1984) 36 Cal.3d 15, 25 [" 'if on the face of the complaint the action appears barred by the statute of limitations, plaintiff has an obligation to anticipate the defense and plead facts to negative the bar.' "].)

Accordingly, failure to affirmatively address the applicability of procedural obstacles to consideration of the claims raised in a habeas corpus petition justifies summary denial without the court's consideration of the merits. We imposed that sanction in *Clark* where, faced with untimely and successive claims raised without adequate justification, we denied the petition without "consider[ing] the merits of any of the claims." (*In re Clark*, *supra*, 5 Cal.4th at p. 799.) That remedy is amply justified on the facts of this case.

In addition, if an attorney prepared the offending petition, that attorney may be found to have crossed an ethical line rendering the attorney subject to consequences. Rule 8.276 of the California Rules of Court authorizes financial sanctions. That rule provides the Court of Appeal, on its own motion, "may impose sanctions, including the award or denial of costs under rule 8.278, on a party or an attorney for: [¶] (1) Taking a frivolous appeal or appealing solely to cause delay." This rule, although referencing the Court of Appeal, applies as well to petitions filed in this court pursuant to our original jurisdiction. (Cal. Rules of Court, rule 8.4(2); *People v. Romero*, *supra*, 8 Cal.4th at p. 737 [Supreme Ct. has original jurisdiction in habeas corpus].) Essentially the same rules applied at the time petitioner filed his petition in this court in 2004. (See Cal. Rules of Court, former rules 27(e)(1)(A) [Ct.App. may impose sanctions for frivolous appeal], 53 [rules apply to original proceedings in the Supreme Ct.]; see also *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 646 [interpreting former rule 26(a) to the same effect].)

Although the situations in which an attorney has been sanctioned financially for filing a frivolous or abusive petition for a writ of habeas corpus are rare, *In re White*, *supra*, 121 Cal.App.4th 1453, illustrates a situation in which the penalty was justified. In *White*, the Third District Court of Appeal found an attorney had filed three patently frivolous habeas corpus petitions for three

different clients.  The first client, White, had already been unsuccessful on appeal and in his first habeas corpus petition, and the petition before the appellate court in *White* asserted claims that were successive, repetitive, and had been, or could have been, raised on appeal.  By the time the offending attorney filed his frivolous petition, the conviction at issue was more than 10 years old.  (*Id.* at pp. 1480-1481.)  In addition, the petition did not attempt to justify either the lateness of its claims or why the claims should be excused from the standard procedural bars.  (*Id*. at p. 1481.)  According to the Court of Appeal, "[a]ny reasonable attorney familiar with the facts and the law would have recognized [the attorney's] contentions regarding procedural bars are indisputably without merit."  (*Id*. at p. 1482.)  The petitions for the other two clients, Pena and Harris-Anderson, were also untimely without an explanation, repetitive, or raised claims that could have been raised on appeal.  (*Id.* at pp. 1484-1486.)  Although the appellate court was careful to explain that it did not "necessarily equate the failure to state a prima facie case for relief with frivolousness, or with incompetence of the attorney representing the petitioner" (*id*. at p. 1462), the court nevertheless invoked its power under the California Rules of Court (*White*, at p. 1479) and sanctioned the offending attorney $25,000 for filing patently frivolous habeas corpus petitions (*id*. at p. 1489).

Although *White* was an extremely egregious case,[38] we agree with the *White* court's holding that rule 8.276 of the California Rules of Court authorizes

---

[38]    For example, the attorney in *White* had unsupervised law students prepare the habeas corpus petitions (*In re White*, *supra*, 121 Cal.App.4th at p. 1459), admitted signing the petitions and filing them with the Court of Appeal without first reading them (*id*. at pp. 1456, 1465), and conceded the petitions he filed were "patently frivolous" (*id*. at pp. 1456, 1474, 1476).

an appellate court to impose financial sanctions on an attorney who files a frivolous or abusive habeas corpus petition. We also agree with the significant caution the court expressed: "Due to the importance of the Great Writ in our system of justice, it is critical not to impede such access to the courts or to deter, for fear of personal liability, the vigorous assertion of an inmate's rights." (*In re White*, *supra*, 121 Cal.App.4th at p. 1456.) "Thus, sanctions should be imposed sparingly, in only the most egregious case, so as not to discourage use of the Great Writ." (*Id.* at p. 1480.)

The problem of frivolous filings arises most often not with respect to habeas corpus petitions but with respect to direct appeals. Aside from the rules of court previously mentioned, Code of Civil Procedure section 907 specifically authorizes the imposition of financial sanctions on an attorney for taking a frivolous appeal, stating: "When it appears to the reviewing court that the appeal was frivolous or taken solely for delay, it may add to the costs on appeal such damages as may be just." Like the court in *In re White*, *supra*, 121 Cal.App.4th 1453, we have recognized the delicate balance appellate courts face when considering such sanctions. On the one hand, "[a]n appeal taken for an improper motive represents a time-consuming and disruptive use of the judicial process. Similarly, an appeal taken despite the fact that no reasonable attorney could have thought it meritorious ties up judicial resources and diverts attention from the already burdensome volume of work at the appellate courts." (*In re Marriage of Flaherty*, *supra*, 31 Cal.3d at p. 650.)

On the other hand, we observed that "any definition [of a frivolous appeal] must be read so as to avoid a serious chilling effect on the assertion of litigants' rights on appeal. Counsel and their clients have a right to present issues that are arguably correct, even if it is extremely unlikely that they will win on appeal. An appeal that is simply without merit is *not* by definition frivolous and should not

105

incur sanctions. Counsel should not be deterred from filing such appeals out of a fear of reprisals. Justice Kaus stated it well. In reviewing the dangers inherent in any attempt to define frivolous appeals, he said the courts cannot be 'blind to the obvious: the borderline between a frivolous appeal and one which simply has no merit is vague indeed . . . . The difficulty of drawing the line simply points up an essential corollary to the power to dismiss frivolous appeals: that in all but the clearest cases it should not be used.' [Citation.] The same may be said about the power to punish attorneys for prosecuting frivolous appeals: the punishment should be used most sparingly to deter only the most egregious conduct." (*In re Marriage of Flaherty*, *supra*, 31 Cal.3d at pp. 650-651.) In short, "the imposition of sanctions in this context remains a delicate task, because an overbroad exaction of damages may significantly chill every litigant's enjoyment of the fundamental protections of the right to appeal." (*Coleman v. Gulf Ins. Group* (1986) 41 Cal.3d 782, 797.) "Thus, an appeal should be held to be frivolous only when it is prosecuted for an improper motive—to harass the respondent or delay the effect of an adverse judgment—*or when it indisputably has no merit—when any reasonable attorney would agree that the appeal is totally and completely without merit*." (*Marriage of Flaherty*, at p. 650, italics added.)

The concerns expressed in *In re Marriage of Flaherty*, *supra*, 31 Cal.3d at pages 650-651, that judicial sanctions for filing a frivolous appeal should not chill a litigant's ability to seek the protections of the law, apply equally to petitions for writs of habeas corpus. We are sensitive to these concerns. They are not, however, determinative in this case. As we have explained, petitioner was retried for his 1976 and 1978 crimes and convicted (and sentenced to death) in 1987, and this court affirmed that judgment in 1995. (*Memro II*, *supra*, 11 Cal.4th 786.) Also in 1995, we denied petitioner's first state habeas corpus petition, finding none of his 20 claims and subclaims stated a prima facie case for relief. Nine

106

years later in 2004, petitioner filed a second habeas corpus petition in this court, raising 143 claims in a 521-page petition, almost all of which are untimely without good cause. (See *In re Robbins*, *supra*, 18 Cal.4th at pp. 780-781.) (The only claims not subject to the procedural bar of timeliness are listed in fn. 17, *ante*.)

In addition to the manifest untimeliness of the great majority of petitioner's claims, almost all of his claims are procedurally barred because they have been raised and rejected on appeal (*In re Waltreus*, *supra*, 62 Cal.2d at p. 225), could have been raised on appeal (*In re Dixon*, *supra*, 41 Cal.2d at p. 759), have previously been raised and rejected in connection with his first habeas corpus petition (*In re Miller*, *supra*, 17 Cal.2d at p. 735), could have been raised in his first habeas corpus petition (*In re Clark*, *supra*, 5 Cal.4th at pp. 774-775; *In re Horowitz*, *supra*, 33 Cal.2d at pp. 546-547), improperly alleged insufficient evidence at trial (*In re Lindley*, *supra*, 29 Cal.2d at p. 723), improperly alleged a violation of petitioner's Fourth Amendment rights (*In re Sterling*, *supra*, 63 Cal.2d at pp. 487-488), and/or because they raise issues originating in petitioner's first trial without an adequate explanation how those claims of error could have affected his rights in his second trial. Many of petitioner's claims are subject to more than one of these procedural bars.

Although rule 8.276 of the California Rules of Court, and its antecedents, have long been the rule, and although *In re White*, *supra*, 121 Cal.App.4th 1453, clearly explains that sanctions can apply to a frivolous habeas corpus petition, this court has not before taken that drastic step. Accordingly, although we find the present petition exhibits many of the abusive practices we have seen develop over the years, we exercise our discretion and decline to invoke rule 8.276 relating to sanctions at this time. Attorneys (and parties) in future cases are forewarned, however, that they bear an affirmative duty to address in petitions for writs of habeas corpus why applicable procedural bars do not preclude consideration of

107

their claims.  Failure to do so, or the assertion of patently meritless explanations, may result in financial sanctions and/or having this court refer the offending attorney to the State Bar for potential discipline.  (See *People v. Hill*, *supra*, 17 Cal.4th at p. 853, fn. 13.)

The abusive nature of the instant petition is by no means an isolated phenomenon.  In those capital cases in which we have affirmed the judgment on appeal and then denied a typically lengthy first habeas corpus petition, we often— years later—receive an exhaustion petition running several hundred pages long.  Evaluation of the exhaustion petition requires several weeks if not months of dedicated work by members of the court.  As here, quite often the petition is nothing more than a repetition or reframing of past claims and unsubstantiated assertions of ineffective assistance of counsel.  Rarely if at all does the petitioner justify his or her untimely presentation of claims.

These practices, along with other factors, have created a significant threat to our capacity to timely and fairly adjudicate such matters.  We are of course aware that "death row inmates have an incentive to delay assertion of habeas corpus claims that is not shared by other prisoners."  (*In re Clark*, *supra*, 5 Cal.4th at p. 806 (conc. & dis. opn. of Kennard, J.); see *Rhines v. Weber* (2005) 544 U.S. 269, 277-278 [suggesting capital defendants "might deliberately engage in dilatory tactics to prolong their incarceration and avoid execution of the sentence of death"].)  Yet those capital defendants whose appeals are fully briefed, and those habeas corpus petitioners whose briefing also is complete who may desire resolution, must sit and wait while we attend to these time-consuming but generally meritless exhaustion petitions.  Some death row inmates with meritorious legal claims may languish in prison for years waiting for this court's review while we evaluate petitions raising dozens or even hundreds of frivolous and untimely claims.  We are not the only state court of last resort concerned that

108

abusive exhaustion petitions threaten the court's ability to function. (See *Commonwealth of Pa. v. Spotz* (2011) 610 Pa. 17, 171 [18 A.3d 244, 336] (conc. opn. of Castille, C. J.) [estimating that the time required to evaluate an abusive postconviction petition in capital cases renders the Pa. Supreme Ct. "unable to accept and review about five discretionary appeals"].)

Accordingly, we deem it necessary to implement a response commensurate with the seriousness of the situation. Therefore, as a judicially declared rule of criminal procedure,[39] upon the finality of this opinion and subject to amendment by subsequent rule-making by the Judicial Council, we hold that although a petitioner's initial petition for a writ of habeas corpus in a capital case may be

---

[39]    Concerns about judicial efficiency and the effective administration of criminal justice have sometimes moved this court to create rules of criminal procedure. In *In re Yurko* (1974) 10 Cal.3d 857, for example, we adopted a judicial rule of criminal procedure requiring *Boykin–Tahl* admonitions (*Boykin v. Alabama* (1969) 395 U.S. 238; *In re Tahl* (1969) 1 Cal.3d 122) to be given not just before a person confesses to a crime but also " 'before a court accepts an accused's admission that he has suffered *prior felony convictions*' " (*People v. Mosby* (2004) 33 Cal.4th 353, 360). Similarly, in *People v. Vickers* (1972) 8 Cal.3d 451, 461, we declined to "reach the issue whether representation by counsel is constitutionally compelled at probation revocation proceedings" but instead held that "*the efficient administration of justice* requires that the defendant be assisted by retained or appointed counsel at all revocation proceedings other than at summary proceedings had while the probationer remains at liberty after absconding." (Italics added.) And in *People v. Coffey* (1967) 67 Cal.2d 204, which concerned a prior felony conviction charged as a sentence enhancement allegation, we authorized criminal defendants to challenge in the current trial the legality of a prior conviction on the ground the defendant was denied counsel in the prior trial. Later, in *People v. Allen* (1999) 21 Cal.4th 424, 430, we described *Coffey*'s holding this way: "In today's parlance, we would characterize the rule [in *Coffey*] as *a judicially established rule of criminal procedure*." (Italics added.) In short, "we have prescribed judicial rules of criminal procedure when necessary to effectuate a fundamental constitutional principle or a specific constitutional protection of individual liberty." (*Stone v. Superior Court* (1982) 31 Cal.3d 503, 519, fn. 9 [listing cases].)

filed with no limit as to length, second and subsequent petitions will be limited to 50 pages in length (or 14,000 words if produced on a computer). Appropriate rules governing the typeface, spacing, margins, etc., will continue to apply. (Cal. Rules of Court, rule 8.204.) It will also be prospective only. Should good cause exist, a petitioner can apply to the Chief Justice for permission to file an overlength brief. (See Cal. Rules of Court, rule 8.204(c)(5) [good cause exception to file an overlength brief in the Ct.App.]; *id*., rule 8.360(b)(5) [same for criminal appeals].)

The volume of claims in the present petition that are either frivolous on the merits or devoid of any recognized basis for surmounting applicable procedural bars is emblematic of the abusive practices we have seen develop over the years. We believe that if counsel appropriately focused on issues that have potential merit and that reasonably may be reached even in light of possible procedural bars, counsel readily can limit the body of the petition to 50 pages (or 14,000 words). A 50-page limit will encourage an appropriate focus on potentially meritorious issues, without the lengthy development of exceedingly weak or even frivolous claims either on the merits or for the purpose of overcoming obvious procedural bars.

This limit is all the more reasonable in that today we adopt another rule of procedure permitting petitioners to present or supplement certain claims via a brief table or chart that would not require the full factual development and legal arguments that ordinarily are required. Here counsel may choose to list (1) repetitive claims proffered as background support for a new claim in the petition regarding cumulative prejudice, and (2) some or all claims that are raised solely for the purpose of federal exhaustion. These will include very succinct statements of potentially meritorious reasons for overcoming any applicable procedural bars, but full development of facts and law will not be required. We

adopt this rule, which is comparable with rule 8.508 of the California Rules of Court for petitions for review, in response to suggestions made by the parties. Petitioner's counsel and various amici curiae argue vigorously that even very weak claims must be presented to this court in some form for exhaustion purposes. The table or chart accommodates that argument and will free counsel to place a greater focus on stronger claims and new (i.e., nonrepetitive) claims in the body of the petition. Even in this abbreviated listing, of course, counsel should make every effort to exclude wholly meritless claims, but inclusion of such claims in this chart will not in any event be considered abusive.

Page limits in petitions for postconviction relief are not uncommon. Florida limits second and successive petitions from capital defendants to no more than 25 pages in length. (Fla. Rules Crim. Proc., § 3.851(e)(2).) Similarly, in Ohio, where capital defendants are specifically precluded from raising in a petition for postconviction relief any defense or due process claim that was or could have been raised on direct appeal (*Miller v. Walton* (2005) 163 Ohio App.3d 703, 706 [840 N.E.2d 222, 223-224]), individual claims for relief in petitions for postconviction relief under section 2953.21 of the Ohio Revised Code are limited to no more than three pages each. (Ohio Rules of Crim. Proc., rule 35(A) [in addition to setting forth a case history and statement of facts, the petition should set forth "separately identified grounds for relief" but "[e]*ach ground for relief shall not exceed three pages in length*"], italics added.) Given Florida's limit of 25 pages for successive petitions, and Ohio's limit of three pages per issue for even first petitions, our proposed limit of 50 pages for successive petitions is unremarkable and should pass constitutional muster.

Petitioner and amici curiae raise a variety of objections to this court's imposing page limits on exhaustion petitions but none are persuasive. For example, petitioner claims page limits will not allow him to preserve his

111

constitutional rights. He also contends the pleading requirements set forth in *In re Robbins*, *supra*, 18 Cal.4th 770, and *In re Gallego*, *supra*, 18 Cal.4th 825, require petitioners in capital cases to file briefs that are longer, not shorter. But such petitioners can assert their rights on direct appeal from their convictions, and can continue to raise nonrecord-based claims in their initial habeas corpus petitions in this court without observing a page limit. In addition, we will permit petitioners to raise claims that are presented to us solely for purposes of federal exhaustion in the abbreviated form of a 10-page table or chart. Any legitimate claims not raised in those two proceedings or by way of a table or chart will generally be limited in number, and we expect petitioners wishing to file additional petitions for postconviction relief will experience no problems raising any residual claims, or claims based on newly discovered evidence, in 50 pages (or 14,000 words) or less. In an attempt to streamline the process and make it work for all concerned, we agree with the suggestion of the parties and amici curiae that a petitioner filing an exhaustion petition include a table or chart listing prior claims so as to facilitate their consideration along with any new claims.

To the extent petitioner argues that inmates will be unable to raise all possible nonfrivolous yet unmeritorious claims within the 50-page limit, we cannot say their constitutional rights will be infringed thereby, especially when the additional table or chart we authorize is considered. In any event, in the rare case in which the need to file a petition in excess of 50 pages is supported by good cause, the inmate can apply to the Chief Justice for permission to file a longer one.

Petitioner also contends the Attorney General, who represents the state in federal court, approaches the question of exhaustion in a hypertechnical manner, insisting in federal court that if a petitioner's claim, as alleged, does not exactly mirror that which was alleged in state court, the claim cannot be considered exhausted under federal law. As a consequence, petitioner claims, he is forced to

112

file in this court an exact replica of his federal habeas corpus petition, including repetitive claims already rejected by this court on appeal or in prior habeas corpus proceedings. He further asserts that "by altering the structure of any of their claims in state court, they may well default those claims as unexhausted in federal court."

We understand that the parties and amici curiae have different points of view on many aspects of procedure, including the Attorney General's alleged practice in federal court regarding the exhaustion of claims. Indeed, habeas corpus counsel suggests that presentation to the federal court of a claim that differs even slightly from that raised in state court requires a return to state court for exhaustion. To the extent a petitioner returns to this court for exhaustion purposes at the behest of the federal courts, that action cannot be characterized as an abuse of the writ process, even if the claim raised is procedurally barred under state law. (Petitioner may choose to raise the issue in a table or chart accompanying the petition, clearly labeling it as being raised for exhaustion purposes only. (See Cal. Rules of Court, rule 8.508 [indicating how to raise issues in a petition for review in a noncapital case "for the sole purpose of exhausting state remedies before presenting a claim for federal habeas corpus relief"].)) In any event, the prospective practice we require in this opinion—clearly identifying which issues are subject to a federal court's order to exhaust, and supporting that assertion with a copy of the federal court's order, along with our permission to raise any exhaustion issue in an extremely abbreviated form—will obviate any suggestion such filing was abusive.

Petitioner's concerns about the Attorney General's practice in federal court does not cause us to question our conclusion with respect to state practice. Our rules prohibit raising again in a second or subsequent petition for a writ of habeas corpus issues that were denied on appeal or in a prior state habeas corpus

113

proceeding. A claim is exhausted for purposes of federal law if the state court has been given "one full opportunity to resolve" the issue (*O'Sullivan v. Boerckel*, *supra*, 526 U.S. at p. 845), and the high court's exhaustion doctrine does not "require prisoners to file repetitive petitions" (*id.* at p. 844). As noted above, if the federal court concludes an issue raised in that court has not been exhausted, for a petitioner to raise the issue in this court for exhaustion purposes would not be an abuse of the writ, although this court's procedural bars may still prohibit this court from considering the issue on the merits.

Petitioner also contends that if the attorney who represented him in his first state habeas corpus proceeding was constitutionally ineffective because he or she failed to raise all potentially meritorious claims, 50 pages may not be enough to raise the claims omitted by previous counsel. Claims that a new round of judicial review is required because prior counsel was ineffective are well known to this court and occasionally accepted, but the justification is, at base, infinitely reductive, for unquestioned acceptance of this reasoning could be used to justify a third, fourth and fifth petition as well, as litigants continually challenge the effectiveness of their previous attorneys.

Respect for the finality of state court judgments supports reasonable limits on this rationale. (Cf. *Martinez v. Ryan* (2012) 566 U.S. ___, ___ [132 S.Ct. 1309, 1320] [although attorney error in a first postappeal collateral proceeding can, in limited circumstances, constitute cause for a failure to raise a claim, that rule does not apply in "second or successive collateral proceedings"].) We reiterate that the mere omission of a nonfrivolous yet meritless legal claim in a prior proceeding is insufficient, standing alone, to show prior counsel's performance fell below that which is constitutionally required. To the extent an inmate wishes to argue previous counsel was ineffective, the claim may be raised in an exhaustion petition but must be supported by specific allegations demonstrating that the omission was

114

objectively unreasonable and that the petitioner was prejudiced by the omission. In those situations in which previous counsel actually omitted a potentially meritorious issue that was arguably prejudicial, we think 50 pages (or 14,000 words) should be sufficient to raise the claim.

Contrary to petitioner's argument, *Cullen v. Pinholster*, *supra*, 563 U.S. ___ [131 S.Ct. 1388], does not undermine the 50-page limit for exhaustion petitions we announce today. As noted, *ante*, at footnote 1, *Pinholster* held that review under the AEDPA "is limited to the record that was before the state court that adjudicated the claim on the merits" and that "the record under review is limited to the record in existence at that same time *i.e.,* the record before the state court." (*Pinholster*, at p. ___ [131 S.Ct. at p. 1398].) Petitioner contends that *Pinholster*'s restriction of federal review to the factual record in state court "thereby requires petitioners to file repetitive claims and identical state and federal petitions to preserve the 'record before the state court' for review in federal court." According to petitioner, "[a] page or word limit on successive petitions would thus frustrate counsel's ability to preserve the state record in support of their client's constitutional rights." We disagree; nothing in *Pinholster* obligates a petitioner to file repetitive claims in state court or to file in state court an exact replica of his federal petition.

Petitioner contends he must file in one petition all claims, including claims already raised and rejected on appeal and on habeas corpus, in order to exhaust, and thus preserve, a claim of cumulative prejudice for consideration by the federal courts. According to petitioner, "[u]nder federal law, if a petitioner does not present all of his claims and supporting allegations (including repetitive claims) in a single petition, he may not be able to exhaust his federal claim of cumulative error." We do not intend to prevent or impede petitioners from satisfying the federal exhaustion requirement; we simply believe that our rules, including the

115

rules we adopt today, afford litigants a reasonable opportunity to do so. (See, e.g., *Walker v. Martin*, *supra*, 562 U.S. at p. ___ [131 S.Ct. at p. 1131] ["there is no basis for concluding that California's timeliness rule [for habeas corpus petitions] operates to the particular disadvantage of petitioners asserting federal rights."]; *O'Sullivan v. Boerckel*, *supra*, 526 U.S. at p. 845 ["state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."].) In any event, we cannot believe the federal exhaustion rules were intended to deprive the state court of authority to forbid the filing of an abusive writ petition. Likewise we are unpersuaded by the declaration submitted by Wesley Van Winkle, an attorney expert in this field. Although Mr. Van Winkle opines that numerous justifications support petitioner's decision to raise dozens of repetitive, procedurally barred claims in his second habeas corpus petition before this court, we reject them all. First, the fact this court possesses discretionary power to review a previously decided issue does not justify reraising claims already decided. Were we to accept that explanation, the number of times a petitioner could reraise an issue would be without limit, and he or she could postpone execution indefinitely by multiple, serial filings. Second, reraising all previously rejected claims is not necessary to provide "context" for assessing new claims, including claims of ineffective assistance of appellate or prior postconviction counsel. As noted, *ante*, we always consider a petitioner's previous appeal and habeas corpus petitions when evaluating a second or subsequent petition. Third, as also explained, *ante*, reraising all previously rejected claims is not necessary; petitioners need only give this court "one full opportunity to resolve any constitutional issues." (*O'Sullivan v. Boerckel*, *supra*, 526 U.S. at p. 845; see *Coleman v. Thompson* (1991) 501 U.S. 722, 732 [petitioner must give state court an opportunity to address his claims "in the first instance"].) Fourth, reraising all

116

previously rejected claims is not necessary to allow this court to "better assess the prejudice stemming from the multitude of errors infecting petitioner's capital proceedings." In considering petitioner's appeal and his prior habeas corpus petition, we found the vast majority of petitioner's claims failed to show error. Neither Mr. Van Winkle nor petitioner explains how raising claims previously rejected as unmeritorious (and not just nonprejudicial) assists the court in assessing cumulative prejudice. Fifth, reraising previously rejected claims is not justified on the ground that "many [of the new claims] are based on further developments of the facts and law." As we have explained, the petition alleges no new law that justifies the reraised claims, and the allegedly new facts are insignificant. Finally, that the "death penalty law itself is in a constant state of flux" is no justification for repetitive presentation of claims already rejected by this court. Should the law change and benefit petitioner, he would be entitled at that time to file a new petition. Contrary to the suggestion by Mr. Van Winkle, simply filing serial repetitive petitions to delay execution of sentence in the hope the law may one day change in the petitioner's favor is not a justifiable defense strategy, and in fact constitutes an abuse of the writ justifying sanctions.

Petitioner and amici curiae assert that the question of page limits for exhaustion petitions in capital cases is "better answered through procedures adopted by the Judicial Council." As noted, it is the considered opinion of the court that we face an emergency situation in which the time and effort required to read and evaluate wholly meritless and abusive exhaustion petitions threatens to undermine the proper functioning of this court. We thus exercise our inherent judicial power to impose page limits, subject to future modifications and refinements of the rule by the Judicial Council.

Another argument against this court's imposition of page limits is raised by the Habeas Corpus Resource Center (HCRC) as amicus curiae. It contends this

117

court lacks the power to impose page limits on exhaustion petitions in capital cases because noncapital habeas corpus petitions are limited by rule to 50 pages or 14,000 words (Cal. Rules of Court, rules 8.384(a)(2), 8.204(c)), habeas corpus petitions in capital cases are expressly exempt from that 50-page limit (*id*., rule 8.384(a)(2)), and only the Judicial Council may amend the Rules of Court, except the rules in title 8, division 5 (pertaining to the publication of opinions), which may be amended only by the Supreme Court (*id*., rule 8.13).

This argument misses the point; by imposing a page (or word) limit for exhaustion petitions, we do not propose to "amend" the Rules of Court. Under rule 8.384(a)(2), a death penalty inmate's *first* habeas corpus petition in this court may still be filed without any limit on the number of pages or words. But for second and subsequent petitions in capital cases, even though the Rules of Court do not impose a page limit, we have done so in this opinion by exercising our inherent judicial power. To the extent HCRC's argument is premised on the proposition that this court is powerless to impose such remedial requirements in order to protect its docket and ensure the proper functioning of the court, it is mistaken. "It is . . . well established that courts have fundamental inherent equity, supervisory, and administrative powers, as well as inherent power to control litigation before them. [Citation.] 'In addition to their inherent equitable power derived from the historic power of equity courts, *all courts have inherent supervisory or administrative powers which enable them to carry out their duties, and which exist apart from any statutory authority*. [Citations.] "It is beyond dispute that 'Courts have inherent power . . . to adopt any suitable method of practice, both in ordinary actions and special proceedings, if the procedure is not specified by statute or by rules adopted by the Judicial Council.' [Citation.]" [Citation.] That inherent power entitles trial courts to exercise reasonable control over all proceedings connected with pending litigation . . . in order to insure the

118

orderly administration of justice. [Citation.] "Courts are not powerless to formulate rules of procedure where justice demands it." [Citations.]' " (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 967, italics added.)

No question exists that this court, as the highest judicial body in the State of California, has as much inherent judicial power as the trial court at issue in *Rutherford*. "Although some of these [judicial] powers are set out by statute . . . , it is established that the inherent powers of the courts are derived from the Constitution (art. VI, § 1 [reserving judicial power to courts] . . .), and are not confined by or dependent on statute [citations]." (*Walker v. Superior Court* (1991) 53 Cal.3d 257, 267.) Moreover, given our unique role in overseeing the imposition of capital punishment in this state,[40] this court a fortiori possesses inherent power to control potential abuses of the writ process.

We therefore reject HCRC's contention that this court lacks the power to protect its docket and impose page limits on exhaustion petitions in capital cases.

---

[40]     See, e.g., California Constitution, article VI, section 11, subd. (a) ("The Supreme Court has appellate jurisdiction when judgment of death has been pronounced."); Penal Code section 1239, subdivision (b) ("When upon any plea a judgment of death is rendered, an appeal is automatically taken by the defendant without any action by him or her or his or her counsel."); *In re Morgan*, *supra*, 50 Cal.4th 932 (exercising this court's inherent authority to permit the filing of a "shell" or "placeholder" habeas corpus petition to preserve an unrepresented petitioner's right to federal review under AEDPA); *Marks v. Superior Court*, *supra*, 27 Cal.4th at page 188 (recognizing, but not exercising, this court's inherent authority in capital cases to authorize habeas corpus counsel's participation in record correction); Supreme Court Policies, policy 3 ("The Supreme Court promulgates these standards as a means of implementing [various] goals with respect to petitions for writs of habeas corpus relating to capital cases . . .").

## IV. CONCLUSION

For the reasons explained above, we conclude the petition for a writ of habeas corpus, filed in this court on May 10, 2004, exemplifies abusive writ practices that cause us to deny the petition in its entirety without reaching the merits of any claim, save the 16 claims mentioned in footnote 17, *ante*, which are denied on the merits. (*In re Clark*, *supra*, 5 Cal.4th at p. 799.) In addition, counsel in both this and other cases are forewarned that the filing of abusive petitions in the future may subject them to financial sanctions under rule 8.276 of the California Rules of Court. Following finality of this opinion, exhaustion petitions in capital cases will be subject to the page (or word) limits and other rules described herein.

The order to show cause is discharged, and the petition for a writ of habeas corpus is denied. The following claims only are denied on the merits: claim Nos. 123, 125, 127, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 138, 139 and 143. (See fn. 17, *ante*.)

**WERDEGAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re Reno
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding** XXX
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S124660
**Date Filed:** August 30, 2012
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** John A. Torribio

_____

**Counsel:**

James S. Thomson, Saor Stetler and Peter Giannini, under appointments by the Supreme Court, for Petitioner Reno.

Bill Lockyer, Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey, Joseph P. Lee, Robert David Breton and Mary Sanchez, Deputy Attorneys General, for Respondent State of California.

Kent S. Scheidegger for Criminal Justice Legal Foundation as Amicus Curiae on behalf of Respondent State of California.

Michael Laurence for the Habeas Corpus Resource Center and California Public Defenders Association as Amici Curiae.

Michael J. Hersek, State Public Defender, and Nina Rivkind, Deputy State Public Defender, for the Office of the State Public Defender as Amicus Curiae.

Cliff Gardner; Lawrence A. Gibbs; and John T. Philipsborn for the Federal Public Defender for the Eastern and Central Districts and the California Attorneys for Criminal Justice as Amici Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

James S. Thomson
819 Delaware Street
Berkeley, CA 94710
(510) 525-9123

Mary Sanchez
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-2364